## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In Re: | |
| | Bankruptcy No. 24-31596 |
| MMA Law Firm, PLLC, | |
| **Debtor** | Adv. Proc. No. 25-03310 |
| CRISTOBAL M. GALINDO, P.C., | |
| Plaintiff | |
| v. | |
| MMA LAW FIRM, PLLC, | |
| Defendant | |

### MMA LAW FIRM,PLLC'S REPLY TO PLAINTIFF'S RESPONSE TO MMA LAW FIRM'S MOTION FOR SUMMARY JUDGMENT

MMA Law Firm, PLLC (**"MMA"**), files this Reply to Cristóbal M. Galindo, P.C.'s (**"Galindo"**) *Response to MMA's Motion for Summary Judgment*, and respectfully show the Court as follows:

### SUMMARY OF RESPONSE

This dispute arises from a joint contingency fee agreement between three law firms: MMA, Galindo, and Krause & Kinsman Trial Lawyers (K&K), who entered into these agreements with clients pursuing hurricane-related first-party insurance claims. Galindo has now sued MMA, asserting claims such as breach of contract, turnover, and unjust enrichment, all of which require proof that Galindo performed legal services and is entitled to fees.

However, despite multiple opportunities, including a response to MMA's Claim Objection, a formal Complaint, and now an opposition to MMA's Motion for Summary Judgment, Galindo has not submitted a single piece of competent evidence demonstrating that it performed any legal

work for a single client or assumed joint responsibility for the clients. Instead, Galindo's response relies primarily on: (1) its own vague and conclusory self-serving declaration; (2) a retainer agreement that does not show what, if any, work was performed by Galindo or that it assumed joint responsibility for any client; and (3) the deposition of Adam Krause, a partner at K&K, who was thoroughly discredited under cross-examination.

Notably absent from Galindo's 24 exhibits attached to its response to the MSJ, are <u>any</u> of the basic indicia of legal work: no emails with clients, no legal filings, no court appearances, no pleadings, no discovery documents, no time records. The evidence that does exist is that Galindo never had access to the client files.

Therefore, the record is devoid of any factual basis upon which Galindo's claim for fees can rest and summary judgment should be granted.

## I.   <u>RELEVANT LAW</u>

1.      As outlined in greater detail in MMA's Motion for Summary Judgment (**"MSJ"**), the laws of Texas, Mississippi, and Louisiana restrict fee sharing among attorneys where the non-participating lawyer either performs no legal work or fails to assume joint responsibility for the representation. These requirements bar all of Galindo's claims asserted in the Complaint.

2.      In Louisiana, each attorney involved in a joint representation must render meaningful legal services in order to share in any portion of the fee.[1]

3.      In Texas and Mississippi, the standard is slightly broader and provides that fees may be shared with an attorney if they assume joint responsibility for the representation.[2]

4.      Under Texas Disciplinary Rule of Professional Conduct (**"TDRPC"**) Rule 1.04, a referring attorney may share fees only if: (a) the fee division is in proportion to the professional services

---

[1] *See* Rule La. St. Bar Ass'n. Art. XIV 1.5; Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 118 (La. 1978)
[2] TEX. R. PROF CONDUCT 1.04; Dickens v. Jason C. Webster, P.C., No. 05-17-00423-CV, 2018 Tex. App. LEXIS 10893, *35- 37 (Tex. App.—Dallas Dec. 31, 2018, no pet.); Garcia-Vela v. Jolly, No. 04-21- 00541-CV, 2023 Tex. App. LEXIS 2469, *12-14 (Tex. App.—San Antonio Apr. 19, 2023, no pet.).

performed by each lawyer; or (b) the lawyers have entered into an arrangement whereby they assume joint responsibility for the representation.

5.      Comment 13 to TDRPC Rule 1.04 clarifies the meaning of "joint responsibility," explaining that it entails ethical responsibilities for the representation and that a mere referral is insufficient. The referring lawyer must be actively involved in ensuring proper representation and communication and this includes: (a) Maintaining ongoing communications with the client; (b) Monitoring the matter throughout the representation; (c) Responding to client inquiries; and (d) Assisting the lead counsel as necessary.

6.      Therefore, in order for Galindo to prevail on its claims:

> a.  Under Louisiana law, it must show that it rendered meaningful legal services; and
>
> b.  Under Texas and Mississippi law, it must show either that it performed legal services or assumed joint responsibility in accordance with the standards described above.

7.      Galindo failed to provide this Court with evidence of either. Accordingly, it is not entitled to share in any fees and its claims must be dismissed as a matter of law.

## II.      THE FACTS

RELEVANT BACKGROUND

1.      MMA is a Texas-based litigation firm that represented thousands of clients across in first-party insurance claims stemming from Hurricanes Laura, Delta, and Ida (the, **"Clients"**).

2.      In 2021, MMA entered into thousands of engagement agreements with the Clients that included two other law firms: Galindo and K&K.

3.      The three firms entered into standard contingency fee agreement with the Clients.  Under the agreement, Galindo was to receive 50% of the contingency fees, MMA 37.5%, and K&K

12.5%.[3]

## BANKRUPTCY FILED AND CLAIM OBJECTION

4.      MMA filed a Chapter 11 bankruptcy petition on April 9, 2024.

5.      On August 13, 2024, Galindo filed Proof of Claim No. 47 asserting a claim based on breach of contract, unjust enrichment, quantum meruit, and related theories (the **"POC"**).[4]

6.      MMA objected to Galindo's POC on February 5, 2025, arguing that Galindo had not performed any legal services and was therefore not entitled to any fees (the **"Claim Objection"**).[5]

7.      On April 28, 2025, the Court held a status conference and converted the Claim Objection into an Adversary Proceeding, directing Galindo to file a formal Complaint.

8.      On May 12, 2025, Galindo filed its Complaint and affirmatively asserted that it provided valuable services to the Clients without providing any facts to support this allegation.[6]

## MMA'S MOTION FOR SUMMARY JUDGMENT

9.      On June 16, 2025, MMA filed a straightforward Motion for Summary Judgment under Rule 56 (the, **"MSJ"**).[7]

10.     On July 7, 2025, Galindo filed its Response to the MSJ (the, **"MSJ Response"**).[8]

11.     To survive summary judgment, Galindo must present evidence sufficient to create a genuine issue of material fact as to whether it performed legal services in the Louisiana cases, and whether it either performed legal services or assumed joint responsibility for the representation of the Texas and Mississippi Clients.

12.     This should be a simple task if Galindo's prior written representations in the Complaint were truthful.

---

[3] Exhibit A: Contract
[4] Exhibit B: POC
[5] Exhibit C: Claim Objection
[6] Exhibit D: Complaint (Paragraph 55)
[7] Exhibit E: MSJ
[8] Exhibit F: Response to MSJ

13.     For any law firm, especially one claiming millions in contingency fees, producing even minimal evidence of legal work should be a low bar, yet Galindo has failed to produce even a single document showing it worked on any case

### III.  KRAUSE'S DEPOSITION TESTIMONY

14.     In its MSJ Response, Galindo relies heavily on the deposition of Adam Krause, a named partner at K&K, who testified that Galindo performed "meaningful legal work" alongside MMA and K&K, citing tasks such as client intake, bringing in cases, handling upset clients, delivering settlement checks, vetting cases, obtaining insurance information, and employing attorneys to review claims.

15.     However, while Krause echoed these claims on direct examination, his testimony collapsed under cross-examination.

**KRAUSE REVEALED THAT GALINDO DID NOT HAVE ACCESS TO CLIENT FILES – DESTROYING ANY CLAIM THAT GALINDO COULD HAVE PERFORMED LEGAL WORK OR ASSUMED RESPONSIBILITY FOR THE CLIENTS.**

16.     Despite testifying at length as if he had firsthand knowledge of Galindo's conduct and legal work, Krause's credibility unraveled under cross-examination during his deposition. As discussed in greater detail below, Krause's statements on direct were nothing more than speculation.

17.     Crucially, Krause admitted, on cross, that Galindo never had access to the client files maintained in the SmartAdvocate system used by MMA. This fact alone makes it impossible for Galindo to have performed any legitimate legal work or assumed legal responsibility for any client. Without access to basic case information, Galindo was completely shut out of the legal process.

> **GOOTT:**      So Galindo didn't have access to SmartAdvocate, right?
>
> **KRAUSE:**     That's right.
>
> **GOOTT:**      And Galindo didn't have access to the client files.
>
> **KRAUSE:**     He did not.
>
> **GOOTT:**      So Galindo didn't have access to discovery, right?

| | |
|---|---|
| **KRAUSE:** | No. |
| **GOOTT:** | Galindo wouldn't have had access to any case-level detail that wasn't in a report that was generated and sent, right? |
| **KRAUSE:** | That's right. |

*(Krause Depo. Tr. 140:12 – 24, Exhibit G)*

## CLIENT INTAKE AND CASE ORIGINATION: NO PERSONAL KNOWLEDGE

18.     Galindo points to Krause's testimony to support the claim that Galindo conducted intake and brought in clients. But on cross-examination, Krause admitted he had no personal knowledge about any of this:

| | |
|---|---|
| **GOOTT:** | Did Galindo use a third-party company to bring in those cases? |
| **KRAUSE**: | I don't know. |
| **GOOTT**: | You don't know where the clients came from? |
| **KRAUSE:** | It was not my responsibility. |

*(Krause Depo. Tr. 143:23 – 144:3, Exhibit G)*

**…..**

| | |
|---|---|
| **GOOTT:** | So when – so let me ask the question again. When Mr. Shelton asked you specific questions about what Galindo did regarding his intake role, you don't have any personal knowledge of that, correct? |
| **KRAUSE:** | No. |
| **GOOTT:** | Correct? |
| **KRAUSE:** | You heard me. I said no. |

*(Krause Depo. Tr. 157:23 – 158:5, Exhibit G)*

**……..**

| | |
|---|---|
| **GOOTT:** | You have no personal knowledge of Galindo's practices in doing intake; isn't that true? |
| **KRAUSE:** | I don't know who answered the phone. |
| **GOOTT:** | That's right. You don't' know if Galindo did it, correct? |
| **KRAUSE:** | Correct |
| **GOOTT:** | You don't know if someone in his staff did it, right? |
| **KRAUSE:** | Correct. Correct. |

**GOOTT:**      You don't know if he hired a third party to do it.

**KRAUSE:**    I do not know.

**GOOTT**:      No idea.

**KRAUSE:**    No idea.

*(Krause Depo. Tr. 159:12 – 160:1, Exhibit G)*

19.      More fundamentally, as discussed above, the Comment 13 to TDRPC Rule 1.04 clarifies the meaning of "joint responsibility," explaining that a **mere referral is insufficient**.

### CASE VETTING: NO LEGAL WORK, NO ACCESS, NO KNOWLEDGE

20.      Galindo also relies on Krause's deposition testimony to prove that Galindo vetted potential cases for validity and likelihood of success.

21.      Yet Krause admitted that he had no personal knowledge of who handled intake, and that the "vetting" involved only basic, non-legal screening questions:

**GOOTT:**      All right. And you would – would you – would you agree with me that those questions are not legal questions?

**KRAUSE:**    Those are not legal questions. Those are gateway questions, is what I'm going to call them.

**GOOTT:**      I would agree with you.  Intake questions so that someone else can determine whether or not this become a client, right?

**KRAUSE:**    That's right. I will say that I do believe –

**GOOTT:**      And –

**KRAUSE:**    It is the role of an attorney to determine, ultimately, if he could represent that client. That's a legal –

**GOOTT:**      I --

**KRAUSE**     -- decision.

*(Krause Depo. Tr. 153:23 – 154:13, Exhibit G)*

**......**

**GOOTT:**      That information, that gateway information, would be passed to MMA, right?

**KRAUSE:**    Right.

**GOOTT:**    And we don't know who – who created the gateway information, but we do know that it ended up with MMA, right?

**KRAUSE:**    Right.

**GOOTT:**    And then MMA would take that data, right you said, is that right?

**KRAUSE:**    That's right.

*(Krause Depo. Tr. 155:16 – 25, Exhibit G)*

22.    In short, Krause conceded he had no idea whether Galindo ever answered a single client call. The so-called alleged "vetting" amounted to asking if the caller had insurance or storm damage, none of which requires legal expertise.

23.    More importantly, as discussed above, Krause admitted that Galindo had **no access to client files**, meaning Galindo had no way to evaluate a case's merits. *(Krause Depo. Tr. 140:12 – 24, Exhibit G)*

## CHECK DELIVERY: NOT LEGAL WORK

24.    Galindo's MSJ Response also relies on Krause's testimony that Galindo delivering settlement checks to clients somehow constitutes legal work.

25.    However, under cross-examination, Krause conceded that this activity requires no legal work:

**GOOTT:**    And do you believe that someone that delivers checks requires any legal skill?

**KRAUSE:**    No.

*(Krause Depo. Tr. 132:6 – 8, Exhibit G)*

**….**

**GOOTT:**    Do you believe that the physical delivery of a check to a client is legal work?

**KRAUSE:**    I don't think that's legal work, no.

*(Krause Depo. Tr. 136:3 – 5, Exhibit G)*

26.    The idea that driving a check to a client amounts to legal services is baseless, and Krause admitted it.  Furthermore, Krause never testified that he had any personal knowledge that Galindo

actually delivered checks to clients. In fact, Krause admitted, *"I don't know how many checks were actually delivered to clients". (Krause Depo. Tr. 114:6 – 7, Exhibit G)*

### GATHERING INSURANCE INFORMATION IS CLERICAL WORK AND NO EVIDENCE THAT IT OCCURRED

27.    Galindo also points to the gathering of basic insurance information as legal work and depends on Krause's deposition testimony to bolster this point.

28.    However, under cross-examination Krause again admitted that this does not amount to legal work.

> **GOOTT:** Okay. That makes sense. And so whoever answered these calls asked specific questions, right? And those questions are questions that you described as do you have insurance, right?
>
> **KRAUSE:** Correct.
>
> **GOOTT:** Who is your insurance company; is that right?
>
> **KRAUSE:** Yep.
>
> **GOOTT:** Did you suffer damage in a hurricane?
>
> **KRAUSE:** Exactly.
>
> **GOOTT:** Are you represented by counsel?
>
> **KRAUSE:** Yep.
>
> **GOOTT:** All right. And you would -- would you -- would you agree with me that those questions are not legal questions?
>
> **KRAUSE:** Those are not legal questions. Those are **gateway** questions, is what I'm going to call them.
>
> *(Krause Depo. Tr. 153:11 – 154:2, Exhibit G)*

29.    The above testimony reveals that Krause not only conceded that obtaining insurance information does not constitute legal work, he also admitted that that information was gathered during intake and referred to them as "gateway" questions.  Later in the deposition, Krause again

confirmed that these types of questions are "gateway" or "threshold" questions. *(Krause Depo. Tr. 154:3 – 25, Exhibit G)*

30.     More importantly, under cross examination Krause confirmed that he had no personal knowledge of Galindo's intake procedures or what occurred during that process. Therefore, Krause's deposition testimony fails to provide any evidence that Galindo even gathered insurance information from the Clients. *(Krause Depo. Tr. 159:12 – 160:1, Exhibit G)*

## SKIP TRACING DOES NOT REQUIRE A LAW LICENSE

31.     Galindo next leans on Krause's deposition testimony to claim that Galindo engaged in "skip tracing" to find missing clients and that this too amounts to legal work performed.

32.     During direct examination, Mr. Shelton asked Krause, "What kind of legal work, to your recollection, did they [Galindo] do?" MMA's counsel objected to this question as it called for a legal conclusion. In response, Krause testified that Galindo would "try to find" missing clients "by doing skip traces". *(Krause Depo. Tr. 113:16 – 114:4, Exhibit G)*

33.     However, Krause admitted on cross that skip tracing is not legal work and does not require an attorney:

> **GOOTT:**     Does – does an attorney – does someone who does that type of skip tracing work need to be an attorney?
>
> **KRAUSE:**     No.
>
>  *(Krause Depo. Tr. 131:4 – 7, Exhibit G)*

## GALINDO DEALING WITH UPSET CLIENTS IS UNSUPPORTED BY KRAUSE'S TESTIMONY

34.  Galindo claims that Krause testified that Galindo helped deal with hostile or upset clients, but this too evaporates under scrutiny. Krause admitted he had no personal knowledge of any such interactions:

> **GOOTT:**     Thank you. All right. And then the last thing you said regarding Galindo's

legal role was that second tier -- on a second-tier level, he [Galindo] would talk to  clients who were upset, right?

**KRAUSE:**     Yes.

**GOOTT:**      Were you ever part of those calls?

**KRAUSE**:     No.

**GOOTT:**      Did you ever listen to those calls?

**KRAUSE**:     No.

**GOOTT:**      You ever hear a recording of those calls?

**KRAUSE**:     No.

**GOOTT**:      So you don't know if they actually happened, right?

**KRAUSE**:     I don't know.

*(Krause Depo. Tr. 163:16 – 164:5, Exhibit G)*

35.     More fundamentally, as discussed above, Krause admitted that Galindo never had access to the clients' files, the SmartAdvocate system containing those files and communications, any discovery, or any case-level details. *(Krause Depo. Tr. 140:12 – 24, Exhibit G)*

36.     Krause's deposition testimony confirmed that he had no personal knowledge of Galindo's alleged assistance with upset clients, and more importantly, that Galindo lacked the most basic tool necessary to handle such matters: access to any information about the clients' cases.

### "ATTORNEYS ON STAFF" IS AN UNSUBSTANTIATED TALKING POINT

37.     Galindo also relies on Krause's vague testimony that Galindo had "attorneys on staff reviewing the claims."

38.     However, a full reading of the deposition transcript confirms that Krause had no personal knowledge to support this assertion.

39.     On direct examination, prompted by Mr. Shelton, Krause testified: "*What I do know is that they hired individuals to answer the phones **to vet out good claims versus claims** that would never survive and should never be filed. I do know that they had attorneys on staff reviewing the claims.*" *(Krause Depo. Tr. 68:4 – 8, Exhibit G)*

40.     But under cross-examination, this testimony quickly unraveled. Krause admitted he had no actual knowledge of Galindo's intake practices. He could not say who answered the phones, whether those individuals were attorneys, or who created the intake questions, only that the information was eventually sent to MMA. He further admitted that the questions asked were basic, non-legal "gateway" questions that did not require an attorney at all. *(Krause Depo. Tr. 159:12 – 15, Exhibit G)*

> **GOOTT:**     That information, that gateway information, would be passed to MMA, right?
>
> **KRAUSE:**    Right.
>
> **GOOTT:**     And we don't know who -- who created the gateway information, but we do know that it ended up with MMA, right?
>
> **KRAUSE:**    Right.
>
> **GOOTT:**     And the MMAN would take that data, right, you said, is that right?
>
> **KRAUSE:**    That's right.
>
> *(Krause Depo. Tr. 155:16 – 25, Exhibit G)*

41.     Krause's reference to "attorneys on staff reviewing claims" was not based on any firsthand knowledge, documentation, or specific observation. It was pure conjecture, yet another unverified talking point, not admissible evidence of legal work.

### Orchestrated Testimony by Galindo's Counsel Mr. Shelton

42.     The most troubling aspect of Krause's testimony is not merely its lack of substance or personal knowledge. During cross-examination, Krause revealed that just before the deposition, he met privately with Galindo's counsel, Mr. Shelton, who coached him on the topics he would be questioned about.

> **GOOTT:**     And his [Galindo's] attorney meets with you prior to your deposition and Let's you know in advance the topics of what he's going to ask you about today, right?
>
> **KRAUSE:**    Indeed.

*(Krause Depo. Tr. 217:16 – 20, Exhibit G)*

43.     Not only did Mr. Shelton provide Krause with the deposition topics in advance, but he also supplied him with the exhibits to be used during the deposition. At the start of direct examination, Mr. Shelton presented Krause with Exhibit #4, a declaration by Mr. Moseley, and asked if he had seen it before.

> **SHELTON:**   And I'll just -- for identification purposes, this is filed in Case number 2503310, which is an adversary proceeding pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. I think it's this very case. It's Docket number 74-1. It was filed on June 16th, 2025. And it purports to be the declaration of John Zachary Moseley.
>
> **SHELTON:**   Have you seen this document before, Mr. Krause?
>
> **KRAUSE:**   I – I have.

*(Krause Depo. Tr. 112:3 - 14, Exhibit G)*

44.     Under cross-examination, it took 17 pages of evasive and untruthful testimony before Krause finally admitted that he had only seen the exhibits because Mr. Shelton handed them to him right before the deposition began when he met with Mr. Shelton. Krause's initial denials gave way to the undeniable fact that Mr. Shelton prepared him by providing these documents immediately prior to questioning.[9]

> **GOOTT:**   And how is it that you received a copy of Mr. Moseley's declaration in his claim objection?
>
> **KRAUSE:**   Well, I review every single filing that's on the ECF or whatever that thing's called.
>
> **GOOTT:**   Really?
>
> **KRAUSE:**   Well, okay. Admittedly, I don't look at all of them, but I do look at a lot of them. There's a lot of bankruptcy filings that are there. I do my very best, but –

---

[9] Exhibit G:  Krause's Deposition Transcript – Pages 203 through 211, and 220-228 – show the full extent of Krause's evasive testimony regarding how he obtained the deposition exhibits from Mr. Shelton.

**GOOTT:**      So my question is: How did you review -- Mr. Shelton showed you and pulled up Mr. Moseley's declaration, right?

**KRAUSE**:      Yes.

**GOOTT:**      And you looked at it, and you immediately said, "I'm familiar with this," right?

**KRAUSE:**      Well, I reviewed it, and I said I was familiar with it.

**GOOTT:**      That's exactly what I asked you. You didn't have to read it to know it. You looked at it and immediately answered, right?

**KRAUSE:**      That's right. What did you say?

**GOOTT:**      How did you get a copy of the declaration?

**KRAUSE:**      The copy of the declaration is here at the deposition right now.

**GOOTT:**      Who gave it to you?

**KRAUSE:**      Mr. Shelton.

**GOOTT:**      Mr. Shelton gave it to you?

**KRAUSE:**      Indeed.

**GOOTT:**      When did he give it to you?

**KRAUSE:**      I got it here today.

**GOOTT:**      Before the deposition?

**KRAUSE:**      Well, I printed out the pages for him for this deposition when he got here.

*(Krause Depo. Tr. 203:13 – 204: 20, Exhibit G)*

…

**GOOTT:**      Well, we know you had his [Mr. Shelton's] exhibits prior to the deposition, right?

**KRAUSE:**      Correct.

**GOOTT:**      Because you printed them for him, right?

**KRAUSE:**      I did.

**GOOTT:**      What did he tell you about the declaration?

> **KRAUSE:**  He says we were going to go through these documents, and then we went through the topics that we were going to go over today.
>
> *(Krause Depo. Tr. 206:17 – 207:1, Exhibit G)*

45.     The excerpted transcript reflects only a portion of the extensive questioning required to obtain a clear admission from Krause: that Mr. Shelton personally gave him the very exhibits used to support Galindo's narrative just before the deposition began. Krause resisted answering directly, and it took persistent, pointed questioning over eight pages to uncover that fact. *(Krause Depo. Tr. 220-228, Exhibit G)*

46.     What's even more troubling is the timing. Krause's deposition was originally scheduled for 9:00 a.m. However, just days before, Galindo's counsel emailed MMA's attorney stating: "*In addition, please be advised that Adama Krause has just told me that he cannot attend the deposition before 10:15 a.m.  So, we will not start before 10:15 a.m.*"[10]

47.     It is now clear that the delayed start was orchestrated to give Mr. Shelton time to meet privately with Krause before the deposition in order to review exhibits and walk through key topics of the choreographed testimony.

48.     Even more egregious, at the outset of the deposition, Mr. Shelton asked Krause how he prepared. Krause never disclosed that he met with Mr. Shelton beforehand or that he reviewed the exhibits with him.

> **SHELTON:**  What did you do to prepare for today's deposition?
>
> **KRAUSE:**  Very little. I looked for the documents in your subpoena, that was really it.
>
> **SHELTON:**  Okay. All right. Let's talk a little bit about -- about you. You're an attorney, correct?
>
> *(Krause Depo. Tr. 11:23 – 12:4, Exhibit G)*

49.     During cross-examination, Krause was pressed on this issue by MMA's counsel:

---

[10] <u>Exhibit H</u>: Email from Ms. Van Meter delaying deposition.

| | | |
|---|---|---|
| **GOOTT:** | You remember Shelton asked how you prepared, right? | |

**GOOTT:** You remember Shelton asked how you prepared, right?

**KRAUSE:** Yes.

**GOOTT:** Why didn't you say you spoke with him beforehand and he told you what he'd ask?

**KRAUSE:** I didn't really view that as much preparation. What I did do –

**GOOTT:** Knowing the topics of what the lawyer is going to ask you? Was he being -- that seems awfully helpful for the person -- the lawyer deposing you, to let you know in advance what he's going to ask you. Is that not unusual for you?

**KRAUSE:** I mean, I don't know. I'm a witness in this whole deal, but --

*(Krause Depo. Tr. 215:20 – 216:9, Exhibit G)*

50.     Despite knowing Krause's testimony was incomplete and misleading, Mr. Shelton, an officer of the court, remained silent, knowingly allowing these critical omissions.

51.     In summary, on direct, Krause confidently testified about documents placed before him, creating the false impression of personal knowledge. But under cross-examination, that façade collapsed completely. Krause admitted he never saw the documents until Mr. Shelton handed them to him in their meeting prior to the deposition. He did not prepare or verify their contents, had no knowledge of their origins, and did not know if the data was accurate.

**K**RAUSE **A**DMITS **T**HAT **G**ALINDO'S **R**OLE AND **V**ALUE **W**AS **R**EFERRING THE **C**ASES

52.     As discussed above, merely referring a client does not entitle an attorney to a legal fee under Texas, Louisiana and Mississippi law.

53.     During cross-examination, Krause admitted that Galindo was receiving 50% of the attorneys' fees because he referred the cases.

**GOOTT:** Now, Mr. Shelton asked you about the benefit that you thought Galindo brought to this relationship, and I want to talk to you about that.  And I believe your response was there was a benefit because of the potential attorney's fees, right?

| | |
|---|---|
| **KRAUSE:** | Indeed. |
| **GOOTT:** | And if Galindo brings in – well, let me back up. If Galindo doesn't bring in clients, then there's no way to make money; is that essentially what you're saying? That's the benefit? Without a client, there is no agreement, and, therefore, no means to make money? |
| **KRAUSE:** | Yeah, that's right. |
| **GOOTT:** | Okay. And would you agree with me that 15 that is a financial benefit? |
| **KRAUSE:** | Definitely, it's a financial benefit. |
| **GOOTT:** | And -- and the fact that he brought in the 18 -- in these cases to this relationship is why he was 19 receiving a substantial fee. |
| **KRAUSE:** | That -- yeah. That was a big reason, that he was paying for the advertising and bringing in the clients for us to represent. And so, therefore, he got a -- you know, it was anticipated he would get a big fee. Yeah, that's right. |

*(Krause Depo. Tr. 172:25 – 173:24, Exhibit G)*

54.     Furthermore, in Galindo's MSJ Response, he explains that the relationship with MMA was formed because Mr. Moseley convinced him MMA had the infrastructure to handle the claims and needed someone to bring in the cases. These admissions—by both Krause and Galindo—confirm that Galindo's value to MMA lay solely in referring cases, conduct which, standing alone, does not entitle an attorney to a fee and is expressly prohibited under the rules governing referral fees.[11]

**BIASED WITNESS**

55.     To compound this, Krause disclosed that K&K and Galindo currently serve as co-counsel on 5,000 cases that Galindo referred to Krause where they are sharing fees. *(Krause Depo. Tr. 196:19 – 198:4, Exhibit G)*

56.     This clearly exposes Krause not as a neutral witness but as a witness defending his business partner.

---

[11] Exhibit F: MSJ Response (Paragraph 15)

## IV.   SECOND MSJ EXHIBIT - GALINDO'S DECLARATION

57.     The second of only three exhibits cited by Galindo in the body of the MSJ Response is Mr. Galindo's own sworn, self-serving declaration (the **"Galindo Declaration"**).[12]

58.     At the heart of this dispute is a single critical question: Did Galindo perform legal work on behalf of clients, or did he assume joint responsibility for their representation?

59.     The Fifth Circuit has held that self-serving affidavits used in summary judgment must include facts that are particularized, not vague or conclusory. *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013).

60.     Despite submitting a seven-page declaration intended to establish that he performed legal work, Galindo fails to offer any particularized, specific, or substantiated facts. The entirety of his legal work claim boils down to a handful of vague and conclusory assertions, including:

    a.   *"I do know that GLF performed legal work on the cases."*[13]

        i.   This is a pure conclusion, lacking any description of what legal work was done, when, or by whom. No supporting facts or documentation are attached to the declaration.

    b.   *"The legal work performed by GLF was constant, almost daily, monitoring the Cases by customized reports that either MMA and/or K&K would provide to GLF."*[14]

        i.   "Monitoring" reports, especially ones prepared by other firms, is not legal work. Galindo does not claim to have created, analyzed, or acted upon the reports. Merely receiving does not continue legal services.

        ii.   More importantly, Galindo fails to identify the type of reports he allegedly monitored. For instance, reports showing only the amounts Galindo was

---

[12] <u>Exhibit I:</u> Galindo's Declaration attached to MSJ Response
[13] <u>Exhibit I:</u> Galindo's Declaration (Paragraph 24, last sentence)
[14] <u>Exhibit I:</u> Galindo's Declaration – Paragraph 26)

owed on cases do not reflect joint responsibility for client representation—they merely indicate an interest in tracking payment. This is precisely the type of vague and conclusory statements prohibited in self-serving affidavits.

c. *"I flew to New Orleans at least 31 times between September 2021 and March 2023, to meet with my co-counsel in the Louisiana Cases, including but not limited to Mr. Moseley, his staff, and his team.*"[15]

    i. The frequency of travel is meaningless without any description of the substance of those meetings. Galindo does not say what was discussed, what legal tasks (if any) he performed, or what resulted from those trips.

d. *"In fact, GLF was in touch with clients and MMA on an almost daily basis related to the Cases and further handled difficult clients when MMA was unable to do so."*[16]

    i. Again, this statement lacks all detail as it provides no names, no topics, no timeframes, no records, no results. Once again, this is another example of a vague statement that should not be considered by the Court.

e. *"Further evidence of the relationship is that on January 27, 2023, MMA sent an email to GLF recognizing that GLF had earned over approximately $1.2 million pursuant to some of the recoveries under some of the Cases.*"[17]

    i. This proves only that MMA entered into a fee agreement to share fees. It is not proof that Galindo actually performed any legal services or incurred joint responsibility for the clients that earned those fees.

---

[15] <u>Exhibit I:</u> Galindo's Declaration – Paragraph 27)
[16] <u>Exhibit I:</u> Galindo's Declaration – Paragraph 28)
[17] <u>Exhibit I:</u> Galindo's Declaration – Paragraph 29)

61.     In Paragraph 36 of Galindo's declaration attached to the MSJ (Exhibit I), Galindo includes a generic bullet-point list of alleged "meaningful legal services." However, not one item on this list satisfies the Fifth Circuit's requirement that summary judgment evidence must include specific facts, not vague or conclusory assertions. See *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013).

   a.   "Identified and assisted potential claimants by providing them information about their rights to seek compensation for their losses."

      i.   This is a vague statement that refers to "potential claimants", not clients. The term "assisted" is undefined, and no information is provided about who these individuals were, when these conversations took place, or what information was allegedly provided. There is no documentary support as there are no emails, letters, notes, call logs, or affidavits from any person who received this so-called assistance. Without any specifics, this is nothing more than a generic description of intake work, not legal work. Nor does Galindo even identify that the "potential claimants" actually became clients.

   b.   *"Vetted the cases and issues"*

      i.   This is an entirely conclusory statement. Galindo fails to explain *how* he vetted the cases, *what issues* he evaluated, *which clients* were involved, or *what criteria* he used. There is no documentation showing that any review took place or who conducted this review for thousands of clients. There are no case summaries, legal memoranda, emails, notes, or even a list of the issues supposedly vetted. Galindo fails to even assert that this was done for the benefit of clients as opposed to the many calls received by potential claimants who did not qualify and were not retained. This is a textbook example of a vague assertion devoid of evidentiary support or facts.

c.  *"Acquired client documents that would be needed to prove the client's cases."*

    i.  This statement lacks any reference to *what documents* were acquired, *from whom*, *when*, or *why* they were necessary. Galindo does not identify a single client, document, or case in which he allegedly performed this task. He does not even state whether these documents were obtained through legal requests, informal conversations, or standard intake procedures. No examples or supporting exhibits are attached—again, rendering the statement entirely conclusory and vague.

d.  *"Answered all client questions regarding the case process"*.

    i.  Galindo fails to explain what "questions" were asked, what responses he provided, or whether those responses required legal knowledge. He does not name a single client or provide even one example of such a conversation, yet baldly asserts that he answered "ALL" client questions for thousands of clients. There are no call records, emails, time entries, or notes to corroborate this claim. Without that context, the statement is both vague and unverifiable.

e.  *"Consistently communicated with the Insureds as needed."*

    i.  This broad and undefined statement fails on multiple levels. Galindo does not explain who "the Insureds" were, what was communicated, or what prompted these alleged communications. No timeframes are given. No content is described. No method of communication (phone, email, in person) is identified. Not a single document supports this statement. It is precisely the kind of hollow assertion that courts disregard at summary judgment as it is vague and conclusory.

f.   *Handled difficult clients that MMA was unable to handle.*

      i.   Galindo does not name a single "difficult client," nor does he explain what made them difficult or how he resolved the issue. He provides no context or content for these alleged interactions. No documentation, no follow-up, no summaries. This claim is not only vague but also suspiciously convenient, designed to suggest problem-solving without any evidence of substance. It lacks the specificity and evidentiary backing required to have any weight under Rule 56.

g.   *"Had regular meeting and communications with MMA to discuss, assist, and monitor the case."*

      i.   Galindo does not say when these meetings occurred, how often they took place, who attended, what was discussed, which cases were discussed, or what impact they had. The vague phrase "monitor the case" does not suggest substantive legal work or having responsibility for the Clients. Furthermore, Galindo fails to provide even one record of communication—no emails, no memos, no notes, no agendas. The absence of any documentary support makes this statement completely unprovable and inherently conclusory.

62.   Every material statement in Galindo's declaration falls short of the Fifth Circuit standards There is no detail, no context, just vague and conclusory statements that are unsupported by any evidence. *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013).  Therefore, Galindo's declaration fails to create a genuine issue of material fact as it is conclusory, vague, unsupported, and cannot withstand summary judgment.

## V. THIRD MSJ EXHIBIT – RETAINER AGREEMENTS

63.     The final exhibit cited in Galindo's MSJ Response is a sample attorney-client employment contract (the "**Contract"**), attached as *Exhibit A.*

64.     While the Contract may support Galindo's claim to joint representation in theory, it does not prove that he performed legal work or assumed joint responsibility as required by Mississippi and Texas law.

65.     The Contract contains standard contingency fee language and boilerplate references to joint representation, but it says nothing about what legal services, if any, Galindo provided. It does not identify what cases he worked on, what legal tasks he performed, or whether he had any interaction with clients, co-counsel, or opposing counsel regarding legal matters.

66.     As discussed above, in Louisiana, a lawyer must show that they performed legal work, and the Contract offers no evidence of such work. In Texas, simply agreeing to joint representation is insufficient. Under TDRPC Rule 1.04(f) and Comment 13, assuming joint responsibility requires maintaining communication with the client, monitoring the case, responding to inquiries, and assisting lead counsel when necessary.

67.     The Contract does not specify who would perform the legal work or assign any responsibilities to Galindo, nor does it suggest he played any role in the representation.

68.     The only reference to Galindo in the Contract relates to fee-sharing, which appears in a single footnote. This language merely reflects a financial arrangement; it does not demonstrate legal services rendered or joint responsibility actually assumed.

69.     In short, the sample contract does not show that Galindo took any actions consistent with the obligations of a jointly responsible counsel under ethics rules. It is a generic form that proves nothing about Galindo's actual conduct in these cases.

70.     Therefore, Galindo's third and final exhibit referenced in the MSJ Response suffers from the same fundamental flaw as the others. It lacks any connection to actual legal work or legal

responsibility. Taken together, the three exhibits, his declaration, the deposition of Adam Krause, and the retainer agreement, fail to raise a genuine issue of material fact. None provides competent evidence that Galindo performed legal services or assumed joint responsibility.

71.     At best, the Contract shows that Galindo merely referred the clients and now seeks 50% of the fees for the referral. As discussed above, merely referring a client does not provide a basis for sharing in fees.

## VI.     ADDITIONAL EXHIBITS ATTACHED TO THE MSJ RESPONSE FAIL TO PROVIDE EVIDENCE OF LEGAL WORK

72.     Galindo's MSJ Response references three primary exhibits: his declaration, Adam Krause's deposition, and a sample retainer agreement. However, he also attaches twenty-one additional exhibits, including unrelated deposition transcripts, pleadings, and orders from this case.

73.     None of these documents provide any evidence, direct or circumstantial, that Galindo performed legal services or assumed responsibility for the clients.

74.     The sealed exhibits attached to the MSJ Response fare no better.

### SEALED EXHIBIT I

75.     Sealed Exhibit I is a financial report summarizing checks received and distributed. It is purely an accounting record and contains no indication of legal tasks or client representation. Galindo's declaration attached to the Sealed Exhibit I does not state that the document was used in any way to assist with client representation.

### SEALED EXHIBIT T

76.     Sealed Exhibit T, titled "Galindo's Declaration Regarding Payment," consists of an email referencing payments allegedly made to Galindo along with an attached report. This document is also financial in nature and not evidence of legal involvement. In fact, Galindo's own declaration

attached to Exhibit T confirms that he did not create the report and that it was merely forwarded to him by Mr. Vottiero, an employee of MMA.

77.     Galindo's declaration attached to Exhibit T does not state or suggest that the report was used to assist in the representation of any client.

SEALED EXHIBIT G

78.     Sealed Exhibit H purports to be a list of client cases. However, the document includes no information indicating that Galindo provided legal services or had any involvement in handling those matters.

SUMMARY OF ADDITIONAL EXHIBITS

79.     In sum, none of the 21 additional exhibits, even collectively, supports Galindo's claim that he performed legal work or assumed responsibility for the clients. There are no pleadings, legal opinions, communications, time entries, or records reflecting Galindo's participation.

80.     Like the three primary exhibits cited in Galindo's MSJ Response, these additional attachments fail to rebut the core, undisputed fact: Galindo did not perform legal work in these matters and did not assume responsibility for the clients.

## VII. GALINDO'S LEGAL ARGUMENTS FAIL UNDER FEDERAL LAW AND ESTABLISHED SUMMARY JUDGMENT STANDARDS

GALINDO'S ARGUMENT THAT "NO EVIDENCE" SUMMARY JUDGMENT IS IMPROPER UNDER FEDERAL LAW IS BASELESS

81.     Galindo argues that MMA's Motion for Summary Judgment is improper because it is based on a lack of evidence. This is a fundamental misstatement of federal law.

82.     Under long-standing Fifth Circuit precedent, in *Austin v. Kroger Texas, LP*, 864 F.3d 326, 336 (5th Cir. 2017):

"Under federal law, however, it has long been the rule that when the nonmovant has the burden of proof at trial, the moving party may make a proper summary judgment motion, thereby shifting the summary judgment burden to the nonmovant, with an allegation that the nonmovant has failed to establish an element essential to that party's case."

83.    This is precisely what MMA has done.

84.    Galindo has pled six causes of action, each requiring proof that it is entitled to attorney's fees. His claims for declaratory relief, breach of contract, and turnover all hinge on one core issue: Did Galindo perform legal work entitling it to fees, and did he assume responsibility for the non-Louisiana clients?

85.    Absent proof that it did, every single one of Galindo's claims collapses. Galindo's breach of contract claim fails because there is no breach if no fees were earned. The quantum meruit and unjust enrichment claims fail because there is no enrichment absent services performed. Finally, Galindo's conversion and turnover claims fail because it cannot claim ownership over funds the law firm did not earn.

## GALINDO'S CLAIM THAT MMA FAILED TO MEET ITS SUMMARY JUDGMENT BURDEN IS FALSE

86.    Galindo misleadingly argues that MMA's Motion is "wholly lacking in evidence." That is simply false.

87.    Attached to MMA's MSJ is the sworn declaration of Mr. Moseley, one of the attorneys at MMA (**"Moseley Declaration"**).[18] Mr. Moseley clearly and unequivocally states:

     a.    I am unaware of any legal work performed by any attorney working for Cristobal M. Galindo, P.C. for any client represented by MMA.[19]

---

[18] <u>Exhibit J</u>: Moseley's declaration to MSJ
[19] <u>Exhibit J</u>: Moseley's declaration to MSJ (Paragraph 6)

b. If an attorney at Cristobal M. Galindo, P.C. had performed actual legal work on behalf of a client also represented by MMA, I would have actual knowledge of that fact.[20]

88.     Galindo attempts to discredit this by arguing that Mr. Moseley failed to specify the time period. This is a red herring as MMA argues that Galindo did not perform legal work at any point during the relevant engagement for any client. Moseley's statement supports that conclusion and is fully consistent with MMA's position.

89.     Galindo also argues that MMA's Motion fails because it does not detail how much work MMA performed. This argument is legally irrelevant. The burden is not on MMA to prove the work it performed. The burden is on Galindo to prove that it did work that entitles it to fees. Whether MMA did 1% or 99% of the legal work is immaterial if Galindo did zero.

90.     Furthermore, there is no doubt that MMA was tasked with and handled the legal work for the Clients. This fact was admitted by Galindo in his MSJ Response when he explained that *"Mr. Moseley convinced Mr. Galindo that MMA had the infrastructure in place to handle the claims and that MMA only needed to obtain the cases."*[21]

## <u>NO GENUINE ISSUE OF MATERIAL FACT PRECLUDES SUMMARY JUDGMENT</u>

91.     Galindo's remaining arguments are equally flawed. He points to a sample retainer agreements (Exhibit A) in an effort to claim that Galindo "assumed joint responsibility" for the cases. But assuming joint responsibility under a retainer agreement does not establish that Galindo actually performed legal work or assumed joint responsibility for the clients. At best, it shows the possibility that Galindo could have. It does not show that it did.

92.     More fundamentally, the existence of a retainer agreement or fee-sharing clause does not answer the dispositive question: Did Galindo perform any legal services to earn those fees or did

---

[20] <u>Exhibit J</u>: Moseley's declaration to MSJ (Paragraph 7)
[21] <u>Exhibit F:</u> MSJ Response (Paragraph 15)

Galindo assume joint responsibility for the representation? A contract may reflect expectations, but it does not prove actual performance.

## GALINDO'S "LOGIC" ARGUMENT IS MISGUIDED AND IRRELEVANT

93.     Galindo then argues that because MMA has not accounted for the exact proportion of work performed by each firm, the MSJ must "fail as a matter of logic." This argument is as legally hollow as it is logically flawed.

94.     Again, the Court is not being asked to apportion fees among three firms. The Motion asks a straightforward question: Did Galindo do any legal work that would entitle it to share in the fees and did Galindo assume joint responsibility for the Texas and Mississippi clients? If the answer is "no," the analysis ends. There is no need to determine how much MMA or K&K did. If Galindo did nothing, he gets nothing.

95.     Galindo also argues that because MMA paid fees, that alone proves Galindo must have performed legal work. That is patently false. Past payment is not proof of entitlement or that legal services were performed.  If anything, such payments may give rise to a claim by the Bankruptcy Estate for the turnover of those prior fees, relief that MMA intends to pursue.

## MOSELEY'S PERSONAL KNOWLEDGE IS NOT ONLY ADEQUATE—IT'S CONFIRMED BY GALINDO HIMSELF

96.     Galindo also objects to Moseley's declaration on the grounds that he lacks personal knowledge of Galindo's conduct. That objection is not only unfounded, but it is directly contradicted by Mr. Galindo's own assertions in his declaration.

97.     In the Galindo Declaration attached to the MSJ Response (Exhibit I), in order to provide this Court with some evidence that he performed legal work, Mr. Galindo claims that he worked "closely" with Moseley, flew to New Orleans over 30 times to meet with him and his staff, and maintained near-daily communication with his co-counsel.[22] If that were true, then Moseley would

---

[22] Exhibit I: Galindo Declaration

necessarily have personal knowledge of whether Galindo participated in case strategy, pleadings, or other legal activities.

98.     Galindo cannot have it both ways. He cannot simultaneously claim that he worked hand-in-hand with Moseley as part of his "legal work" and then argue that Moseley has no personal knowledge of what Galindo did or didn't do. The inconsistency is glaring, and it underscores the hollow nature of Galindo's defense.

## VIII. GALINDO'S ADMISSIONS IN PRIOR PLEADING

99.     On July 2, 2025, five days before Galindo's response to the MSJ was due, Galindo filed an *Emergency Motion to Extend the Deadline to Response to the MSJ* (the **"Emergency Motion"**).[23]

100.    In support of the Emergency Motion, Galindo submitted a sworn declaration in which he admitted that he could not adequately respond to MMA's MSJ without conducting further discovery (the, **"Emergency Declaration"**). [24]

101.    Specifically, in the Emergency Declaration, Galindo swore that, in order to rebut MMA's argument that he performed no legal work on the relevant cases, he *"needs discovery from Defendant and third-parties, including depositions and/or documents from MMA's current and former attorneys who witnessed GLF performing work on the cases, former employees of GLF that did work on the cases, and documents from the Defendant that may establish the work that GLF did on the cases."*

102.    Despite these admissions, the Court denied the Emergency Motion. Galindo nevertheless filed his MSJ response on July 7, 2025, without having conducted any additional discovery or obtained any of the documents or depositions he claimed were necessary.

103.    Galindo cannot credibly claim to possess evidence supporting his position when, just days earlier, he expressly admitted under oath that he needed discovery to obtain such evidence. His

---

[23] Exhibit K: Galindo's Emergency Motion to Extend
[24] Exhibit L: Declaration by Galindo attached to Emergency Motion

own declaration confirms that he lacked the necessary proof at the time. Moreover, in the brief period between the filing of his Emergency Motion and his subsequent MSJ Response, Galindo did not receive any documents from MMA, nor did he conduct any depositions.

104.    Accordingly, Galindo's assertion that he now possesses supporting evidence is plainly inconsistent with both the record and his prior representations to this Court. This inconsistency is further underscored by the fact that his MSJ Response fails to include any of the alleged critical evidence.

105.    This contradiction highlights that Galindo's claims remain unsubstantiated.

## <u>CONCLUSION</u>

This case boils down to a single question: Did Galindo provide this Court with any evidence to show that it either provided legal services or assumed responsibility for the Clients? The answer is clearly no. Despite submitting 24 exhibits and a lengthy declaration, Galindo has presented no competent evidence.

Galindo's only testimonial support comes from Adam Krause, whose deposition collapsed under cross-examination. Krause admitted to having no personal knowledge of Galindo's practices and was clearly coached by Galindo's counsel. His testimony was a performance, not evidence.

At best, Galindo merely demanded fees from MMA. But demanding payment is not the same as earning it. Without proof of legal work or responsibility, none of Galindo's six claims—declaratory relief, turnover, breach of contract, quantum meruit, unjust enrichment, and conversion—can survive. Galindo has failed to meet his burden.

As Galindo has not raised a genuine issue of material fact, summary judgment should be granted, and all claims dismissed.

Dated: <u>July 9, 2025</u>

Respectfully submitted,

By: <u> /s/ Miriam T. Goott</u>
        Miriam T. Goott
        Attorney-in-charge
        SBN 24048846
        COUNSEL FOR MMA

OF COUNSEL:
Walker & Patterson, P.C.
P.O. Box 61301
Houston, TX 77208
(713) 956-5577 (telephone)
mgoott@walkerandpatterson.com

## <u>CERTIFICATE OF SERVICE</u>

I, Miriam T. Goott hereby certify that a true and correct copy of the foregoing Reply was served on Mr. Shelton and Ms. Van Meter, counsel for Galindo on July 9, 2025.

By: <u> /s/ Miriam T. Goott</u>
        Miriam T. Goott
