Exhibit
D





NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide
COURT REPORTING
LEGAL VIDEOGRAPHY
REMOTE DEPOSITIONS
TRIAL PRESENTATION
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

Powerful
LITIGATION SUPPORT


IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE: MMA LAW FIRM, PLLC,

DEBTOR. CASE No. 24-31596

---

CRISTOBAL M. GALINDO, P.C.,

PLAINTIFF,

VERSUS ADVERSARY NO. 25-3310

MMA LAW FIRM, PLLC,

DEFENDANT.

VIDEOTAPED DEPOSITION OF

ADAM KRAUSE

TAKEN ON

THURSDAY, JUNE 26, 2025

10:31 A.M.

KRAUSE & KINSMAN

4717 GRAND AVENUE, SUITE 300

KANSAS CITY, MISSOURI 64112

APPEARANCES

Appearing on behalf of the Plaintiff:
RUTH A. VAN METER, ESQUIRE (via Zoom)
Van Meter, P.C.
9322 Shady Lane Circle
Houston, TX 77063
(713) 858-2891
ruth@vanmeterlaw.com

-and-

CHARLIE SHELTON, ESQUIRE
Hayward, PLLC
7600 Burnet Road, Suite 530
Austin, TX 78757
(737) 881-7100
cshelton@haywardfirm.com



APPEARANCES (CONTINUED)

Appearing on behalf of the Debtor/Defendant:
MIRIAM T. GOOTT, ESQUIRE (via Zoom)
Walker & Patterson, P.C.
4815 Dacoma Street
Houston, TX 77092
(713) 956-5577
mgoott@walkerandpatterson.com

Appearing on behalf of Krause & Kinsman Trial Lawyers:
TURNER N. FALK, ESQUIRE (via Zoom)
Saul Ewing, LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7777
turner.falk@saul.com



APPEARANCES (CONTINUED)

Appearing on behalf of Unsecured Creditors Committee:
NATALIE R. GALERNE, ESQUIRE (via Zoom)
Lawson & Moshenberg, PLLC
2301 Commerce Street
Houston, TX 77002
(713) 337-5580
natalie.galerne@lmbbusinesslaw.com

Also Present:
John (Zach) Moseley



EXAMINATION INDEX

| | PAGE |
|---|---|
| EXAMINATION BY MR. SHELTON | 8 |
| EXAMINATION BY MS. GOOTT | 128 |

EXHIBIT INDEX



| EXHIBIT | | PAGE |
|---|---|---|
| 1 | CHECKS REPORT | 37 |
| 2 | AGREEMENT | 94 |
| 3 | EMAIL 012623 | 103 |
| 4 | DECLARATION | 111 |





VIDEOTAPED DEPOSITION OF
ADAM KRAUSE
TAKEN ON
THURSDAY, JUNE 26, 2025
10:31 A.M.

THE VIDEOGRAPHER: We are on the record. The time is 10:31:45. The date is June 26, 2025.
This is the beginning of the deposition of Adam Krause. The case caption is Galindo versus MMA Law Firm.
Will counsel introduce yourselves and state whom you represent.
MR. SHELTON: Starting in the room, this is Charlie Shelton with Hayward, PLLC. The last name is S-h-e-l-t-o-n. And I'm representing Galindo Law.
MS. VAN METER: Appearing virtually is Ruth Van Meter. Last name is two words, V, as in Victor, a-n, second word M-e-t-e-r, also representing Cristobal M. Galindo law firm.
MS. GOOTT: Miriam Goott here on behalf of MMA Law Firm.
MR. FALK: Good morning. Turner Falk, from Saul Ewing, LLP, counsel for Krause & Kinsman



Trial Lawyers.
THE VIDEOGRAPHER: Is that everybody? Okay.
The court reporter will now swear in the witness.
THE REPORTER: Mr. Krause -- thank you.
Do you affirm under penalty of perjury that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?
THE DEPONENT: I do.
THE REPORTER: Thank you. You may proceed.
MR. SHELTON: All right.
MS. VAN METER: Can I get Natalie and Zach to make appearances on the record, please.
MS. GALERNE: Yes. This is Natalie Galerne, here with Lawson Moshenberg, PLLC, representing the Unsecured Creditors Committee.
MR. MOSELEY: John Moseley, tuning in.
ADAM KRAUSE, having been first duly affirmed to tell the truth, was examined, and testified as follows:
EXAMINATION
BY MR. SHELTON:
**Q. Okay. Good morning. How are you, Mr. Krause?**



A. Good.
**Q. I'm still going to go through some of the -- some of the -- the preparatory -- I think that's the right word -- admonitions that are given in most depositions, even though I'm -- I'm sure that you're very familiar with a lot of them. So I'll make them fairly truncated.**
**First, because we're making a transcript, of course, as you know, it's important not to interrupt. So I'll try to let you finish your answer, but also try to let me finish my question because, of course, we can't record two people talking at once; does that make --**
A. Understood.
**Q. Okay. And the court reporter has a difficult time, of course, recording head nods and head shakes. So verbal -- it would be appreciated; understood?**
A. Understood.
**Q. Okay. The other one -- it comes up often -- is the phrases "huh-uh" and "uh-huh" I think are very ambiguous. So please, yes or no as appropriate, okay?**
A. Understood.
**Q. If a question's unclear, just ask -- just**

Page 10

**let me know, and I'll try to restate it. Well, does that make sense?**
A. Makes sense.
**Q. All right. And if you -- if you answer a question, I'm going to presume you understood it. Again, if you don't understand it, just -- just ask, and I'll try to restate it if I can.**
A. Got it.
**Q. If you don't -- if you don't know the answer, it's okay with me if you answer that you don't know. If you're going to make a guess, I would ask that you indicate that this is a guess or an approximation, or something to that effect; does that make sense?**
A. Sure.
**Q. And you understand, of course, that your testimony here is under oath. And so it must be as truthful and complete as if you were testifying in front of a judge or jury, correct?**
A. Correct.
**Q. And that this testimony may be used in a trial at some later date, all right?**
A. Understood.
**Q. Okay. Can you just provide the very briefest explanation of, generally speaking, what**

Page 11

**you did to prepare for today's deposition?**
MS. VAN METER: And excuse me. I'm sorry. Charlie, can I get you to turn on your camera?
MR. SHELTON: Sure.
MS. VAN METER: Okay. Thank you.
THE DEPONENT: You had asked a question, right?
MS. GOOTT: And Charlie, just -- and the Federal Rules of Evidence apply.
MR. SHELTON: Is that a statement? Or sorry. Was that a statement or a question?
MS. GOOTT: Well, that is my assumption. So if you disagree, you can put it on the record.
MR. SHELTON: I -- I appreciate that. No, I have no disagreement. I was just --
MS. GOOTT: Okay.
MR. SHELTON: -- I was just curious if you were stating it or asking me. But no, that's -- that's fine. The Federal Rules of Evidence cover the -- the -- the deposition.
MS. GOOTT: All right.
BY MR. SHELTON:
**Q. Well, my -- my question was: Generally speaking, what did you do to prepare for today's deposition?**

Page 12

A. Very little. I looked for the documents that were in your subpoena, and that was really it.
**Q. Okay. All right. Let's talk a little bit about -- about you. You're an attorney, correct?**
A. I am.
**Q. All right. And can -- give me a little bit about your educational background. Where did you go to school? When did you graduate? Sort of the whole CV.**
A. Sure. I went to the University of Kansas, undergrad, as a Jayhawk, studied biology. And then I went -- I worked for a pharmaceutical company for a little bit. Now -- and then I went to UMKC law school, which is a law school in Kansas City.
We started our law firm, my business partner and I, out of school against everyone's advice. We started off immediately kind of in a deep end in mass tort litigation, representing in our first case a bunch of corn farmers who their price of corn fell from 750 a bushel down to 281 a bushel. And we sued on behalf of them to recover the loss against a chemical company.
And ever since, we've been doing mass tort litigation involving folks that got cancer to sexual abuse survivors to fire survivors in Maui and

Page 13

environmental catastrophes.
And that's really -- we're kind of a one-trick pony. We've done mass tort litigation from -- from the get-go.
**Q. And Krause & Kinsman is a firm in which you have an ownership interest in?**
A. I do.
**Q. Okay. And is that the firm that you started right out of law school?**
A. We had -- we have a number of variations of it, depending on the litigation that we're in. Krause & Kinsman Group, LLC, was our first, and it was our first firm that we started.
**Q. Okay. And when did you start Krause & Kinsman Group?**
A. Krause & Kinsman Group was started -- well, we moved to Puerto Rico. So I'm a Puerto Rican. I live there, have for about three years. We spend the bulk of our time down there. I -- you know, my kids go to school there now. I litigate down there. All of our actions that we take are now in Puerto Rico.
And then we still travel, you know, kind of around other parts. But when we moved to Puerto Rico permanently, we started Krause & Kinsman Group,

Page 14

LLC.
**Q. Okay. When was that, approximately?**
A. Three years ago.
**Q. Three years ago. So approximately 2025? Sorry. Sorry. 2022. Let me do a little --**
A. Yeah.
**Q. -- let me do better with the basic --**
A. Yeah.
**Q. Sorry. And when did -- when did you graduate from law school?**
A. I think I graduated in like 2013.
THE VIDEOGRAPHER: Can you move that cup --
THE DEPONENT: Oh, I'm sorry. Yes.
BY MR. SHELTON:
**Q. So you graduated law school in 2013. You started your own firm right out of law school. And you said you were starting -- you started in mass torts right away?**
A. Yes.
**Q. Okay. Let's talk a little bit about the sort of life cycle of -- of mass torts, in general. You said you were representing farmers who had some bushel pricing issues. I don't need to know about that particular case. But just generally speaking,**

Page 15

**what does that phrase "mass torts" mean to you?**
A. Yeah. The way that I describe mass torts, it's one event that hurts a lot of people. And that could be emotionally, financially. It could involve property damage cases. It could involve environmental cases. It could be personal injury cases. But it's typically one type of catastrophe that hurts a lot of people.
**Q. You -- do you also work with -- with storm cases?**
A. The first time that I ever worked in storm litigation was with Hurricane Ida, Laura, Delta, Zeta.
**Q. Ida, Laura, Delta, Zeta -- that's the full name?**
A. They were multiple hurricanes.
**Q. Those are all -- those are all different. I didn't -- I didn't know that. I haven't heard of -- I've heard of Ida. I have not heard of Laura, Delta, and Zeta.**
**And when -- when did you start handling storm cases?**
A. The only time that I've handled storm cases, and the first time, was approximately -- I've got to think when these storms hit -- probably four

Page 16

years ago. I think that's when Hurricane Ida had hit. I think it was -- don't even quote me -- but I think it was around four years ago. I think it was August 28th of, what, 2021. I could be off by a year. But I -- I remember it was August 28th.
**Q. And as a matter of procedure, is -- do you handle mass tort cases or dockets differently than you would handle a storm damage docket or case?**
A. I think it depends. So I think if you -- I would say yes and no. So if I make kind of -- opine a little bit about that, so if you're representing a very large commercial storm damage case, then, you know, say, involving a church and it's the -- you know, a really catastrophic storm damage case, you might treat it very similarly to a case where it would be like a trucking case in personal injury, or something like that, where you're going to have very specific experts, you're going to work them up very individually.
Whereas, if you were going to have a mass hurricane damage docket where you're representing 1,000 individuals, then it might look a little bit more like a mass tort where you're hiring some of the same appraisers. You know, in mass tort litigation, you'd be hiring some of the same

Page 17

pharmaceutical experts. And you're kind of applying processes and procedures more methodically down a large number of individuals.
**Q. Since 2013, do you have an estimate of how many -- let's talk about how many cases, just how many cases you've handled.**
A. Sine 2013, I'm sure we've handled well in excess of 100,000 cases.
**Q. And when you're saying we, you're referring to the firm, not you personally?**
A. That's right. Yep.
**Q. Okay. Just confirming.**
A. Team effort.
**Q. And what about -- what about trial? Do the -- do the -- I'm assuming the majority of those settles -- settle. But do -- I'm assuming you've taken some all the way to trial; is that correct?**
A. I have. Yep.
**Q. Okay. And do you have an estimate on the number that you've taken all the way to trial?**
A. We've taken -- personally, we've taken about five cases to trial.
**Q. Okay.**
A. We've been a part of trial groups in many cases. So we have not been the lead lawyer every

Page 18

time, but we've in a trial group where there could be, you know, as many as 30 lawyers that are working on the case at trial. And we've had I don't know how many, but many.

**Q. And if you have 30 lawyers -- my apologies. One moment.**

THE REPORTER: It was Galerne. She was rejoining.

MR. SHELTON: Okay. Just making sure you didn't need -- need me to pause for any reason.

BY MR. SHELTON:

**Q. If there is a trial group of 30, is that -- is that more in the context of the mass tort, or is that a storm case?**

A. No. That's in the mass tort context. You're going to have experts in all sorts of things, right? So I am -- I don't know. I -- I -- I can't say I'm an expert in it, but I gravitate towards more of the science stuff just because of my biology background, where others would be really good at e-discovery, and others are really good at depositions. Some people are really good at the briefing and writing.

And -- and so you kind of come together and, you know, the avengers come together and form

Page 19

kind of a super firm amongst multiple law firms. And that's generally how it works.

**Q. And so you said that -- again, you had used the word "we," referring to your firm, and -- and you said a team effort. There was about 100,000 cases that you've been involved in. With respect to those, do you have a supervisory capacity with those or some sort of governing capacity into how the case is handled or the strategy?**

A. Yes. I -- myself and Robert are usually the lead litigators at our firm. And even nationwide, we're usually on the PSC, Plaintiffs Steering Committee, Plaintiffs Executive Committee, you know, gearing up and leading the state court actions. We are very, very active.

And then as far as the -- the workup of the 100,000 cases, you know, Robert and I are designing all of the workup and doing all of that work.

We -- you know, we started off our firm so early we only had Robert and I. And then, you know, now we have 100-plus people. And so the way we always kind of say it is that like, you know, if it was a restaurant, we've been the -- the chef, we've been the food runner, the expo, the dishwasher.

Page 20

We've done it all.

And so that's kind of what we do in our law firm as well, too, is that, you know, we kind of know how to govern down to the legal assistant, to the paralegal, to the call center, to everything.

**Q. When you're referring to Robert -- and -- is that Robert Kinsman?**

A. That's right.

**Q. Okay. All right. So you -- you get out of law school in 2013, and you start your own firm. What was the name of that firm again?**

A. Krause & Kinsman, LLC.

**Q. That's Krause & Kinsman, LLC. All right. And then in 2021, approximately, you got involved in your first storm case, which was Hurricane Ida; is that correct?**

A. That's right.

**Q. All right. Can you explain to me when you first met MMA? And for the --**

A. Yeah --

**Q. -- for the -- one second. Just for the sake of making sure -- for clarity, hold on. Let me give you the exact. McClenny Moseley & Associates, PLLC. And I'm going to refer to them as MMA from here on out; is that okay?**

Page 21

A. Sure.

**Q. Okay. Can you describe your -- your history with MMA generally, when you -- particularly, starting when you first met?**

A. Yeah. If -- if I recall, we first met through a mutual legal acquaintance. And I'm trying to remember if we met at a -- kind of like a conference or if we met -- I potentially think it might have been at a basketball game as well, too, or maybe the basketball game as part of the conference, one -- one of the -- the -- but we were introduced by another individual who thought that we could work together.

**Q. When you said we first met, who's the -- who's the we in that?**

A. So this is Robert, myself, and then Zach was the first one that we met from MMA -- Zach Moseley.

**Q. Is that the same as John Moseley that's on the Zoom right now?**

A. Yes.

**Q. Okay. And so you were introduced by another individual?**

A. Yes.

**Q. And who was that?**

A. I believe it was Tighe Wilhelmy.
**Q. Can you spell that for me?**
A. I only can spell the first name, but T-i-g-h-e. I'll take a shot at the last name -- W-i-l-l-h-e-l-m-y.
**Q. So it sounds like the introduction was made because Mr. -- was it Wilhelmly or Wilhelmy?**
A. Wilhelmy.
**Q. Wilhelmy. It sounds like Mr. Wilhelmy thought that you guys might make a good pairing. Was that because at that time you had the mass tort docket and he felt --**
MS. GOOTT: Object --
MR. SHELTON: Well, let me at least finish the question first.
BY MR. SHELTON:
**Q. -- and he felt that it would match your skillset?**
MS. GOOTT: Objection; calls for speculation.
THE DEPONENT: Yeah. So I think the reason why was because we had a lot of mass tort experience which involves, you know, very large dockets. I mean, we've represented people in Syngenta corn lace -- case. Literally our first



case ever was 3,000 people, which is fairly substantial for most practitioners.
We then, you know, had grown much larger dockets than that, so we had that skillset.
And then MMA had the skillset of being really good storm litigation lawyers where they -- their entire practice was focused on storm litigation regarding hurricanes and tornadoes and hail and wind and -- and other type of storm-related environmental cases.
BY MR. SHELTON:
**Q. And when was this meeting again?**
A. I think this was -- if we could somehow -- if someone could tell me when Hurricane Ida exactly was, I could tell you when this meeting was. But I could tell you that it was three months before Hurricane Ida, which I think is 20- -- I'm going to go with 2021 sounds about right to me. So I would say this meeting happened with -- with -- within 2021.
MS. VAN METER: You're -- you're correct. It's 2021.
THE DEPONENT: Okay. Yeah. So this happened in probably --
MS. GOOTT: I'm going to -- I'm going to



object to Ms. Van Meter's comments. She's -- is she testifying, right? She's providing answers for the witness. I would strongly encourage you not to do that. Inappropriate.
BY MR. SHELTON:
**Q. Does August or September of 2021 sound approximately when Hurricane Ida formed in -- to your recollection?**
A. I believe it was August 28th of 2021 is when Hurricane Ida had reached landfall. And Hurricane Laura had happened a year or two before, but many of those claimants were still unrepresented. So we worked on that, too.
But the first time that we met would have been April or May, I would assume. Yeah, April or May of 2021 was the first time that I'd ever met Zach and MMA.
**Q. And what did you understand MMA to be bringing to -- to the table or the early relationship?**
A. Yeah. So they had storm knowledge. They knew what a good storm case looked like. They knew the experts to hire, the appraisers to hire. They had had success in the storm litigation arena before. They -- that's what they were essentially



focused on.
They were not in mass tort litigation. They were not in personal injury litigation. They had -- you know, that -- that was my wheelhouse -- you know, no pharma litigation, no med device litigation. They were strictly storm. And that's what they ran the table -- table, was all the storm knowledge.
**Q. So then what -- what were you bringing to the table with respect to this? It sounds like maybe MMA could have just done it on their own.**
A. Well, they -- the reason that I -- I believe they brought us on is because we had done thousands of the cases at a time. So we had done very, very, very large dockets. You know, prior to us being involved, I don't believe they ever had more than a hundred cases at a time.
And so when hurricane litigation occurs, you know, it obviously affects tens of thousands of people. And so they brought us in to help bring infrastructure and processes and procedures and, effectively, kind of teach them how to do things at scale.
**Q. And did you two eventually partner up?**
A. We did.

Page 26

**Q. Okay. And I'm not -- you didn't form a firm together or any corporate entity together; did you?**

A. We did not.

**Q. Okay. And I'll get into more detail on the co-counsel agreements. We'll get into that in a little bit. But I'm using the term --**

MS. GOOTT: Object --

BY MR. SHELTON:

**Q. -- "partner" --**

MS. GOOTT: -- to the side -- hold on -- objection to the sidebar.

MR. SHELTON: Well, let me at least finish the sidebar before you object to it.

MS. GOOTT: Well, I -- I thought you were finished. And we don't need your sidebar anyway. Keep going.

MR. SHELTON: Well, I'm still going to finish my sidebar. So --

MS. GOOTT: All right. Go ahead. Do it again.

BY MR. SHELTON:

**Q. I will get into the co-counsel agreements. I'm just making sure -- clarifying for you that, when I use that term "partnership" or "partner," I'm**

Page 27

**not using it in a legal sense. I'm not trying to say that you formed a legal partnership under any sort of state law or anything.**

MS. GOOTT: Objection; sidebar; assumes facts not in evidence.

BY MR. SHELTON:

**Q. So your understanding was that MMA was bringing storm knowledge regarding who to hire, that they had success, and that they knew what cases to take, and that you were bringing the ability to handle the volume, like a larger volume of cases; is that correct?**

A. Correct.

MS. GOOTT: Objection -- objection; mischaracterizes prior testimony.

MR. SHELTON: Is that a valid objection under the Federal Rules, Ms. Goott?

MS. GOOTT: You're not here to ask me questions. You ask him questions. I'll raise objections. Move on.

MR. SHELTON: No, I'm not going to. I'm just going to tell you right now --

MS. GOOTT: Move on.

MR. SHELTON: No.

MS. GOOTT: Move on.

Page 28

MR. SHELTON: No.

MS. GOOTT: You're -- it's not your --

MR. SHELTON: No.

MS. GOOTT: -- it's not your day to ask me questions today.

MR. SHELTON: No. Listen.

MS. GOOTT: Yep.

MR. SHELTON: Ms. Goott, stop.

MS. GOOTT: I'm not -- I'm not the witness.

MR. SHELTON: Stop.

MS. GOOTT: You're not here to ask me questions. I make my objection.

MR. SHELTON: Stop.

MS. GOOTT: It's real simple, real simple.

MR. SHELTON: Please stop.

MS. GOOTT: You ask the question. You ask the question. I get to object. Mr. Krause either answers the question or listens to his counsel's advice and doesn't ask -- answer the question. You don't get to ask me questions.

MR. SHELTON: Ms. Goott --

MS. GOOTT: Go ahead.

MR. SHELTON: Ms. Goott, this deposition will only have valid objections. If you continue to

Page 29

raise objections that are not sanctioned by the Federal Rules of Evidence, I will bring that --

MS. GOOTT: Then what? Then what? What are you going to do?

MR. SHELTON: Can you please stop interrupting me?

MS. GOOTT: What are you going to do? You want to threaten me. If I don't do this, then what? Tell me what you're going to do. Do you want to call the Court? Do you want to stop this and -- and have Judge Rodriguez determine --

MR. SHELTON: No, I --

MS. GOOTT: -- whether or not my objections are valid?

MR. SHELTON: No, no.

MS. GOOTT: We --

MR. SHELTON: Actually, I -- I don't. What I would prefer would -- would be for you to assert objections that are valid under the Federal Rules of Evidence. That's my --

MS. GOOTT: All right. You're -- you're not --

MR. SHELTON: That's my --

MS. GOOTT: -- a judge.

MR. SHELTON: Can --

Page 30

MS. GOOTT: You're not a judge. You don't get to determine today if my objections are valid. That's not your role. Your job is to ask questions and then be quiet while I make objections and then move on.

MR. SHELTON: I -- I do -- I don't concur with that.

MS. GOOTT: I don't need --

MR. SHELTON: Can --

MS. GOOTT: -- you to concur with that. I need you to do your job and conduct the deposition and ask the deponent questions. I am not being deposed today.

MR. SHELTON: Ms. Goott, I'm -- again, I'm just going to -- I need to get this on the record because it will come up in --

MS. GOOTT: It's on the record.

MR. SHELTON: Ms. Goott --

MS. GOOTT: It is on the record.

MR. SHELTON: Ms. Goott, stop interrupting me.

MS. GOOTT: I'm not interrupting you. If --

MR. SHELTON: I believe --

MS. GOOTT: -- you're telling me if I

Page 31

don't, then what? That's what I'm asking you.

MR. SHELTON: Ms. Goott, please stop --

MS. GOOTT: Do you want to keep -- do you want to keep having this conversation? We can do it.

MR. SHELTON: I will do this --

MS. GOOTT: You're wasting your time.

MR. SHELTON: I will do this --

MS. GOOTT: I think you have --

MR. SHELTON: I will do this for the next hour if we have to. Please let me get this statement on the record.

MS. GOOTT: I'll do it for the next six hours. You're not going to intimidate me.

MR. SHELTON: It's not about -

MS. GOOTT: I know your tactic. I know your tactics. I know what you like to do. It's not going to work. Move on.

MR. SHELTON: Ms. Goott, I'm going to -- I'm still going to finish my statement.

MS. GOOTT: Go ahead.

MR. SHELTON: The -- there are valid objections under the Federal Rules of Evidence. If you wish to continue to assert invalid objections, that is certainly your business.

Page 32

MS. GOOTT: Thank you.

MR. SHELTON: However -- however -- if those objections start to become disruptive, that becomes our business. If your objections --

MS. GOOTT: Yes. And that's --

MR. SHELTON: Let me --

MS. GOOTT: -- what I told you.

MR. SHELTON: Let me finish. I'm not done. I will -- let me tell you -- I'll tell you what. When I'm done, I will say I have completed my thought.

MS. GOOTT: Okay. Keep going.

MR. SHELTON: If you have a particular objection and raise it and it is a sporadic interruption, I will probably take no action. However, if we're going to have excessive objections that exceed the scope of permissible objections under the Federal Rules of Evidence such that that rises to the level of disruptive behavior, I will not only go to Judge Rodriguez, I will try to get the time back, and I will not only continue the deposition, I will, in fact, retake it. And that will be brought to the Court's attention.

Again, I'm not trying to be unreasonable. I just want to make it clear that there are limited

Page 33

objections that are available under the Federal Rules of Evidence. This -- as you indicated --

MS. GOOTT: Really?

MR. SHELTON: -- this is not a courtroom. And I would request that you refresh your recollection as to what the permissible objections are rather than raising impermissible ones.

With that stated, I have not completed my thought regarding that topic. Thank you.

MS. GOOTT: All right. If you think you understand what the objections are and you think I'm doing it wrong, then you can take it to the Court. You are not the Judge. You don't get to rule on my objections. You don't get to tell me that my objections are improper. That is not your role.

Your role is to ask questions. Mr. Krause's role is to answer them. And it's both of your job to sit quiet while I make my objection. And Mr. Krause gets to answer as he chooses to.

You don't get to tell me. You're not the Judge. If you have a problem and you think that my evidentiary objections are wrong, you have a method to deal with it. But lecturing me and threatening me and telling me you're going to do X, Y, and Z is ineffective. So please do your job.

Page 34

And now I'm done.
MR. SHELTON: Thank you.
BY MR. SHELTON:
**Q. All right. So let's go back because I think my train of thought was interrupted for some reason.**
THE DEPONENT: Did you get all of that? All right.
BY MR. SHELTON:
**Q. I think where I ended --**
MS. GOOTT: I --
BY MR. SHELTON:
**Q. -- your understanding --**
MS. GOOTT: I couldn't --
BY MR. SHELTON:
**Q. -- was that --**
MR. SHELTON: Sorry. Is there something else?
MS. GOOTT: I -- I couldn't hear you.
MR. SHELTON: Oh, sorry. Is -- by the way, is the feed to Zoom coming through my microphone or coming through -- okay. All right.
I'll try to make sure that I'm facing the mic, Ms. Goott. I think I -- I have a mic on my tie, but apparently that's not actually what you're

Page 35

getting my voice through. So let me know if I -- if -- if my voice dips.
BY MR. SHELTON:
**Q. All right. So your understanding was that storm knowledge was -- sorry -- was that MMA was bringing storm knowledge, they knew who to hire, that they had a success rate, and they knew what cases to take, and that you were bringing the -- the under -- the understanding regarding volume, infrastructure, and processes; is that right?**
A. Yes.
**Q. Okay.**
MR. SHELTON: Is there an objection, Ms. Goott?
MS. GOOTT: Keep going. I'll let you know. I can speak for myself. Thank you.
MR. SHELTON: Sorry. I thought I heard a sound. I was just trying to be courteous. My error for sure.
MS. GOOTT: It -- yeah. We -- we know that that is not what you're trying to do, but keep going.
BY MR. SHELTON:
**Q. Did you eventually -- and you did eventually enter into -- again, not using legal**

Page 36

**term, but into some sort of partnership with MMA, correct?**
A. Yes.
MS. GOOTT: Objection; calls for a legal conclusion -- Mr. Krause, I'm so sorry. If you wouldn't mind, before you answer your question, if you could just pause for a second in case I need to make an objection.
THE DEPONENT: Sure.
MS. GOOTT: Thank you.
BY MR. SHELTON:
**Q. And how was that agreement memorialized?**
A. So the agreement was -- it was very simple. It was -- if you look at a retainer agreement that a claimant, plaintiff, signs, there was a memorialization at the bottom of it that indicated who the lawyers on the case were. And so it's in the footer where it indicates the name of the law firm within the footer, and that's how we came to this agreement.
**Q. Did you have any sort of master agreement with MMA?**
A. No.
**Q. Did you have any sort of agreement with Mr. Moseley directly?**

Page 37

A. No.
**Q. I'm going to put it in the chat as well as show you a document. This is probably going to be labeled as Exhibit 1.**
MS. GOOTT: Probably or is?
MR. SHELTON: Probably. Actually, I retract the probably. We'll label it as Exhibit 1.
(WHEREUPON, Exhibit 1 was marked for identification.)
MR. SHELTON: And what I've done, for those in -- on Zoom, is I'm changing the file name. Just add Exhibit 1 in the front. That way, it's easy to sort.
And I'm handing the same exhibit to Mr. Krause as well as to the court reporter.
BY MR. SHELTON:
**Q. Have you seen this document before, Mr. Krause?**
A. Yes.
**Q. Can you tell me what it is?**
A. This is a retainer agreement between counsel and a potential claimant.
**Q. Okay. When you say you've seen this before, was this the -- we were just talking. You said that the -- when there was -- there was a**

Page 38

**retainer agreement, the plaintiff signs. There's an agreement memorialized in the footer. Is this one of those agreements?**

A. Yes.

**Q. Okay. Can you take a brief moment to look at it and tell me if -- to your recollection, if this is consistent with all of the agreements that you've entered into with respect to particular plaintiffs and MMA and Galindo Law?**

MS. GOOTT: Objection; foundation.

THE DEPONENT: This agreement is consistent with all of the agreements with MMA, Galindo Law, and Krause & Kinsman Trial Lawyers, LLP, which I will call KKL -- KKTL often through this deposition.

BY MR. SHELTON:

**Q. And I see that there's a Footnote 1 at the bottom of page 1; do you see that?**

A. Yes.

**Q. Is that the memorialization of the agreement that you believe that -- or that you had with MMA and Galindo Law?**

A. Yes.

**Q. And can you -- just for the record, can you tell me -- can you tell me what that agreement**

Page 39

**is?**

A. Sure. So this outlines that the co-counsel of these hurricane litigation cases is between MMA, Galindo, and KKTL. And then it says these various splits that each party is supposed to bear, so MMA is supposed to get 50 percent. Galindo Law is supposed to get -- I'm sorry. Scratch that.

MMA is supposed to get 37.5, Galindo is supposed to get 50 percent, and KKTL is supposed to get 12.5 percent. My apologies on that.

**Q. No problem. And when you're saying KKTL, just for the record, you're referring to Krause & Kinsman Trial Lawyers, LLP; is that correct?**

A. Yes.

**Q. Okay.**

MS. GOOTT: But -- sorry for the interruption. But I've tried to log in so I can look at the documents. I can't see it.

MR. SHELTON: Oh, I can share my screen, Ms. Goott. I'm sorry. I put it into the chat. I wasn't -- I'll share my screen as well for you.

MS. GOOTT: Can someone also let me in? I just -- I clicked on the Zoom link from a different computer.

THE REPORTER: Yes. One moment.

Page 40

MR. SHELTON: Do you need time with this document on the screen, Ms. Goott, or are you good for now?

MS. GOOTT: No, I'm good. I -- I'm -- I'm in now.

MR. SHELTON: Okay. And just for your orientation, we were talking about the bottom of Footnote 1 -- or sorry -- Footnote 1 at the bottom of page 1.

THE DEPONENT: Yes.

BY MR. SHELTON:

**Q. Okay. Well, what's interesting about this is, suddenly, I see Galindo Trial Attorneys. And what you were just telling me was that we had -- you have the expertise regarding large cases, and MMA has the expertise regarding storm cases. So why is Galindo in here, to your recollection?**

A. Yeah. So Galindo Law Firm was a co-counsel in the hurricane litigation cases. They were responsible for -- you know, if you're going to take a three-legged stool, Galindo Law Firm was responsible for intake of plaintiffs who were seeking representation for hurricane litigation.

And Galindo Law Firm, you know, also did a number of other things like client outreach and a

Page 41

number of things throughout the litigation. But they did the client intake. They did -- you know, certainly, dealt with hostile clients. And you know, they delivered checks. And they did a number of other things as well, too. But that's kind of how the -- the three groups worked together.

**Q. Let's talk about the -- the volume. I think you had used the phrase "all cases" with -- when you were describing that this agreement is pretty much the same with respect to all cases. And for the sake of the future discussion, just to make sure we're -- I'm being clear, I'm going to refer to -- to this -- this agreement. You had called it a retainer agreement; is that correct?**

A. Yes.

**Q. Okay. I'm going to call it a retainer agreement, but I'm also going to just make sure we call it -- I'm going to call it the MMA, Galindo, and Krause & Kinsman retainer agreement because there are others out there, it sounds like, that may not have Galindo Law Firm; is that correct?**

A. Correct.

MS. GOOTT: Objection --

MR. SHELTON: Okay.

MS. GOOTT: -- assumes facts not in

Page 42

evidence.
BY MR. SHELTON:
**Q. Okay. But I just -- I'm not talking about that other group out there. I don't know anything about those.**
**So with respect to this three-party -- maybe it's a better way to say it -- with --**
MS. GOOTT: Hold. I'm sorry. I'm sorry. I'm going to object to the sidebar.
BY MR. SHELTON:
**Q. With respect to this three-party retainer agreement, do you have a sense of the volume by number of agreements that were executed by plaintiffs -- sorry. How many plaintiffs -- that's what I should say -- how many plaintiffs executed these agreements?**
A. I believe there were between 5 and 6,000 cases that involved MMA, Galindo, and KKTL.
**Q. And if I wanted a copy of all 5 to 6,000 agreements, where would I go to get that?**
A. If you wanted a copy of all 5 to 6,000 agreements, then I would go into a system called SmartAdvocate, which is a CRM system that houses all of the data associated with these cases.
**Q. Okay. I'm going to talk about**

Page 43

**SmartAdvocate later. Let's go -- let's go back to Galindo. Do you recall when Galindo Law Firm got involved in the -- and, again, I'm using the term not legally -- "partnership" between MMA and Krause & Kinsman?**
A. Yeah. I don't remember exact month, but I remember it was very early on because it -- it was obviously right -- in or around August 28th of 2021 because Galindo started signing up a number of cases somewhere around that time. So it was during -- during the time frame of Hurricane Ida.
**Q. And you indicated -- well, let me make sure. Did you -- at the time when Galindo was joining, did -- what did you understand they were bringing to the table?**
A. Yeah. I didn't -- we knew that Galindo was bringing the intake of cases. So he was vetting the cases, determining if the cases were, you know, valid. He was obtaining some of the insurance information of the claimants.
You know, he was responsible for vetting out if the case was going to be potentially viable or not or, you know, whether or not the -- the client -- you know, right, there's some people that call in that are just simply interested. You know,

Page 44

he -- he would be responsible for determining whether or not this claimant would have an actual valid potential first-party hurricane litigation claim.
**Q. You also indicated that he handled -- did you say troubled clients? Is that the phrase you used?**
A. Well, throughout the litigation, he was also tasked and responsible -- if you had clients that were just kind of upset, you know, many -- some people at his firm would handle the clients that were really upset for things taking too long or, you know -- especially during these types of cases, they're upset about a lot of different things, you know. There's water leaking into their roof and into their properties.
And -- and so his firm would handle many of the hostile complaints. They had a number of folks over there that were good at speaking with claimants like that.
**Q. So dealing with difficult or upset clients or clients that needed a little bit more attention, that sounds like that was not part of the basis originally for bringing Galindo Law Firm into the three-party partnership; is that right?**

Page 45

A. It -- what I would say is that I think we were figuring a lot of this stuff out as -- as we go. And they had a strength in handling some of the -- the hostile clients, and they -- they had the bandwidth to do so. And so, you know, I know they were given a list of individuals to help that were not only hostile -- or, certainly, they were given lists of people that were really hard to find.
This clientele group in a mass tort litigation, in general, they're very transient, especially in hurricane litigation because they -- you know, they lost their homes, right? And so, you know, I know that Galindo's group helped with finding people that you just simply couldn't get a hold of because they, you know, who knows, changed their phone number or they moved. They -- for whatever reason, they're -- they're gone. And so he helped with that as well, too.
**Q. So the relationship between you and MMA started in approximately, I think you said, April or May of 2021, right?**
A. Correct.
**Q. And it sounds like Galindo Law Firm joined in -- or approximately the same time or shortly thereafter?**

Page 46

A. No. Galindo Law Firm joined in probably in like September of 2021. It was after the hurricane had hit.

Now, I have absolutely no idea if Zach and Cris knew each other prior. They're both Houstonians. So who knows? They could have been friends and worked together prior. I -- I have absolutely no idea.

But what I do know is that Galindo, when I met him, was after Hurricane Ida. But again, they could have been, you know, who knows, high school buddies. But what I know is that, in 2021, after the hurricane hit is when he came at least into my life, you know.

**Q. And when did -- when did you sign up your first client from Hurricane Ida?**

A. September of 2021 -- late September of 2021.

**Q. And during the period in which the partnership between MMA, Galindo Law, and KKLF, during the time period when that was productive, would you say that Galindo Law Firm did its part with respect to vetting, bringing cases, and determining if they had some level of chance of success on the merits?**

Page 47

A. Yes.

**Q. And then throughout that relationship, would you say that Galindo Law Firm performed its responsibility with respect to dealing with upset or difficult clients?**

A. Yes.

**Q. Are you still taking storm cases under this retainer agreement that we've marked as Exhibit 1?**

A. No.

**Q. When did that end?**

A. I think it ended in -- sometime in 2022.

**Q. Do you have an approximate, if it's in the beginning, middle, or end of the year?**

A. I believe it was March of 2022.

**Q. What brought it to an end?**

A. Well, it may have been a little later than that. But the reason that it ended is there was a lot of stuff that ended up coming down where MMA had some scrutiny in Louisiana for some of the filings they did. And so that kind of ended the -- the relationship between all of us.

**Q. And are you still performing mass tort -- I'm sorry -- mass storm cases -- or storm cases? Sorry. I sort of mixed up my terms there. Are you still handling storm cases?**

Page 48

A. I am not handling storm litigation. However, I am doing a property case in Maui where there was a big fire that was in Maui. And so while that is property-related, it doesn't really involve very much first-party litigation. It's more third-party litigation and with a potential bankruptcy component to it. But as far as the types of litigation that we were doing here, I'm not doing it right now.

**Q. So it sounds like you're unsure regarding the -- the date, or date range, as to when the relationship ended. But you said it was related to a lot of stuff coming down from Louisiana?**

A. Correct.

**Q. "Scrutiny," I think was the phrase you used.**

A. That's right.

**Q. So from the beginning, from that September of 2021, until the relationship ended, is that the time period in which the 5,000 to 6,000 cases were brought in under this retainer agreement?**

A. Yes.

**Q. And to your knowledge, who -- who brought in those cases?**

Page 49

A. Specifically with the retainer agreement that we're talking about here with the three of us, Galindo Law Firm brought in all of those cases.

**Q. All of those cases?**

A. Yes.

**Q. All of those cases?**

A. All of those cases.

**Q. All right. When those cases were brought in -- well, let's -- let's start talking about the process now a little bit.**

**So when one of these cases comes in during this window, it sounds like it's approximately from September of 2021 until, you said, March of 2022, maybe a little later. But when -- during that period, when a case came in, can you just walk me through the process a little bit? How does a client get signed up? Who handles it? How -- you know, who takes it to trial? How does the money come in? Just that whole process is all I'm looking for.**

A. Sure.

MS. GOOTT: Object -- objection as to speculation as to anything besides what Mr. Krause did.

THE DEPONENT: Sure. So what would happen is that Galindo Law Firm -- and I'm speaking just of

Page 50

these types of cases. There -- there were other different avenues and -- that didn't involve Galindo. But since we're here and I'm getting deposed by Galindo's attorneys, I'm going to talk about Galindo.

So Galindo would do some type of advertising, you know, digital advertising, you know, town hall meetings, things like that, to bring awareness to the hurricane litigation. Then clients would call in to Galindo, and he would have a group of individuals that would answer the phone, and they would ask questions about, you know, what type of damage they suffered, what hurricane it was, who's your insurance company, do you have an insurance company, the -- do you have an attorney that already represents you, just a number of questions to effectively qualify those individuals as someone that we could possibly represent.

After that, there was an API, which is basically a fancy word that means passing information from one computer system to another system -- an API that would go from the Galindo Law Firm into McClenny Moseley & Associates, effectively passing the data from Galindo Law Firm on over to MMA. It would also pass the retainer agreement into

Page 51

their system as well, too.

And then that information would then trigger various actions to happen. So a text message would go out to the client, oftentimes with a video within the text link. An email would go out to the client. And then the claimant would be assigned to a lawyer at MMA who would be responsible for working up that case.

Then down the line, an appraiser would be assigned to the case. The case would have the appraiser go out. The appraiser would do a report. The appraisal report would come back. The lawyers would look at the appraiser -- appraisal report.

And then a demand letter would be sent out to the insurance company. The insurance company then would respond. Then there would be potentially some type of mitigation. They would then resolve it. And then money would be given from the insurance company, and money then would be given to the client and to the lawyers for their roles in the litigation.

And then there's a lot of small steps in between all of that, that, you know, I could go into. But I think that's a very big overview of how everything worked.

Page 52

BY MR. SHELTON:

**Q. You said that when Galindo Law Firm would sign up a client, that they would transmit it via an API to MMA and put it into MMA's system or computer; is that correct?**

A. Yes.

**Q. And is that system or computer, is that SmartAdvocate?**

A. Yes.

**Q. What -- was Galindo creating the SmartAdvocate profile, or was that created as a result of the transfer of the data?**

A. Yeah. So Galindo used a different system, and he would create a profile within his system. I can't -- it might be HubSpot. I can't -- I think that's right. It might be HubSpot.

And then what would happen is that the data would push over into MMA's SmartAdvocate system, which would then create a profile or, basically, a case number. So the case number would be 2100344, and then it would house all of the data of that claimant.

So all of the data -- data that Galindo got would be transferred over to MMA, and that's where the bulk of the data would live.

Page 53

**Q. And what is SmartAdvocate?**

A. It's just a customer management system very similar to Salesforce or HubSpot or monday or many of the other ones that are out there. This one is law-specific.

**Q. Is that just a commercially available software, or is that in-house?**

A. So it's commercially available. However, it's very useless off the shelf. And so what -- much of our role, KKTL's role, was working with MMA to make that software bespoke and add the functionality that MMA would want inside their system.

**Q. Did that require ongoing efforts from you, or was it just set up once and then done?**

A. Daily.

**Q. Daily.**

A. Yes.

**Q. Okay. We'll get back to that in a second.**

**You indicated that the transfer of data from GLF to MMA would trigger text messages, maybe the delivery of a video, and information to the claimant letting them know that -- that -- that they had the case. That triggering, who -- or let me back up.**

Page 54

**Q. The sending of the text message in the video, who actually did that?**

A. It was automated. So the profile gets created with the transfer of the data from Galindo to McClenny Moseley & Associates. Once that profile is created, a text message automatically goes out to the claimant and sends an email.

**Q. And that's automated process.**

A. Yes.

**Q. And then you said an appraiser would be assigned. Who assigned the appraiser?**

A. The appraiser would be assigned by one of the individuals at McClenny Moseley & Associates, MMA.

**Q. And the appraisers would be tasked with going out to a particular address and determining the estimated cost of -- or value -- cost of repair and damages with respect to that property that was caused by the storm that had just occurred; is that correct?**

A. Yes.

**Q. But those appraisers didn't work for GLF or MMA or KKLF, correct?**

A. They worked on behalf of us.

**Q. Right. But they weren't employees,**

Page 55

**correct?**

A. No.

**Q. Okay. And who -- so they were paid. And who -- who paid for the -- those appraisers, generally?**

A. MMA paid for the appraisers. However, to be honest, I have no idea and -- on the Galindo cases if Galindo paid for them or MMA. I know that I didn't because I wasn't responsible for that.

If Galindo did, maybe, I have no idea. If MMA did, I don't really know. Between those two, that was a deal that was between them.

**Q. Okay. Who sent out the letter to the insurance company?**

A. MMA.

**Q. And did you have any role in reviewing or modifying that or opining on it at all?**

A. The role that I -- well, when I say me, it's KKTL. The only role that we provided was to teach them how to send it out in an automated fashion where it would pull the information from, you know, this is the insurance number, this is the insurance company number. It was a sophisticated mail merge that would bring the data in and allow them to send a letter to the insurance company.

Page 56

We provided that infrastructure. However, they provided all of the content within the letter.

**Q. And then you said, typically, it would go to mediation after that; is that right?**

A. Yes.

**Q. The mediation, in your experience, did the majority of cases settle at mediation or no?**

A. Yes.

MS. GOOTT: Objection; calls for speculation; foundation.

BY MR. SHELTON:

**Q. You said yes. Can you explain to me how you know that the answer is yes?**

A. Well, when you would go to mediation, I know that there -- there would be, say, 20 cases going to medication with State Farm. And then you could see, based on the settlement reports, that 17 of them settled of the 20 cases. And maybe three didn't because they needed more information, or they come to -- they couldn't come to some type of an agreement or they needed to go into litigation.

But I would say, you know, by and large, if you went to mediation on 20 cases, 17 of them would settle. Potentially, like if it was LIGA, all of them would settle.

Page 57

THE REPORTER: With who?

THE DEPONENT: LIGA, L-I-G-A.

BY MR. SHELTON:

**Q. You said that there was -- you would -- you could tell from the settlement report. What is the settlement report?**

A. A settlement report -- there are various reports within SmartAdvocate that report data that indicate what happened with a claimant or a group of claimants. So a settlement report can be run in lots of different ways. You could run a settlement report that says I want to know every single case that has settled between this date and this date with State Farm, and I want to know how much it settled for; I want to know whether or not they've paid yet.

You could run a report to say I want to know all of the cases that have ever settled in Hurricane Ida, or I want to know all of the settlements that ever happened in Hurricane Laura.

And all of that information is in SmartAdvocate, which is what makes SmartAdvocate so cool, is that it's a SQL database that allows you to basically ping the database and say give me this information back. And -- and -- and that's how it

Page 58

works.

**Q. You said SQL database. That's S-Q-L, correct??**

A. Yeah.

**Q. Just making sure I understood.**

**So if a case were to settle at mediation, populating the information that ultimately -- that ultimately led to the report being able to be generated, who would input that information, to your recollection?**

A. It would be McClenny Moseley & Associates. So they would take the settlement amount. So let's say the case settled for 100 grand. They would type that into SmartAdvocate, and then that person would also make sure to make sure that the proper attorney fees -- like if it was a 33 percent contract, that would be notated correctly in SmartAdvocate. That person would also be responsible for making sure that all the expenses were in the -- the system as well, too. So if you paid for an appraiser for $2,000, then that needs to be in SmartAdvocate. And then if there's referral lawyers in the case, that information would -- you need to make sure that that's in there as well, too.

And the reason why you would do all that

Page 59

is that, after settlement, the next step is paying these clients out. And so you want to make sure there's a proper ledger that indicates how much a client's getting paid and everyone's getting paid and that MMA is getting paid back their expenses that they spent on their appraisal and -- and all that stuff.

**Q. Do you know if the mediations were in person or remote?**

A. I believe most of them were in person.

**Q. Okay. And when you say you believe, what's the basis of that knowledge?**

A. I would talk to William Huye. And I know that he was going to mediation. And while I never asked him, you know, when you're going to mediation, is that in person or otherwise, going to mediation kind of indicates that it was in person to me.

**Q. Okay. And you say William Huye. Is his last name spelled H-u-y-e?**

A. Yes.

**Q. Okay. And who is William Huye?**

A. He is a lawyer that worked at MMA. He was -- he was a good lawyer. He worked at MMA, and he was the one that was responsible for the hurricane litigation in Louisiana. So he was in charge of all

Page 60

of the Louisiana department for MMA.

**Q. You gave me an example in the event of, let's say, 20 cases being mediated with State Farm that maybe 17 would settle. Just working off of that example, there's three that haven't settled in your example. What happened to those three?**

A. Yeah. So --

**Q. Or what would happen to those three? Sorry.**

A. In those three, they could go into litigation. So you know, the case actually gets filed, you know, just like typical litigation, requests for production, document exchange happens. And then, also, sometimes, you know, you leave mediation, and someone calls you up. And they're like, you know, you're right; we'll pay you $5,000 more. And the case settles. So that happens as well, too. And so one of those two things would happen.

None of these cases -- I mean, we didn't really get this far, but none of the cases ever went to trial.

(Zoom interruption.)

THE REPORTER: One moment. I'm not sure who that is. Carry on?

Page 61

THE DEPONENT: Maybe we could take a break for five, and then you could also figure out who that is.

MR. SHELTON: Yeah. We can go off the record.

THE REPORTER: Okay. We're off the record --

THE VIDEOGRAPHER: Give me one second. Hold on one second.

THE REPORTER: Oh, yeah.

THE VIDEOGRAPHER: I got to do it for video.

All right. Stand by. The time is 11:33:57. We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 11:51.

BY MR. SHELTON:

**Q. When we left, you indicated that some, it sounds like, maybe small percentage of the cases, if mediation was unsuccessful in reaching a resolution, some small percentage would go to -- to litigation. If it went to litigation -- or to trial, I should say -- if it went to trial, who handled that?**

A. No cases went to trial.

Page 62

Q. No cases went to trial. So for the cases that didn't resolve in mediation, they all resolved in some other settlement?
A. No. So not all cases resolved. So there are cases that settled. Those that didn't settle would go into litigation, and they stayed within litigation.
However, due to what we were talking about before, some of the scrutiny that happened in Louisiana, many of the cases never reached a resolve at all.
Q. Do you believe those cases are still alive, or active, to your knowledge?
MS. GOOTT: Objection; foundation.
THE DEPONENT: Some of them, for sure.
BY MR. SHELTON:
Q. So they're in litigation, but they haven't made to trial some of them. And let's talk about two different windows of time then, I think is what needs to happen.
So the additional scrutiny from the Louisiana court was sometime in 2022. Prior to that, is it correct to say that there were cases that went to mediation, were unable to be successfully settled, and were therefore in full

Page 63

litigation, well, period -- or question mark?
A. Yes.
Q. Okay. For those that are within that window, so prior to the scrutiny from the Louisiana court, to your knowledge, who would be handling the cases that were in litigation that were subject to these retainer agreements?
A. MMA.
Q. Do you know which individuals, per chance?
A. If we're talking about the Louisiana cases, it would have been William Huye and, I believe, someone named Cameron.
Q. Okay.
A. And there are a couple other lawyers, but I don't remember their names.
Q. Okay. And that's the Louisiana cases. So there are other states involved?
A. Yes.
Q. Okay. Such as?
A. Florida, Mississippi, Texas.
Q. Does that -- so between Texas, Florida, and Mississippi and Louisiana, does that exhaust the 5 to 6,000 cases that were brought in?
A. Yes.
Q. And are you aware of any outside of those

Page 64

four states?
A. No.
Q. And do you know who was handling litigation for Texas?
A. It was MMA. It -- I don't remember the attorney's name. I apologize.
Q. Okay. Was MMA handling the Florida cases as well?
A. Yes.
Q. And was MMA handling the Mississippi cases?
A. Yes.
Q. And these are all storm cases?
A. Yes.
Q. None of these are the mass tort docket that we were talking about earlier.
A. MMA does not handle mass tort --
Q. Okay.
A. -- as far as like pharmaceutical, medical device litigation. They only handle storm litigation.
Q. Do you know the individuals who were --
MS. GOOTT: Object -- I'm going to --
MR. SHELTON: Oh.
MS. GOOTT: -- object; calls for

Page 65

speculation; and foundation.
BY MR. SHELTON:
Q. Do you know who individually handled the Florida and Mississippi litigation for MMA?
A. No.
Q. Does the term, or phrase, "handling attorney" mean anything to you?
A. Yes.
Q. Can you tell me what that is?
A. I don't know if it's an actual like legal, you know, terminology or anything like that. But the way we would call a handling attorney, they would be the ones that are responsible for actually filing the case. Their name would be actually on the plating. They would be the ones that are responsible for actually handling the case as far as the litigation goes.
Q. And those were MMA attorneys?
A. Yes. As far as the cases that we're talking about here, yes.
Q. Going back to Exhibit 1 --
MR. SHELTON: And if anybody attending remotely wants me to pull it up, I can. Actually, I will.
MS. GOOTT: Yes, please.

Page 66

MR. SHELTON: Yeah. I -- I will. One moment.
BY MR. SHELTON:
**Q. Going back to Exhibit 1, I just want to get a couple of clarifying points. Can you tell me, if you know, how these fee splits were decided? And again, I'm referencing Footnote number 1 where it shows 37.5 percent MMA, 50 percent to Galindo, and 12.5 percent to KKTL. Can you tell me how that split was decided?**
A. Sure. It was decided between all of us. And it was based on, for example, I was to receive -- excuse me -- KKTL was to receive 12.5 percent. That was because we were, I would say, serving a minority role in this litigation. We were providing the infrastructure, the -- you know, the standard operating procedures. And -- and we weren't funding anything, and we weren't putting any capital at risk here, whereas the others were -- were doing other work and putting capital at risk. And -- and so that's why they got their splits. And -- but, I mean, we just kind of all came to an agreement.
**Q. And out of the 5 to 6,000 different retainer -- sorry -- out of the 5 to 6,000 individual retainer agreements, you said that they**

Page 67

**were all identical. But I just want to confirm. Was the attorney fee split, to your knowledge, identical in all 5 to 6,000 of them?**
A. To my knowledge, yes.
**Q. Okay. You said that the agreements started coming in -- the retainer agreements started coming in, in late September of 2021, correct?**
A. Correct.
**Q. And can you tell me -- did you get 5 to 6,000 in late September 2021, or was it spread out over time? Or how did that work?**
A. No. They came -- as you could imagine, marketing would run, and then that would cause people to call -- call in, interested in hiring an attorney for their hurricane litigation.
Those people would call in. But the -- the marketing ran, you know, daily. And so people would see it, they would call in, get interested, retain us. And so it was not 6,000 cases all at once. It was, you know, over a time period.
**Q. Of course. I think that was -- well, strike that.**
**Do you know -- and, if so, how -- do you know the magnitude -- strike that.**
**Do you know the, or have an estimate of,**

Page 68

**the effort that Galindo Law Firm went into to develop and to market and to obtain the 5 to 6,000 cases? And if you do know, how do you know that?**
A. What I do know is that they hired individuals to answer the phones to vet out good claims versus claims that would never survive and should never be filed. I do know that they had attorneys on staff reviewing the claims. I do know they created criteria in conjunction with MMA because they were the ones that had the storm expertise. And so they worked together to come up with the criteria.
But I have no idea as far as who ran their advertising or the infrastructure that was set up to advertise or how they even advertised. I have no idea on any of that. But I do know they had people that were answering the phones, able to reach out to clients, and develop criteria. As far as the advertising goes, I don't know.
**Q. And how do you know that they hired individuals to answer the -- the phones and do some of that initial vetting?**
A. Well, along with the retainer agreements that were signed also came data that the clients supplied, such as their loss address, their mailing

Page 69

address, which could be different because they lost their homes, obviously, phone numbers, who was on the deed, their insurance company, the insurance company number, whether they sustained loss in multiple hurricanes, which hurricane, what type of loss. All of that information was given to someone on the phone, who entered it into their system that was pushed over to MMA. And so I know they had a group of individuals doing that all the time.
**Q. Do you know how many individuals were doing that all the time?**
A. I don't.
**Q. Did KKTL handle any of the clients directly?**
A. No.
**Q. During the period of performance, so from when the relationship started in -- and you started receiving clients from September of 2021 onward, do you know if Galindo was involved in -- we already talked about his involvement with some of the clients, in particular, some of the troubled clients. I'm more interested right now in his involvement in the process generally. Was he involved in monitoring case status, for example?**
A. He was involved as far as reviewing case

reports that would come to him. He was involved in -- you -- so which -- the case reports would have the status of wherever the case was. So the -- if his was in litigation or about to go to mediation or simply just retained, you know, whether or not the client had an appraiser or not, you know, he would be receiving those types of reports that gave him that information.

**Q. Okay. And how do you know he was -- he was receiving those reports?**

A. Because I was asked to create those reports.

**Q. And did you deliver those reports to Mr. Galindo yourself or no?**

A. Well, what I did is I set up automatic reports that came from the SmartAdvocate system to Galindo Law Firm and -- and MMA as well, too. So they would want like a settlement report. They would want a status report. They would want a report on how many cases were signed up and pushed over. That way, you could cross-reference how many cases were at the Galindo -- how many cases Galindo's side and how many cases were in the MMA system. You want to make sure that they were exactly the same so, in case the API broke, you



could determine, you know, if your two clients are missing, that would be a big problem, obviously.

And so we set up many, many, many reports for -- so, that way, communication could go back and forth between those two.

**Q. Who asked you to create those reports?**

A. MMA asked me to create a lot of reports. Galindo asked me to write -- do a bunch of reports. We set up many, many reports. We -- we set up many custom reports, which we had to work with SmartAdvocate's team. And you pay extra money, actually, for custom reports to be created.

Really, our -- KKTL's role was basically we were support to whatever these guys wanted. And we would set up all sorts of reports.

**Q. Did Galindo Law Firm, to your knowledge, follow up on any of the reports that were generated and sent automatically?**

A. I know they -- there was like a missing client report. And I know that they were following up on missing clients often. So that was a report that was there. And the idea was that they could get a hold of their clients. That way, we could progress along with those cases, you know, by getting them appraisers and delivering them checks



and other things. You know, it's tough when you can't get a hold of a client to prosecute their case properly.

**Q. I think you have implied the answer, but I want to make sure I understood. What is a missing client report? What does that -- what does that tell the -- the reader of that report?**

A. Yeah. So this would be the client that would be flagged in the SmartAdvocate system. And they could -- we -- we need some type of information from them to be able to proceed.

So an example would be, if we didn't have their insurance company right within the system, we need to call that client and say, you know, are you insured by State Farm, or are you insured by State Farm Property and Casualty, which there are many nuances of insurance companies. You know, they may sound right, but there could be six iterations of that insurance company and you may have it wrong.

And so when you send a letter of representation to the insurance company, it pops back, and they say, hey, we don't insure this client, which is a problem.

And so that would be someone that would show up on the missing client report. If MMA was



unable to get a hold of them, then, you know, Galindo Law Firm would be tasked with reaching out to those folks to see if they can't gather information for MMA.

**Q. Let's talk about the insurance. If -- well, you said if the insurance was either ambiguous or you didn't have it, that we would contact the client. Who is we in that?**

A. Well, MMA would be the responsible person -- excuse me -- entity at first to -- to do it, and they did it. They tried very, very hard for a while. And then when they couldn't get a hold of them via email, text, call, then -- again, then they would show up on the missing client report. The missing client report would go to Galindo Law Firm.

Galindo Law Firm would use other methods like skip tracing and other calling methods by -- you know, there are a lots of different calling methods you could use. You could use a different phone number, which, you know, a client may have blocked one number and they will answer the number. Or maybe they only wanted to be called -- they will only answer a phone number that is the local area code.

And so you could also change the caller ID

Page 74

to say Law Firm, and they might actually answer, as opposed to thinking it's spam. So there's a lot of different techniques that you use and try to getting a hold of these missing clients. And that would -- so I would call that like the tier 2 triage level of trying to find clients, is what Galindo would do.
**Q. And was your experience that, when it went to the tier 2 triage level for -- and Galindo Law Firm was tasked with finding them, that they performed in that task, at least as attempting to perform, I should say?**
A. Yeah. They would attempt to perform. I mean, nobody's 100 percent in this. It's really difficult. But they definitely got clients back.
**Q. Did those clients add value to the three-party agreement?**
A. I guess what I would say is I don't know which clients were on the missing report and then eventually settled because I didn't track them. It's something that I could run in SmartAdvocate, but I never tracked them from they were missing to getting settled. But you know, they -- they came back in our system that allowed us to get appraisers and -- appraisals and go to mediation.
**Q. Do you still have access to the**

Page 75

**SmartAdvocate system?**
A. No.
**Q. Who has access to that?**
MS. GOOTT: Objection; calls for speculation.
THE DEPONENT: MMA.
BY MR. SHELTON:
**Q. You believe MMA does?**
A. Yes.
**Q. Why do you believe that?**
A. It's their system.
**Q. When did you lose access?**
A. I don't know. A couple years ago.
**Q. Do you believe that Galindo bringing in the 5,000 to 6,000 clients provided a benefit sort of at large to the retainer agreement?**
MS. GOOTT: Objection; calls for a legal conclusion; foundation.
THE DEPONENT: Can you rephrase the question?
BY MR. SHELTON:
**Q. Sure. Again, using the phrase "partnership," not in a legal sense, do you believe that Galindo bringing the 5 to 6,000 cases benefitted the partnership between MMA, KKTL, and**

Page 76

**Galindo Law Firm?**
A. Yeah.
MS. GOOTT: Objection; calls for a legal conclusion.
THE DEPONENT: Yes.
BY MR. SHELTON:
**Q. Okay. And can you tell me why you believe that?**
A. Well --
MS. GOOTT: Objection; foundation.
THE DEPONENT: Sure. Well, 5 to 6,000 cases, if all settled, would be worth a considerable amount of money in attorney fees. And so it's a big benefit. Without those, we wouldn't have gotten attorney fees on 5 to 6,000 cases. But the potential amount of attorney fees of those cases was substantial.
BY MR. SHELTON:
**Q. Is -- you're using the phrase -- or the word "potential." Did they not all -- then we -- we already know they didn't all settle. Do you have a sense of the dollar amount that did settle?**
A. I --
MS. GOOTT: Objection; foundation; calls for speculation; best evidence rule.

Page 77

THE DEPONENT: I don't.
BY MR. SHELTON:
**Q. Let's go back to the very beginning of the relationship. We're back in April of 2021 now -- April or May of 2021, when you first started interacting with -- with Moseley. Have you met McClenny?**
A. Yes.
**Q. Okay. What's his first name, by the way? I actually don't know.**
A. James.
**Q. James. All right. So you had met James. Did you meet James in this window when you were forming a relationship with MMA, or did you meet him later?**
A. We didn't meet at the first meeting. We met -- I think the first time we met was probably in like September-ish of 2021.
**Q. And that was after you had already decided to enter into this partnership; is that correct?**
A. Correct.
MS. GOOTT: Object -- I'm going to object to -- unless we have an agreement, if we could, Charlie, going forward, that when you use the term "partnership" without the caveat that it's not a

real partnership, then I'm not going to object. But can we have that understanding?

MR. SHELTON: Yeah, absolutely. And in fact, that was -- that's my intention. I appreciate the -- the -- the --

MS. GOOTT: Okay.

MR. SHELTON: -- clarity -- the clarity, Ms. Goott.

MS. GOOTT: Okay. Then you don't need to say the --

MR. SHELTON: I appreciate it. Thank you.

Yeah. I've been trying to think of a better term. I just haven't got there.

MS. GOOTT: How about relationship?

MR. SHELTON: That -- that may very well be the better term. But --

THE DEPONENT: How about co-counsel?

MR. SHELTON: Co-counsel --

MS. GOOTT: How about --

MR. SHELTON: -- relationship.

MS. GOOTT: How about relationship? None of us are the Judge, right?

MR. SHELTON: All right. All right.

THE DEPONENT: Well, it does say co-counsel includes blah, blah, blah.



MR. SHELTON: Let's --

THE DEPONENT: But I'm not the lawyer.

MR. SHELTON: I'll -- I'll stick with "relationship." That -- that term is fine with me.

THE DEPONENT: Okay.

BY MR. SHELTON:

**Q. So you met McClenny after the relationship had been formed between the three law firms.**

A. Yes.

**Q. Okay. Just for the sake of clarity, you used the term "CRM" earlier with respect to SmartAdvocate. Can you tell me what CRM stands for?**

A. I believe it's customer resource management.

**Q. Okay.**

A. The --

**Q. But it's a term that refers to the software, generally.**

A. Yes. The RM, speculating.

THE DEPONENT: You could object, Miriam.

MS. GOOTT: Thanks. I don't want to get in trouble.

MR. SHELTON: That really wasn't my intention. But if you're -- yeah, if -- it's been noted that it was speculation.



THE DEPONENT: Very good.

BY MR. SHELTON:

**Q. You indicated that the reason for entering into the three-law-firm relationship -- well, the -- sorry -- entering into a relationship with MMA in the first instance was because MMA had storm knowledge, they knew who to hire, they had a successful track record, and they knew what cases to take; is that right?**

A. Yes.

**Q. And during the existence of the three-law-firm relationship and the parties' performance under those agreements, did you find MMA to have the requisite storm knowledge, knowing who to hire, success rate, and knowing what cases to take?**

A. Yes.

**Q. Did MMA live up to the entirety of its agreement to share its co-counsel fees with you?**

A. I don't believe so in that there were cases that were settled that I didn't receive my co-counsel fee.

**Q. How do you know there were cases that were settled that you didn't receive the co-counsel fee on?**

A. Well, there was settlement reports that



showed how much money cases settled for, and I know that I never received checks for those amounts.

**Q. So you're able to -- when you were able to access the settlement report, you were able to review it and compare it to the money that you did receive; is that correct?**

A. Yes.

**Q. And you've -- and you identified that there were gaps between what you should have received and what you did receive?**

A. Yes.

**Q. What about with respect to Galindo? Do you believe that MMA paid Galindo everything it was entitled to under the --**

MS. GOOTT: I --

MR. SHELTON: Just let me just finish real quick.

BY MR. SHELTON:

**Q. -- under the -- pursuant to the relationship and the retainer agreements?**

MS. GOOTT: Object; foundation; calls for speculation.

If you're asking -- I just want to make sure. You're asking if he knows what Galindo received?

MR. SHELTON: No. I'm asking not the -- not whether or not Galindo actually received something; whether or not he knows if MMA paid it -- slightly --

MS. GOOTT: Oh, yeah.

MR. SHELTON: -- slightly --

MS. GOOTT: Absolutely. Objection; calls for speculation; and foundation of what MMA did.

THE DEPONENT: So here's what I do know, is that I know that MMA did write some checks to Galindo Law Firm. I'm not sure how much they wrote, but I do know there was a check or two that was written to Galindo Law Firm during the -- the time frame.

BY MR. SHELTON:

**Q. So you -- you know that some money went to Galindo. But are you -- but do you know that all money that should have been paid to Galindo was paid or no?**

A. I don't --

MS. GOOTT: Objection; assumes facts not in evidence; foundation; calls for speculation.

THE DEPONENT: Right. So what I know is that there are many cases that settled that I do not believe had been paid to the co-counsel in these



cases, including us and Galindo, for a variety of reasons. But I believe that there is still money that would be owed to co-counsel.

BY MR. SHELTON:

**Q. Including Galindo Law Firm?**

A. Yes.

MS. GOOTT: Objection; calls for speculation; foundation.

BY MR. SHELTON:

**Q. You said for a variety of reasons. You mentioned earlier a review of the settlement report and identifying gaps as being one of those reasons, correct?**

A. Can you say it again? I'm sorry.

**Q. You said you believe that there were many cases were settled that co-counsel did not receive their fee and that you believe that for a variety of reasons. You had mentioned earlier the -- reviewing the settlement report helped you identify some gaps between what was settled and what was paid. Is that one of the variety of reasons?**

A. That was -- it -- that's not a reason. The -- the -- the settlement report just shows to me that I know that there were cases settled. And if you look at the amounts that were owed to the



various firms, I know for certain that KKTM -- KKTL wasn't paid all of the fees that they were owed.

And one of the reasons I was -- will say is that I -- I would call it like trap cash or locked of cash, is that there was a significant amount of checks that were encumbered. These are cases that there was a mortgage on the -- the mortgagor was a lienholder on the -- on the check. And so -- and we're talking -- that -- that's a significant amount of money where, you know, tens of millions of dollars where that money we never got paid on because there was a lien on it.

But I also know there were other cases settled. And there was ACV checks that we should have got paid on as well, too. And the -- those hadn't been paid off.

THE REPORTER: What --

BY MR. SHELTON:

**Q. ACV?**

A. ACV.

**Q. Can you -- what is that?**

A. I don't know what it stands for. But what I do know is that it's like a temporary check that is given by the insurance company to the plaintiff. That check is often used for, you know, tarping your



house, or something like that, so secondary damage would not occur. It's a way to protect your house, and you use that money, typically, to do some -- some type of fixing so, by the time you get your big check to restore your entire house, it's not much worse.

**Q. Let's talk about the trapped cash. That was interesting. You said that there was tens of millions of dollars in trapped cash?**

A. I call it trapped cash because this is money where -- like say you settle a case for a hundred grand. The insurance company will write a check for 50 grand that's unencumbered and 50 grand that's encumbered by a mortgage. And so you must get the mortgagor to release their lien in the $50,000 that's encumbered.

And -- and so there's a lot of money that's what I would call encumbered, meaning that you cannot disburse that cash out to the -- potentially the claimant -- well, actually, definitely the claimant, the law firm, appraisers, things like that.

**Q. If $100,000, to use that example, comes in -- and for the sake of this question, let's just assume expenses are zero somehow magically -- the --**

Page 86

and we're in pre-suit, okay? Actually, let's use easier math. Let's say it's post-suit. We've got a filed lawsuit.

So I'm looking back at Exhibit 1. Let me pull it up.

And I see that the agreement has 33.33 percent if it's pre-suit resolution; is that correct?

A. That's correct.

Q. Okay. And then I see 40 percent if it's post-suit, correct?

A. Correct.

Q. That's the -- that's the attorney's fees -- just to make sure we're all on the same page, if $100,000 comes in from an insurance company, let's just say that's the final resolution. There's nothing else remaining. It's 100 percent, you know, full satisfaction of the claim. If that $100,000 comes in, it could be payable to a number of people, right? The property owner, the mortgage company, any other lienholders or interest holders, right?

A. Yes.

Q. The attorney's fee, the 40 percent, where does that fit into that $100,000?

A. It's a priority lien, so the attorney fees

Page 87

on that would be post-suit. We're talking about it would be 40 percent, or 40 grand.

Q. Okay. So you just take the -- the gross recovery -- or it could be called a net recovery, depending on where -- where you're at in the process -- but you take the gross recovery from the insurance company. And 40 percent, you get a $40,000 attorney's fee, correct?

A. Correct.

Q. Okay. And then we apply the calculations that are at the bottom of Footnote -- or sorry -- that are in Footnote 1 at the bottom of page 1 of the retainer agreement, correct?

A. Correct.

Q. To determine to whom the money should go. And again, this is assuming for now that the expenses are zero. But that's how that would work, right?

A. Correct.

Q. Okay.

MS. GOOTT: I'm going to object; best evidence rule; mischaracterizes the terms in this document.

BY MR. SHELTON:

Q. If there is a lienholder, does that change

Page 88

the 40 percent off the gross number?

A. No.

Q. And you used an example of a 50-50 check, 50,000 -- two checks, it sounds like, a $50,000 check that's unencumbered and another $50,000 check that's, to use your phrase, trapped cash. Your 40 percent is coming out of that total 100 grand, correct?

A. Yes.

Q. Would you take the $50,000 of unencumbered cash? And I say you. Strike that.

Do you -- would it be MMA that would take that check and put it into the bank, to your knowledge?

A. Yes.

Q. And presumably, they should pay the attorney's fees out of that unencumbered check or no?

MS. GOOTT: Objection; foundation; calls for speculation.

THE DEPONENT: Yeah. So that's a pretty good question. The -- it just depends on where we were at as far as in the litigation. So at one time, they could take -- you -- you treat it as a $100,000 settlement. And therefore, you would take

Page 89

40 grand from the single unencumbered check.

Then you have 10 grand remaining, right? And then you would pay expenses. In this case, we don't have any. But then that $10,000 would then go to the claimant.

And then what they would do, also, is take the encumbered check, which is 50 grand, right? And they would sign it and then give it back to either the client or the mortgagor. And I'm not exactly sure which one they would do.

BY MR. SHELTON:

Q. And when you're saying they would, the "they" is MMA; is that your -- is that what you mean by that?

A. Correct.

Q. Whose responsibility was it to get a resolution with the mortgage company or lienholder with respect to the encumbered checks?

A. MMA.

Q. Do you believe MMA performed on that responsibility?

A. I believe --

MS. GOOTT: Objection; calls for speculation; foundation.

THE DEPONENT: I believe they attempted

Page 90

to.

BY MR. SHELTON:

**Q. Do you believe they -- they did in some cases achieve success?**

A. In some cases, they achieved success, and then I know that they -- there were many, many, many, many cases that they hadn't gone further -- far along enough in the process, then were deciding whether to interplay the checks or file lawsuits, declaratory judgment lawsuits, against the mortgagors. I do -- they -- they -- they filed like 15 of those in federal court. I don't believe there was any resolve. And then I know they were building out a lien team to -- to resolve those.

**Q. A lien team, l-i-e-n -- lien team?**

A. Yes.

**Q. What is a lien team?**

A. A lien team is those responsible to negotiate with the mortgagors to release the trapped cash and/or to file declaratory judgments in federal court to have the court say release the attorney fees on the checks.

**Q. You said that MMA was building out a lien team. First of all, how do you know that they were building one?**

Page 91

A. Because I assisted them in building it out.

**Q. And when were they building it out?**

A. During Hurricane Ida.

**Q. Did they have the lien team, to your knowledge, in September of 2021?**

A. Certainly not to the scale that we needed in Hurricane Ida, Laura, Delta, Zeta.

**Q. Did they have any lien team, to your knowledge, in September of 2021?**

A. I don't know.

**Q. Do you know if they had any lien team of any size in 20- -- in October of 2021?**

MS. GOOTT: Objection; foundation; calls for speculation.

THE DEPONENT: I don't know.

BY MR. SHELTON:

**Q. When did they start building out a line team, to your knowledge?**

A. It would have been --

MS. GOOTT: Object as foundation other than if it was done with you.

THE DEPONENT: Yeah. So May of 2022 as far as Louisiana goes. They didn't have a lien team in Louisiana until the hurricanes hit. They may

Page 92

have had some folks working in -- in Texas. But you know, they weren't really litigating in Louisiana very much prior to all of these hurricanes.

BY MR. SHELTON:

**Q. May of 2022? So you're thinking that's when they started building out a lien team with respect to Louisiana?**

A. I believe that's right. Yeah.

**Q. And that's because you were helping with that process?**

A. Yes.

**Q. Let's talk about dates real fast. I just want to make sure because I think -- maybe I didn't take a note on it. But I thought you said that the relationship continued until there was increased scrutiny from Louisiana and that you thought that was in --**

A. March.

**Q. -- March of '22.**

A. Yes, which the question that you were asking me at the time was when the effective lease -- we signed up all the cases. However, we continued to work on those cases thereafter, of course. And so the lien team came after much of the intake had already occurred.

Page 93

And so it could have coincided with each other a little bit. But that was the reason that I would say that probably around like May the bulk of the cases had already started -- had already entered. And many, many, many checks were being received daily. I mean, hundreds -- sometimes hundreds of checks were being received daily.

**Q. Do you need a lien team with respect to mass tort cases, generally speaking?**

A. So in mass tort litigation, we typically hire a third-party company to handle liens with Medicare, TRICARE, Medicaid, and others. That is an industry standard to hire someone to do that.

**Q. Do you have any knowledge as to why it wasn't done -- or why MMA didn't do it in this case?**

A. Because I don't --

MS. GOOTT: Objection; calls for foundation; speculation.

THE DEPONENT: Yeah. I mean, I -- I know why in this litigation, is that there is no such company that does that, to my knowledge, is that the lien negotiators in my world, which is the pharmaceutical world, which is not MMA's world, is, in storm damage litigation, they don't have someone that negotiates with the mortgage companies. That

Page 94

would be the law firm itself.

MR. SHELTON: If you need to step out and let a colleague know about taking over the other cases, feel free to just let me know.

THE DEPONENT: Give it maybe 10 more minutes and then --

MR. SHELTON: Okay.

BY MR. SHELTON:

**Q. The document I'm sharing right now I'm going to label as Exhibit 2.**

(WHEREUPON, Exhibit 2 was marked for identification.)

MR. SHELTON: And for the folks on Zoom, I've also added it to the -- to the chat function on Zoom. I can also email it if you want, but I think you can download it directly.

BY MR. SHELTON:

**Q. Have you seen this document before?**

A. I don't think so.

**Q. Okay. The reason I was saving expenses for last -- so I just want to make sure that I understand how they work. So just for the sake of expediency, this document purports to be an email. It looks like it was printed on March 20 -- March 5th, 2025, but it's for -- but it's an email dated**

Page 95

**January 26, 2023, at 4:51 from somebody named Phil Vottiero. And that's V-o-t-t-i-e-r-o. Do you know who that is?**

A. Yep.

MS. GOOTT: I'm going to -- hold on -- I'm going to object; hearsay; foundation; and -- and to the sidebar of reading a document that the witness is unfamiliar with.

BY MR. SHELTON:

**Q. Okay. Do you know who Phil Vottiero is?**

A. Yes.

**Q. Who is Phil Vottiero?**

A. He originally worked at Velawcity and then took a role at MMA as well, too.

**Q. Who is Velawcity?**

A. It was a marketing company that was used to get hurricane cases -- advertise for hurricane cases.

**Q. And is Velawcity spelled V-e-l-a-w-c-i-t-y?**

A. Yes.

**Q. Okay. Do you know in January -- in January 26 of 2023, do you know if Phil Vottiero was working for MMA or for Velawcity, if you know?**

A. So he was working for MMA.

Page 96

**Q. How do you know that?**

A. Because he has an MMA email address right here.

**Q. Have you met Phil Vottiero before?**

A. I have.

**Q. Okay. Who's Robert Higdon?**

A. Robert Higdon was like a -- he was like the main accountant guy at MMA during a time period.

**Q. How do you know he was an accountant at MMA?**

A. I worked with him a lot of times. And it always involved where to put a check and accounting information in MMA's SmartAdvocate system.

**Q. Okay. This email is from Phil Vottiero, and it's addressed to Robert Higdon, Cristobal Galindo, Zach Moseley, and William Huye; you see that?**

A. Yeah.

**Q. And it says, "Hey Cris." Do you understand that to be Cristobal Galindo?**

A. I do.

MS. GOOTT: Objection; foundation; calls for speculation.

BY MR. SHELTON:

**Q. Are you aware of any other Cris's to whom**

Page 97

**Phil Vottiero may have been communicating?**

MS. GOOTT: Objection; speculation; foundation.

THE DEPONENT: I -- I don't know of any others.

BY MR. SHELTON:

**Q. All right. It says thank you for taking the time to speak with us. Total amount owed: $1,266,690.85; do you see that?**

A. Yes.

MS. GOOTT: Objection; calls for hearsay; foundation.

BY MR. SHELTON:

**Q. It says, "Prior Payment: $197,749.69;" do you see that?**

A. Yes.

**Q. And it says, "Cost of filing fees: $24,750 (99 files);" do you see that?**

MS. GOOTT: Objection; relevance; foundation.

THE DEPONENT: Yes.

BY MR. SHELTON:

**Q. Then it says Cost of Estimator, 550,000 -- sorry -- $558,750 (447 Closed); do you see that?**

A. Yes.

Page 98

MS. GOOTT: Objection; relevance; foundation.
BY MR. SHELTON:
**Q. And then it says equals $492,441.16; do you see that?**
MS. GOOTT: Objection; relevance; foundation.
THE DEPONENT: Yes.
BY MR. SHELTON:
**Q. Okay. And then it says, "@Robert please send Cris a wire for $492,441.16. Thank you. Best regards, Phil;" do you see that?**
MS. GOOTT: Objection; relevance; foundation.
THE DEPONENT: Yes.
BY MR. SHELTON:
**Q. So this --**
THE VIDEOGRAPHER: If we could just --
MR. SHELTON: Oh, my apologies. Am I bumping it?
THE VIDEOGRAPHER: No, you're good.
BY MR. SHELTON:
**Q. This document seems to show that we've got a subtraction from the total amount owed to Cris of filing fees and the cost of an estimator, right?**

Page 99

MS. GOOTT: Objection; calls for speculation; foundation.
THE DEPONENT: Yes.
BY MR. SHELTON:
**Q. Okay. Is it your understanding of the agreement -- sorry -- the memorialization of the co-counsel fees that are contained in the retainer agreement between the partnership between MMA, Krause & Kinsman, and Galindo Law Firm, is it your understanding that expenses should be deducted before co-counsel fees are paid?**
MS. GOOTT: Objection; assumes facts not in evidence; best evidence rule --
THE DEPONENT: Yeah. So --
MS. GOOTT: -- and hear --
THE DEPONENT: Sorry. So I know what it pertains to KKTL is that I know that we were to receive 12.5 percent of the gross attorney fee. It didn't matter of the filing fees, or whatever the expenses were in the case. However, there could have been definitely a different agreement between MMA and Galindo within that arrangement. I don't know.
BY MR. SHELTON:
**Q. There may have been a separate -- a**

Page 100

**separate agreement that you're unaware of; is that --**
A. Correct.
MS. GOOTT: Objection --
MR. SHELTON: Okay.
MS. GOOTT: -- sidebar.
THE DEPONENT: Correct.
BY MR. SHELTON:
**Q. But your understanding that Krause & Kinsman was to receive money from the gross attorney's fees without deducting expenses, is that understanding based on Footnote 1 from the retainer agreement?**
A. Yes. And also just I know that's what it was supposed to be.
**Q. How do you know? If it's not in writing, how do you know?**
A. You know, just -- it may not have been in writing, but I'm -- I'm sure that's what it was supposed to be. Perhaps it should have been in writing. But the -- that's what it was supposed to be.
And it really doesn't matter, right, if you think about it, is that --
MS. GOOTT: I'm going to -- I'm going to

Page 101

object. There's no question pending.
BY MR. SHELTON:
**Q. Do you have any additional thoughts, Mr. -- Mr. Krause?**
A. Yeah. I was just thinking, to the actual math, it doesn't really matter, right? So if you have a case that settles for 100 grand and then you have costs and other expenses that are borne by the client, then it's coming -- your attorney fees are coming off the gross anyway, so -- right?
Look, if you're doing it case by case and you're getting paid case by case, if you have a case that settles for 100 grand, there's $40,000 in attorney fees and, say, $2,000 in appraisal cost, then what happens is you go $100,000. 2,000 goes to whomever paid for the appraisal cost and whatever the agreement was. And then leftover are the attorney fees. So it shouldn't matter.
Now, as far as like what the attorney fees goes, it doesn't -- you don't get like a bonus for paying for the expenses. You just get reimbursed back if you paid for them, if that's what the agreement was. So it doesn't matter to me because I didn't pay for anything, the expenses.
**Q. Based on your recitation of what the past**

Page 102

**course of conduct with respect to the relationship was, it sounds like you -- your understanding was that MMA was handling most of the case expenses, distinct from marketing expenses and any expenses you may have incurred with respect to SmartAdvocate. But MMA was handling the case expenses, to your knowledge, right?**
A. Yes.
**Q. Okay. And by case expenses, just to put little tighter brackets around that, you're referring to hiring of an appraiser, correct?**
A. Yes.
**Q. Litigation staff, correct?**
A. I view case expenses in -- if we're looking at the term of the -- you know, the -- the contract that we're looking at, case expenses are hard costs. So that's going to be filing fees, appraisers, perhaps transportation for the clients, deposition fees, videographer fees. Hard costs in litigation is what I call case expenses.
**Q. And your understanding was that MMA was the one that was handling that during the pendency of cases, correct?**
A. Yes, is what I had thought. But also, Galindo could have handled it, and I would have had

Page 103

no idea.
**Q. Are you aware of any efforts to deduct from your payment of co-counsel fees expenses?**
A. No.
MR. SHELTON: Can we go off the record one moment?
THE VIDEOGRAPHER: Sure. Stand by.
We are off the record. The time is 12:47:12.
(WHEREUPON, a recess was taken.)
THE VIDEOGRAPHER: Okay. We are back on the record. The time is 12:50:20.
BY MR. SHELTON:
**Q. The document that I've shared with you now -- and it's the same as what's up on the screen -- I'm going to mark as Exhibit 3.**
(WHEREUPON, Exhibit 3 was marked for identification.)
MR. SHELTON: I've also handed it to the court reporter.
And for those on Zoom, I have also dropped it in the chat if you wish to download a copy for yourself.
BY MR. SHELTON:
**Q. Have you seen this document before?**

Page 104

A. Yes.
**Q. Can you -- or, well, can you tell me what it is?**
A. Yeah. Or perhaps not this exact document, but I've seen a checks received report about 8,000 times. This is a report in SmartAdvocate that was created to highlight a case. And it dictates whether or not a case is settled, whether or not a check is encumbered, how much the check was for, who were the co-counsel on the check, the check number, the date the check was written by the insurance company, the date that the check was entered into SmartAdvocate, and the client that the check pertained to, whether or not the check was due to an ACV or due to a mediation.
But yeah, I've seen this a lot of times. It's a SmartAdvocate report that was created. And you could run whenever you need to determine what checks pertain to a law firm or a client.
**Q. Okay. In the first column -- I'll make this a little bigger for everybody. I may have actually made it worse.**
**All right. The first column, going from left to right, I see Case Number, and then I see a series of numbers. What does -- what do those**

Page 105

**numbers represent?**
MS. GOOTT: Objection; calls for speculation; foundation of this document has not been laid; relevance.
THE DEPONENT: So the check -- or excuse me -- the case number, which is on the lefthand column, the first column, is every case number pertains to a client. So when a case is created in SmartAdvocate, a case number is given to that client.
BY MR. SHELTON:
**Q. Okay. So this isn't a case number referring to litigation. This is an internal case number?**
MS. GOOTT: Objection; calls for speculation; foundation.
THE DEPONENT: Yes. This is an internal case number that is to be used to reference that client. It's much easier to say 2110447 than John Smith because there could be 15 John Smiths inside SmartAdvocate, and there could be 15 different people with 15 different addresses. So it's much easier to just call a client 2100447.
BY MR. SHELTON:
**Q. And that case number, or client number,**

Page 106

**that's -- it sounds like that's established when the API transmits the information from Galindo Law Firm to MMA; is that correct?**
A. Correct.
**Q. Okay. The rest of the column -- so I'm just going to -- so we've got a check amount, check creation date, check number -- just those three columns, just -- where does the information come from to fill those in?**
MS. GOOTT: Objection; calls for speculation; foundation.
THE DEPONENT: So a check is received by MMA at their office in Houston. Once that check is received, an employee writes in the amount the check is. So in this case in the first one is $21,985.
And then you have the check creation date. That is the date that the check was actually entered into the SmartAdvocate system.
And then you have the check number, which is just the number that is printed on the actual check itself that was received by MMA.
BY MR. SHELTON:
**Q. The check creation date, that's not the date that the check is issued; that's the date it's checked into the SmartAdvocate system; is that your**

Page 107

**understanding?**
A. That's right.
**Q. And how do --**
A. There's -- there would be -- there's a way to run this report, and I don't see it right now. There's a way to run this report where it shows the actual date that the check was issued by the insurance company that would be printed on the check. However, I just know the check creation date is the date that it was -- when it was entered in the MMA system.
**Q. And how do you know that?**
A. Because I helped design this report.
**Q. Is that just how that field operates?**
A. Yep. Yes.
**Q. Then I see Check Type. I see Encumbered and Not Encumbered. Who -- who makes the determination -- well, let me back up.**
**Is that -- Encumbered or Not Encumbered, is that a human that's entering that information?**
A. Yes.
**Q. And who -- or how are they making that determination?**
A. They're --
MS. GOOTT: Objection; calls for

Page 108

speculation; foundation.
MR. SHELTON: It's also a form, probably. Let me -- let me rephrase.
BY MR. SHELTON:
**Q. How -- well, who would make that determination as to whether it's encumbered or unencumbered?**
A. An employee at MMA would look at the check, and they would see whether or not it had a mortgage company listed on the check. If there was a mortgage company listed on the check, then it's very simple. You know that the check is encumbered.
**Q. Okay. I think the next column is self-explanatory, the settlement plaintiff. The settlement amount, why do we need a column for check amount and another column for settlement amount?**
A. Yeah, good question. So I'll -- you -- I'll give you an example. You could go -- thank you -- if you go to the second page and if you look at [redacted], you could see that [redacted], her case settled for [redacted]. And you could see that it settled in mediation, which is pretty clear because this says Mediation.
And then you look at the three checks that she received. So she received three checks. She

Page 109

may settle the case for [redacted], but she received a case -- excuse me -- a settlement check for [redacted]. And as you can see, there are three different checks because you look at the check numbers. [redacted]. So there are three checks associated with this individual, and you know that the case settled at mediation for [redacted]. And if they don't, that means you're missing a check.
**Q. And the attorney's fees is calculated off the [redacted]?**
A. Yes.
MS. GOOTT: Objection; calls for speculation; foundation.
THE DEPONENT: Yes.
BY MR. SHELTON:
**Q. Do you know what the -- going two columns over to the right, we have Amount Distributed. Do you know what that column is?**
MS. GOOTT: Objection asked and answered; never seen this document; foundation.
THE DEPONENT: So the Amount Distributed -- here's what I could say about the Amount Distributed. It was a column that was supposed to

Page 110

work but didn't work very well yet. To be completely honest, I think it's a -- I know what it was supposed to do, but based on these numbers, I could tell you that -- and I remember working on it and such. But it's -- it's not really a -- something that you should rely on.
BY MR. SHELTON:
**Q. Okay. The next column says Paid Advertisement. What is that?**
A. So Paid Advertisement is like a key almost for a case. So Galindo Law, MMA, Storm Damage 1, we know means internally -- or MMA -- MMA knows internally that Galindo is supposed to receive X percentage. In this case, it would be 50 percent to Galindo Law Firm, 12.5 percent to Krause & Kinsman Trial Lawyers, LLP, and 37 percent to MMA.
And then if you had a different Paid Advertisement tab, it means that it could be a different referral partner not involving MMA. It could be a referral that is from KKTL to MMA that doesn't involve Galindo. And the fee splits would be different.
And therefore, when the checks get written, either Galindo would get paid if Paid Advertisement was associated with that case.

Page 111

**Q. Did that column work as intended?**
A. Yes.
**Q. Did you -- just to make sure, you said if it -- it could -- there could be a different entity in that paid advertisement. Then you said it wouldn't -- it didn't have anything to do with MMA. Did you mean Galindo, or did you mean MMA?**
A. Apologies. I meant Galindo Law Firm. So as an example, MMA and KKTL had cases together that did not involve Galindo at all. And therefore, the paid advertisement would be written as something different, not Galindo Law, MMA (Storm Damage) R1.
**Q. Okay. And then the final column, DB_ID, is that database ID?**
A. Yeah. So this s a database ID. We added this. And this would correspond with wherein QuickBooks the check would lie. So for example, every CRM accounting system, or whatever, has a -- typically, an internal ID. And I do believe DB_ID is the internal QuickBooks ID with MMA's QuickBooks.
MR. SHELTON: And I apologize. I don't have a printout of the next document, but I'm sharing my screen in the -- I've also put it in Chat. And I will provide a copy later to the court reporter. I'm going to mark this as Exhibit 4.

Page 112

(WHEREUPON, Exhibit 4 was marked for identification.)
MR. SHELTON: And I'll just -- for identification purposes, this is filed in Case number 2503310, which is an adversary proceeding pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. I think it's this very case. It's Docket number 74-1. It was filed on June 16th, 2025. And it purports to be the declaration of John Zachary Moseley.
BY MR. SHELTON:
**Q. Have you seen this document before, Mr. Krause?**
A. I -- I have.
**Q. It's mercifully short. It's got nine paragraphs. If you could --**
MS. GOOTT: Object to the sidebar.
BY MR. SHELTON:
**Q. If you could, can you take a -- take a look at those nine, and I'll scroll as needed. And when you're done reviewing them, let me know.**
A. All right. I'm done.
**Q. Okay. The paragraphs in particular that I want to draw your attention to, paragraphs -- it's paragraph 6 -- it says I am unaware -- that's the**

Page 113

**declaration of John -- whoops; sorry -- it's the declaration of John Zachary Moseley -- I am unaware of any legal work performed by any attorney working for Cristobal M. Galindo, PC, for any client represented by MMA.**
**Then paragraph 7 says, "If an attorney at Cristobal M. Galindo, PC, had performed actual legal work on behalf of a client also represented by MMA, I would have actual knowledge of that fact." Do you see those two paragraphs?**
A. Yes.
**Q. Do you -- well, did Cristobal M. Galindo, PC, perform actual legal work on behalf of clients that were governed by this retainer agreement?**
A. Yes.
**Q. What kind of legal work, to your recollection, did they do?**
MS. GOOTT: Objection; calls for a legal conclusion.
THE DEPONENT: It would be the stuff that I had mentioned prior, which would be like -- it would be intaking a client. It would be finding clients that are missing.
So there was a missing report -- missing client report that we talked about a lot, which was

Page 114

when clients -- MMA couldn't find them, they would go into Galindo. And then Galindo would -- he would try to find those clients by doing skip traces and other things.

He also started like this check delivery process as well, too. I don't know how many checks were actually delivered to clients. But the idea was to like hand deliver the checks to clients after the case was settled in -- in hopes to bringing better client satisfaction.

Again, I'm not sure how many checks actually got delivered like that. But I do know that our -- there was an intention of Cris to do that.

I know Kori Westbrook at their firm, which is a lawyer, she would do -- handle a lot of client escalation complaints. And -- and yeah.

BY MR. SHELTON:

**Q. Is Kori -- is that K-o-r-i?**

A. I think so.

MR. SHELTON: Can we go off the record for a second?

THE VIDEOGRAPHER: Stand by. We are off the record. The time is 1:08:28.

(WHEREUPON, a recess was taken.)

Page 115

THE VIDEOGRAPHER: We are on the record. The time is 1:27:30.

BY MR. SHELTON:

**Q. During the period of performance under the retainer agreements, or attempted performance between the three law firms, are you aware of Galindo Law Firm having met with William Huye?**

A. Yes.

**Q. Okay. Do you know what about or how frequently?**

MS. GOOTT: Objection; foundation; calls for hearsay.

THE DEPONENT: I don't --

MS. GOOTT: Unless he was there. Then I -- then I will withdraw that.

THE DEPONENT: I don't know how frequently. The only thing I know is that at least one time I was asked to help run some reports prior to a meeting between William Huye and Galindo. Or maybe it was -- no, I think that's right. William Huye, Galindo, and maybe Zach -- I don't remember on that part. But I --

MR. SHELTON: Okay.

THE DEPONENT: -- know I was asked to run some reports prior to a meeting they were going to

Page 116

have.

BY MR. SHELTON:

**Q. Okay. And for the sake of clarity, when you're saying Galindo, you're referring to Cris Galindo, the individual, correct?**

A. Correct.

**Q. Okay. And are you aware of any meetings during the performance, or attempted performance, under these retainer agreements between Galindo and Moseley?**

MS. GOOTT: I'm sorry. I couldn't hear you.

BY MR. SHELTON:

**Q. Are you aware of any meetings between Galindo and Moseley -- actually, let me -- I'll rephrase the question anyway.**

**Are you aware of any meetings between Galindo and Moseley regarding performance under this retainer agreement?**

MS. GOOTT: Objection; calls for hearsay; foundation; speculation; unless he was there.

THE DEPONENT: I know they met on a couple occasions, but I do not know what they discussed.

BY MR. SHELTON:

**Q. Did you ever meet with Galindo prior to -- strike that.**

Page 117

**Did you ever meet with Galindo regarding MMA's performance under the retainer agreements?**

A. Yes.

**Q. Okay. When?**

A. I don't recall.

**Q. Did K&K, Galindo, and MMA ever have a joint meeting to discuss performance under the retainer agreements?**

A. KKTL and MMA met quite often. I mean, we met every day, basically, every other day because we were working together on these cases, right? And we had met down in the Houston office a number of times to whiteboard out the systems, process, procedures, the flow of the cases, the APIs, the status changes, the text messages, the -- all of those things. We met a number of times down in Texas. And then, obviously, we met on Zoom -- I don't know -- so many times, too many times.

**Q. Did any of those meetings pertain to any alleged failures by MMA to perform under the retainer agreement, particularly with respect to its payment of co-counsel fees?**

A. What I would say is that there were Zoom meetings that we had discussing that we wanted to

Page 118

get paid because cases were getting settled and we wanted our money.

**Q. And when you say we wanted to get paid, is that just KKTL?**

A. I was only concerned about KKTL at the time. It wasn't my responsibility for -- to issue checks. I wasn't in charge of writing checks. I wasn't in charge of QuickBooks. I wasn't in charge of any of that. That was not me whatsoever. I didn't have access to the QuickBooks account or anything like that. I didn't have check-writing capability. I didn't have any of that. And so I was really only concerned with KKTL getting paid.

**Q. Do you know when this -- do you know when MMA filed for bankruptcy?**

A. I believe we're on the year anniversary, or so.

**Q. Prior to MMA filing bankruptcy, had MMA or Moseley individually ever informed you that they believe that Galindo Law Firm should not be paid under the co-counsel agreements?**

A. No.

**Q. Prior to MMA filing for bankruptcy, did -- sorry, yeah -- did -- did MMA or Moseley, individually, ever tell you that Galindo Law Firm**

Page 119

**had failed to perform under the co-counsel agreements?**

MS. GOOTT: Objection; calls for hearsay.

THE DEPONENT: No.

BY MR. SHELTON:

**Q. Do you have currently, or have you ever had, any issues with GLF's performance under the co-counsel agreement or the retainer -- or sorry -- the retainer agreements?**

A. In the Louisiana cases, no.

**Q. Prior to MMA filing bankruptcy, did MMA or Mr. Moseley, individually, ever tell you that they thought Galindo Law Firm deserved to not be paid?**

A. That was never discussed.

**Q. Do you have any opposition to Galindo Law Firm being paid --**

MS. GOOTT: Objection --

BY MR. SHELTON:

**Q. -- under the --**

MS. GOOTT: -- relevance.

BY MR. SHELTON:

**Q. -- under the retainer agreements and --**

MS. GOOTT: Objection; relevance.

THE DEPONENT: I have no problem with Galindo getting paid.

Page 120

BY MR. SHELTON:

**Q. Are you aware of whether or not Zach Moseley handled litigation of the cases that were signed up under the retainer agreements whether he handled them personally?**

A. I don't -- if you're talking about Zach Moseley himself personally --

**Q. I am.**

A. -- I do not think so because he's not licensed in Louisiana.

**Q. What about Texas, Mississippi, and Florida?**

MS. GOOTT: Objection; foundation; calls for speculation.

THE DEPONENT: Personally, I don't think Zach -- well, he couldn't have handled any of the other cases personally because he's not licensed anywhere but Texas. However, the Texas cases -- I don't think he handled like an individual file. He perhaps gave guidance to some of his lawyers to -- to help handle them. But I don't believe Zach was handling individual cases.

BY MR. SHELTON:

**Q. What did you understand Zach Moseley's role to be individually --**

Page 121

MS. GOOTT: Objection --

BY MR. SHELTON:

**Q. -- in --**

MS. GOOTT: -- vague.

BY MR. SHELTON:

**Q. -- in response to these -- sorry -- in performance under these retainer agreements?**

MS. GOOTT: Objection; assumes facts not in evidence; relevance. This agreement is not with Zach Moseley.

THE DEPONENT: Yeah, could -- would you mind asking the question again?

BY MR. SHELTON:

**Q. Sure. Actually, I'll just -- I'll just withdraw that question anyway.**

**Did -- did MMA ever cut off your access to SmartAdvocate?**

A. They -- yeah. So I stopped getting access. I don't remember at what time. But I -- access was stopped at some sort -- some point in time.

**Q. Do you know if they cut off access to Galindo Law Firm as well?**

A. I --

MS. GOOTT: Objection; calls for

Page 122

speculation; foundation.
THE DEPONENT: To my knowledge, Galindo Law Firm never had access to SmartAdvocate.
BY MR. SHELTON:
**Q. Okay. Do you know why your access was cut off?**
A. There was a lot going on in Louisiana. There was -- you know, we were talking about the scrutiny that was happening. And so MMA had -- was -- was kind of dealing with all that scrutiny. And our relationship -- that's what we're using -- kind of severed at that point and so did the access to SmartAdvocate.
**Q. I'm going to go back to Exhibit 3. One of the questions I didn't ask you about -- I see in the -- on the second column --**
MR. SHELTON: Whoops, my apologies for those on Zoom. One moment.
BY MR. SHELTON:
**Q. All right. The second column, I see a dollar amount that's $26,771,954.62; do you see that?**
A. Yes.
**Q. What does that number represent?**
MS. GOOTT: Objection; calls for

Page 123

speculation; foundation. He already testified he's never seen this document.
THE DEPONENT: So I could tell you that this is a check received report. It says there are 1,750 rows that are within this document. But it actually says records, and records means cases. So there's 1,750 cases within this report, of which there are -- actually, scratch that. I -- I need to say this better.
There are 1,750 records. Each record is a check that was received by MMA. And in this report, which I only have, you know, these pages that I'm looking at right now, but within this report, if you add up the -- all of the records, they equal $26,771,954.62.
BY MR. SHELTON:
**Q. So these two pages are not the full report; that's your understanding?**
A. I know it's not --
MS. GOOTT: Objection; calls for speculation; and foundation.
THE DEPONENT: I know it's not the full report because this says there are 1,750 records. And this is approximately 30 records. Each row is a record.

Page 124

BY MR. SHELTON:
**Q. Okay. But the 26.7 million, you're indicating, is the total of all checks that are captured by this report; is that correct?**
A. Yes.
MS. GOOTT: Objection; assumes facts not in evidence; calls for speculation; foundation.
BY MR. SHELTON:
**Q. Did you receive 12.5 percent of $26.7 million, Mr. Krause?**
A. No.
**Q. But in fact, we can't do that math that way, right, because we've got to figure out the attorney's fees applicable to the 26.7 million.**
MS. GOOTT: Objection; assumes facts not in evidence.
THE DEPONENT: Yes. But I did that math in my head where I said 26 million times 0.33 is approximately $8 million. What's 12 percent of $8 million? I know that I didn't receive that much.
BY MR. SHELTON:
**Q. 12 percent of 8 million is 960,000, I'm pretty sure.**
A. That's good math. This is -- well, I -- I potentially received that much. However, I was also

Page 125

on 8,000 other cases as well, too. So --
**Q. Understood. Okay. Okay. Because there's a whole 'nother universe of relationships out there that we haven't been discussing at this deposition between you and MMA; is that correct?**
A. Yes.
**Q. Okay. And so yeah, then that's -- then that's it. There's no -- there's -- that's sidebar. Sorry.**
**You indicated that the column labeled as Not Distributed didn't work, but you know what it's supposed to do. What was it supposed to do?**
A. What it was supposed to do is that, after the checks were distributed, meaning paid to the proper parties, that be at the expenses, the referral counsel, and MMA, then those should effectively match the check amount. So those would be -- those would cancel each other out. They should equal zero after the check had been written.
We hadn't gotten that far for it to matter yet. We -- that was the intention, though, when we were building all of the reports and QuickBooks to coincide with it.
**Q. After you entered into the relationship with MMA, did you find that MMA, in fact, has the**

Page 126

**capacity to handle the volume of cases that it was receiving from Galindo?**

MS. GOOTT: Objection; assumes facts not in evidence; calls for speculation; and vague.

THE DEPONENT: I believe that they needed to hire more people based on the volume not only from Galindo, but others.

BY MR. SHELTON:

**Q. Do you have in your experience any opinion of the proper ratio of cases to attorneys?**

MS. GOOTT: Objection; this is improper expert testimony. He's not here to give any opinions. He's a fact witness.

THE DEPONENT: I believe it differs based on the litigation. If you are running a Social Security Disability firm, you may be handling more files than someone that is handling wrongful death cases due to trucking accidents. And so while I know how to staff up to handle a pharmaceutical case, that looks a lot different than handling a Boy Scouts sexual abuse case.

So unfortunately, I can't really give you a ratio. I do know that they needed more attorneys here.

BY MR. SHELTON:

Page 127

**Q. Do you have any sense of the proper ratio for storm cases?**

MS. GOOTT: Objection; calls for speculation; and it's improper testimony from a fact witness.

THE DEPONENT: Yeah, I don't know. I -- I think that it just depends on how many would have settled and what stage of the litigation. The -- the answer would be more.

BY MR. SHELTON:

**Q. Well, if you think that -- so you think they were understaffed, it sounds like. With attorneys, in particular, or other staff?**

MS. GOOTT: Objection; calls for speculation; foundation.

THE DEPONENT: They were understaffed everywhere.

BY MR. SHELTON:

**Q. What makes you think that they were understaffed?**

MS. GOOTT: Objection; relevance; foundation.

THE DEPONENT: Well, they were receiving 150 checks a day. They were struggling to keep up with the writing of the checks to the clients. They

Page 128

needed a lien team that was robust to handle the encumbered checks.

They needed a contact center to be able to answer the phone calls. They needed lawyers to be able to do settlements and eventual litigation. They needed to hire a lot more folks.

This was a number of cases that I do not believe they had anticipated there would be this many. And so, you know, they were -- they were attempting to grow, but I don't think they grew fast enough, unfortunately.

BY MR. SHELTON:

**Q. Did they ever tell you -- are you aware of them ever having told Galindo to stop sending cases?**

A. No.

MS. GOOTT: Objection; calls for speculation.

THE DEPONENT: No.

MR. SHELTON: I'll pass the witness and reserve the balance of my time.

EXAMINATION

BY MS. GOOTT:

**Q. All right. Okay. Mr. Krause, can you hear me okay?**

A. Yes.

Page 129

**Q. Okay. And I apologize. I know you said this in the beginning. But refresh my memory. How long have you been practicing law?**

A. It feels like 50 years. The -- I think I've been practicing for like 12 years maybe. I think that's right.

**Q. Okay. And did I hear you right? You said that your firm has 100 employees. Is that -- did I hear that right -- roughly?**

A. Yeah. We've been as much as 175.

**Q. And roughly, I really -- just approximately -- it doesn't really matter -- how many of those are lawyers versus non-lawyers?**

A. Yeah. So it depends on during the time frame, but -- because we'll staff up uncertain projects. Like the Boy Scout litigation, I hired 40 lawyers.

**Q. How about now? How about now? Let's focus on now, just --**

A. Sure. Right now, I think I have 12 attorneys.

**Q. Twelve? And then the rest of the 100 are paralegals, clerks, receptionists?**

A. Yes. Accountants, accounting assts, software engineers.

Page 130

Q. Okay.
A. I have a COO, who has experience -- I hired her directly from SmartAdvocate; call center reps; a skip trace team; a medical record retrieval team; a nurse review team; a data entry team; a data review team; a data scientist; a data analyst. I have -- we have a very robust team.
Q. Okay. Is it fair to say that only the 12 attorneys actually practice law?
A. Correct.
Q. And only the 12 attorneys give legal advice, I presume.
A. You got it.
Q. Okay.
A. Were -- again, if I may say, 12 -- we're talking about right now because I --
Q. Yes.
A. Okay. Very good.
Q. Yeah. I -- I'm not trying -- I'm really not interested in the details of -- of that. I'm just trying to understand your kind of big-picture exposure with different types of stuff.
A. Yeah.
Q. So -- so, for example, you said you have a skip trace team?

Page 131

A. Indeed.
Q. And are those attorneys?
A. No.
Q. Does -- does an attorney -- does someone who does that type of skip tracing work need to be an attorney?
A. No.
Q. And in your experience, would you describe someone that does the skip tracing work as legal work?
A. This is where I -- I know this is going to be like a thing. But here's what I would say, is that --
Q. And I -- I -- I -- I don't want -- just that's what I want to understand, is that --
A. They're not --
Q. -- your -- they're not lawyers, right, the people that do the skip trace work for you?
A. No.
Q. And they don't need to be, right?
A. No.
Q. Okay. Bear with me. I am really just going through comments that you made that I wrote notes on so I don't have anything outside of that. So let's -- I'm just going to skip around a little

Page 132

bit.
A. Sure.
Q. Okay. Do you have anyone that works for you that delivers things, delivers checks?
A. No.
Q. And do you believe that someone that delivers checks requires any legal skill?
A. No.
Q. All right. Now, same question -- and -- and I'm going to -- I'm going to get to the "relationship" in a minute. But I'm just trying to understand your practice.
A. Sure.
Q. So if you have a client, generally speaking -- I'm not talking about the relationship -- you have a client that is frustrated because they didn't get a check, not -- not anything related to a legal issue or a proceeding or a deposition, just I thought I was getting a check and I didn't get it, where is my money situation, is that something in your current firm that would require discussion with an attorney?
A. So here's what I'll -- the important aspect is that every settlement that occurs must -- a lawyer must discuss that with the client.

Page 133

Q. Oh, no, I get that. I get that. I -- I --
A. Okay.
Q. I'm sorry if my question wasn't clear. I'm not talking about anything -- let -- let me -- let me jump back.
A. Yeah.
Q. You -- when we talked about -- maybe this would be easier if we just focus on Galindo and not your firm --
A. Okay.
Q. -- okay, because, really, that's all I want to talk about today, is Galindo.
When Mr. Shelton put Mr. Moseley's declaration in front of you, you testified that you believe that Galindo performed legal work for this relationship; do you remember that?
A. Yeah.
Q. And then he asked you to specify what that meant.
A. Yeah.
Q. And you listed certain examples.
A. Right.
Q. One of those -- and I just want to clarify because maybe certain things were just lumped in

Page 134

together as to everything they did as opposed to legal work because, obviously, now we know that you -- you clearly know what legal work is. So you would agree with me that using skip-tracing services is not required by a lawyer or is legal work, right?
A. I would agree that skip tracing does not require you to be a lawyer. You could be a skip tracer and not a lawyer
Q. Right. And in fact, the skip tracers that work for you are not attorneys, correct?
A. That is correct.
Q. All right. And you would also agree with me that delivering checks to clients, the actual delivery, is not something that would be required for a lawyer to do, right?
A. That is correct. And I should have said we do --
Q. I --
A. -- we do have a courier, by the way, at our office. I think I said we don't have someone -- we don't have someone that delivers checks, but we do have someone --
Q. Right.
A. -- that -- yeah. Just --
Q. That's okay. I shouldn't have -- I

Page 135

shouldn't have even gone down that route. I was trying to really get an understanding before I asked you these questions. But --
A. Got it.
Q. -- so -- so that I -- you know, if somebody asked me about skip tracing, I wouldn't know what they were talking about. So --
A. Okay.
Q. -- I was just making sure that's something that you're familiar with.
So -- so delivery of checks after a case has been settled and a check needs to be delivered, you would agree with me that's not legal work.
A. That does not require you to be a lawyer. It could be any --
Q. No, I -- I know. But you don't consider that to be legal work, delivering a check.
A. Here's where I'm struggling -- and I'll just be honest with you -- is that --
Q. Oh, no, no. I -- I just --
A. -- is a paralegal --
Q. Hold on. Hold on.
A. Yeah.
Q. Let me be -- I -- I want to -- I -- I don't want you to struggle. That means I didn't ask

Page 136

a good question.
A. Yeah.
Q. Do you believe that the physical delivery of a check to a client is legal work?
A. I don't think that's legal work, no.
Q. Okay. Now, let's -- let me ask you this. Earlier you testified that clients would call, and they would be hostile, I think you said, or upset because they wanted to know what was going on in their case, right?
A. Yeah.
Q. And I think you also testified that Galindo was responsible for those calls; is that right?
A. I said he was second tier triage, meaning that MMA --
Q. Oh, I'm sorry. That's right, that if -- oh, I thought you -- second tier for that if --
A. Yeah. So if it was a Galindo client and they were like super mad, it would go to MMA. They would try to appease them. And if it -- if they couldn't, then what would happen is it would go over to Kori Westbrook over at Galindo's office. And then she would try to make them happy and try to, you know, ease that tension that's happening between

Page 137

the law firm and the claimant.
Q. Okay. So let's -- let's back up. You said if it was a Galindo client, right?
A. Yeah.
Q. I -- what -- what does that distinction mean? Because what we're talking about -- what -- everything I'm asking you about, so we're clear, are these cases that you testified about that relate to the relationship between your firm, MMA, and Galindo, right?
A. Yes.
Q. So why did you make this clarification that, if it was a Galindo case, that it would then as a second tier go to Ms. Westbrook?
A. Right. So there is approximately, you know, whatever, 8,000 more cases that MMA represents with KKTL, right?
Q. And we're not talking about those.
A. But I mean, to answer your question, I need to. The -- so --
Q. Okay.
A. -- in those cases, let's say you've got a really ticked off client, right? In those cases, if the client's really, really mad, it's the responsibility of MMA to appease that client, make

them happy, and try to --
**Q. Right.**
A. -- weather that storm. And we obviously wouldn't send that client to Galindo because Galindo is not representing that client at all.
**Q. Okay. So earlier when Mr. Shelton was asking you questions, you never distinguished between the 8,000 additional cases. Were you sometimes talking about -- when you were answering those questions, were you sometimes -- for example, let me -- let me start over.**
**When Mr. Shelton was asking you about the process and what Galindo did and these second-tier calls, were your answers solely responsive to only the Galindo, MMA, and Krause & Kinsman cases, or did those answers also include information related to the additional cases that Galindo is not involved in?**
MR. SHELTON: Objection to form.
THE DEPONENT: I would clarify in my answers -- it -- which I think only happened like maybe once or twice, if I was talking about with the relationship as far as KKTL and MMA only. So all of my answers applied to the tripod, if you will --
MS. GOOTT: Okay.



THE DEPONENT: -- except for the very few times that I qualified the -- my answer by saying, hey, the Paid Advertisement tab, if it said something other than Galindo, that would dictate a different fee split. There I qualified my answer to --
MS. GOOTT: Got it.
THE DEPONENT: -- demonstrate that it was a different type of case.
BY MS. GOOTT:
**Q. Okay. So let's go back to this issue of, if there were cases that MMA could not handle a complaint, that Ms. Westbrook at Galindo would handle those complaints, right?**
A. Right.
**Q. What -- I'm sorry. I'm -- I'm jumping around a little bit.**
A. No problem.
**Q. Did you testify earlier that Galindo didn't have access to SmartAdvocate?**
A. No. He just had access to the -- to my knowledge, he had access -- I never gave him access -- he had access to the report. So --
**Q. Right.**
A. So we --



**Q. They were -- the --**
A. Go ahead.
**Q. He had access to reports. Did -- did he have access to the client files?**
A. No, not to my knowledge.
**Q. Did he -- well -- well, you -- you told Mr. Shelton affirmatively, not qualifying with not to your knowledge, but from -- you -- you seem to know what they have and what MMA has as it relates to the software that you're responsible for, right?**
A. Yep.
**Q. So Galindo didn't have access to SmartAdvocate, right?**
A. That's right.
**Q. And Galindo didn't have access to the client files.**
A. He did not.
**Q. So Galindo didn't have access to discovery, right?**
A. No.
**Q. Galindo wouldn't have had access to any case-level detail that wasn't in a report that was generated and sent, right?**
A. That's right.
**Q. And what -- and -- and Galindo had**



**specifically requested reports from you, right?**
A. Myself and MMA.
**Q. All -- all I'm asking is from you because that's what you would know about. So --**
MR. SHELTON: Objection to the sidebar.
BY MS. GOOTT:
**Q. -- those reports are reports related to how much -- how many cases have come in, right?**
A. Yes. That's one of them.
**Q. And if a case had settled --**
A. Yes.
**Q. -- right? Did any of those reports have case-specific detail in it?**
A. Yeah. There's another report that was pretty specific that would be like who the insurance company was, what was the -- the claim number with the insurance company, whether or not a letter of representation had been sent out to that insurance company, whether an adjuster has been assigned to the case, whom that --
**Q. Okay.**
A. -- adjuster was, whether there was an adjustment, the actual amount that came back from the adjuster. So if the adjuster came back saying there was $300,000 worth of damage, it would be

Page 142

within the -- that report as well, too. And then the status of the case of what stage it was would all be within that report.

**Q. Okay. So Galindo could monitor expenses, right?**

A. Yes.

**Q. And Galindo could monitor whether a case had settled?**

A. Yep.

**Q. And he could monitor how much money had come in.**

A. Yes.

**Q. But Galindo couldn't, for example, get on any software and have access to, to your knowledge, of a mediation statement, right?**

A. That's right.

**Q. All right. And that's because Galindo -- and when I say Galindo, I mean the Galindo Law Firm -- that's because Galindo didn't handle the actual cases in terms of they didn't file any lawsuits, to your knowledge, right?**

A. I --

MR. SHELTON: Objection to form.

THE DEPONENT: I mean, I think they ended up having to file a lot of lawsuits in the Western

Page 143

District, if I recall, like because MMA was having some issues. So I mean, they --

BY MS. GOOTT:

**Q. No. I -- we're -- we're -- we're -- we're talking -- if you need me to clarify, I thought we were talking about the same time period and the cases that you asked -- were asked about from Mr. Shelton because when you -- when you started your testimony --**

A. Yeah.

**Q. -- you specifically explained what the roles were.**

A. Right.

**Q. And you said -- and correct me if I'm wrong -- is that Galindo's role was that he brought in the cases, right?**

A. That's right.

**Q. Right?**

A. However --

**Q. And he brought in the cases and -- tell me this.**

A. Yeah.

**Q. Did Galindo use a third-party company to bring in those cases?**

A. I don't know.

Page 144

**Q. You don't know where the clients came from?**

A. It was not my responsibility.

**Q. Well, then why did you testify earlier that you knew that Galindo hired people to answer the calls?**

A. Because I do know. There was an intake sheet that came along with it. So where --

**Q. I didn't ask -- I didn't ask if you know about a sheet. He -- you testified that you knew that Galindo hired staff to ask questions. So is that testimony incorrect, or do you actually know that he hired staff?**

A. I get what you're saying. The -- that's a good question. I'm not exactly sure. I know that he got information from the clients. Did he hire a third party to do it? I don't know. Was it his own staff? I'm not exactly sure. The -- that's a good point.

I just know that he got a list of questions answered by the claimants. How he --

**Q. That's different. That's different. I'm not -- we're not --**

A. Yeah. Yeah. And I wasn't --

**Q. -- there yet.**

Page 145

A. -- trying to be -- I never really thought too much of the answer. Here's what I would say, is that I know he got the information from the clients somehow.

**Q. I'm not asking about the information. I'm -- I'm asking a very specific question.**

A. Yeah.

**Q. You entered into a relationship where his role, as you said, was to bring in these cases, right? And he was going to get a significant portion under the agreement that you said you agreed to, right, because he was bringing in those cases, right?**

A. Mm-hmm.

THE REPORTER: Is that a yes?

BY MS. GOOTT:

**Q. And you met -- that's yes, please? It'll be -- right? Can you affirmatively answer that for the court reporter?**

A. Yes.

**Q. Thank you. And are you telling me that you met with Galindo and MMA and Galindo's role was to bring in those cases, and you never asked him where are these cases coming from?**

A. So the only time that I had ever met with

Galindo after this relationship was formed, Zach and MMA formed their relationship. And then I was to provide the infrastructure within the SmartAdvocate and all this, which I did.

And then the only time that I had ever met with Galindo was very late into the -- the -- the time frame, which was when Galindo was upset about the amount of information that he was getting from MMA. So I never met with Cris or Galindo until much later on in the litigation process after he was frustrated with the amount of information that he was getting from MMA.

**Q. So you -- you drafted and participated in these agreements for the clients to sign without ever having met Galindo?**

A. Yes.

**Q. Or -- have you ever talked to him?**

A. No.

**Q. How many times over the course of this relationship between your firm, Galindo, and MMA did you speak to anyone at the Galindo Law Firm?**

A. Many times. I don't know. Probably -- I don't know -- 30 times. I don't know. A lot.

**Q. Thirty -- thirty times over the course of the whole relationship?**



A. Yeah.

**Q. How many times did you meet with anyone at the Galindo Law Firm during the course of this relationship?**

A. What do you consider meeting? In person?

**Q. What do you consider meeting?**

A. If we're talking about on the phone, it was quite frequently.

**Q. No. You already told me you talked to them 30 times. I'm asking: How many times did you physically meet with anyone at the Galindo Law Firm?**

A. And I told you the only person I physically met with was Cris, and that was two or three times.

**Q. Well, you -- you didn't tell me that. But --**

A. Yeah. We went into that.

**Q. So you --**

A. We -- we discussed --

**Q. -- you -- you --**

A. -- that I met with Cris two or three times very early on in this deposition. That's exactly what I said.

**Q. Oh. Oh, and maybe you said that to Shelton. I just hadn't asked you that.**



**So through the course of this whole relationship where these three firms are working together, you only met with Mr. Galindo two or three times and spoke on the phone approximately 30 times, right?**

A. Correct.

**Q. But your firm and MMA talked constantly, right?**

A. A lot.

**Q. Probably more than 30 times in one week, right?**

A. Definitely.

**Q. Because your firm and MMA were working these files and these client files on a day-to-day basis, right?**

A. We were working together on a day-to-day basis, yes.

**Q. And Galindo was not involved in any of the communications -- well, let me back up.**

**Those two to three times that you met Mr. Galindo, was Mr. Moseley there?**

A. No.

**Q. So you've never sat in a room with Mr. Galindo and Mr. Moseley.**

A. I don't think so.



**Q. Okay.**

A. I could be corrected on that, but I don't remember us all being --

**Q. You have no memory of it.**

A. No, I don't.

**Q. All right. So any testimony that you gave prior about discussions between Mr. Galindo and Mr. Moseley, you have no personal knowledge of that, right?**

A. The personal knowledge that I had is -- and I qualified it during my statements -- was, well, I knew they were meeting, and I was getting the reports ready for their meetings because, you know, Zach would ask me to get a settlement report ready, or -- or whatever report ready prior to when they were meeting, and I would.

And -- but I would -- and then I told you that I didn't know what they talked about, but I did what I was supposed to, which was provide the information for MMA.

**Q. Right. So somebody told you that the two of them were going to meet, asked you to prepare something for the meeting. But you don't have personal knowledge. You -- you as a lawyer know what personal knowledge is. You weren't there,**

Page 150

right? You didn't see it. You weren't -- you didn't hear it, right?
MR. SHELTON: Objection to --
BY MS. GOOTT:
Q. You just knew -- you just knew that it was -- might happen in the future, right?
MR. SHELTON: Objection to form. I'm not sure what the question is.
THE DEPONENT: So I do know what personal knowledge is. And --
MR. SHELTON: Thank you.
THE DEPONENT: -- I knew that they were going to have a meeting, and then I also know, based on what was told to me, that they had a meeting. But did I physically attend the meeting? No.
BY MS. GOOTT:
Q. Right. And you don't know what occurred in the meeting.
A. I do not.
Q. Okay. All right. And is your testimony today that you have no idea how any of these clients that are your clients came to Galindo?
A. No. I just know they did digital advertising. I'm sure of that.
Q. With who? With who?

Page 151

A. I don't know.
Q. So how do you know they did it?
A. Because I remember seeing the -- the ad that was being displayed. You know, you could see the ad being targeted. So I've seen the ad. But who was doing the ad, I have no idea.
Q. You know who Decibel is; don't you?
A. I do.
Q. And you know that Mr. Galindo has an interest in Decibel; don't you?
A. I do not.
Q. Do you think he does?
A. I don't know if he has an equity interest in Decibel. But I know he's used Decibel.
Q. And he used Decibel for these clients, for this relationship; didn't he?
A. I have no idea.
Q. What about Velawcity?
A. I don't think he used Velawcity.
Q. Why not?
A. Because --
Q. Why would you say you don't think he used Velawcity if you don't know who he used?
A. Well, because Zach had negotiated an exclusivity with Velawcity. And so I assume that

Page 152

they lived up to that exclusivity.
Q. But you don't know.
A. I would hope they did. But no, I don't know.
Q. You don't know. You're -- you're guessing.
A. I'm guessing.
Q. All right. So 6,000 clients come in, and -- and you testified that Galindo's role was to bring in those clients and that his staff -- but -- would ask questions. But we can clarify now that you don't know that it was his staff, correct?
A. That's right.
Q. So it could have been a third party that answered those phone calls, right?
A. It could have been.
Q. All right. So you have no personal knowledge one way or another if Galindo or his team were the ones that answered the phones to these clients, right?
A. Right.
Q. All right. And if you don't know who did it, you don't know what was asked of these clients; is that a fair assumption?
A. That's not a fair assumption.

Page 153

Q. Tell me why.
A. Because as I was saying, there's an intake sheet that comes, and --
Q. Okay.
A. -- it has information on it. And the information is the -- is the questions that are asked.
Q. Got it. So you -- you would have seen the result of whomever answered the phone, right?
A. Correct.
Q. Okay. That makes sense. And so whoever answered these calls asked specific questions, right? And those questions are questions that you described as do you have insurance, right?
A. Correct.
Q. Who is your insurance company; is that right?
A. Yep.
Q. Did you suffer damage in a hurricane?
A. Exactly.
Q. Are you represented by counsel?
A. Yep.
Q. All right. And you would -- would you -- would you agree with me that those questions are not legal questions?

Page 154

A. Those are not legal questions. Those are gateway questions, is what I'm going to call them.

**Q. I would agree with you. Intake questions so that someone else can determine whether or not this should become a client, right?**

A. That's right. I will say that I do believe --

**Q. And --**

A. -- it is the role of an attorney to determine, ultimately, if he could represent that client. That's a legal --

**Q. I --**

A. -- decision.

**Q. That's right.**

A. Yeah.

**Q. But the people answering the phone, whoever they were, right, were they attorneys?**

A. I -- I don't know.

**Q. No. You don't know one way or another.**

A. I don't.

**Q. Okay. So when this -- I'm sorry. What was the term you used to -- to describe those questions?**

A. I just called them gateway or threshold questions.

Page 155

**Q. Gateway. Gateway. Thank you.**

**And I think you then said this -- these gateway questions would then somehow be turned into a report or a form or some document?**

A. Yeah. I call it a questionnaire.

**Q. Right? That's a much better word. Thank you.**

**So you did a questionnaire. And then that questionnaire is sent to MMA, right?**

A. Via API, yes.

**Q. Right?**

A. Yep.

**Q. So -- oh, that's what you said -- API, right?**

A. Yep.

**Q. That information, that gateway information, would be passed to MMA, right?**

A. Right.

**Q. And we don't know who -- who created the gateway information, but we do know that it ended up with MMA, right?**

A. Right.

**Q. And then MMA would take that data, right, you said; is that right?**

A. That's right.

Page 156

**Q. And then MMA would create the retainer agreement, right?**

A. No.

**Q. Who create -- who -- who create -- who decided?**

A. So the way it worked, if I may, is that someone would call in and -- excuse me -- a client would call in. And yes, you are right. I don't know who answered the phone. They would ask the number of questions. And this would be someone -- they -- they would ask the questions, you know, do you have insurance, or whatever like that.

**Q. Right. The gateway questions?**

A. Yeah. And so it's kind of like a decision tree, right? If you don't have insurance, it's I'm really sorry, but we're not going to be able to represent you. Sorry. These we wouldn't be able to have any type of recovery.

And so these gateway questions, if you will, so long as they follow the correct decision tree, a retainer agreement would be sent out to the claimant. The claimant would then --

**Q. Who sent it?**

A. It would be Galindo that sent it.

**Q. How do you know that?**

Page 157

A. I guess I --

**Q. You don't know that; do you?**

A. What I know is that the cases came over from the Galindo Law Firm. How he did it, I don't know.

**Q. Okay. Well, I -- I don't want you to guess because a lot of questions from Mr. Shelton were just assumptions if you don't know what Galindo did, right?**

MR. SHELTON: Objection to form.

THE DEPONENT: Miriam, what's difficult --

BY MS. GOOTT:

**Q. Isn't that right?**

A. -- is that -- is a lot of this is like, in my opinion, technicalities, and I'm not aware of what you all are fighting about. But what I do know is that --

**Q. I -- I don't want you to -- I don't want you to wonder what we're fighting about. I just want you to listen to the question and answer it truthfully from your personal knowledge only.**

A. So I --

**Q. So when -- so let me ask the question again. When Mr. Shelton asked you specific questions about what Galindo did regarding his**

Page 158

intake role, you don't have any personal knowledge of that, correct?
A. No.
Q. Correct?
A. You heard me. I said no.
Q. Oh, you said no. That's confusing for the record. Are you disagreeing with me, or are you agreeing with me that you have no personal knowledge of Galindo's intake process?
A. I do not.
Q. All right. And so any questions that you answered earlier today regarding his intake procedures for the cases pursuant to this relationship, you did not answer that with personal knowledge but based on assumptions.
A. Here's how I'm going to answer that -- I'm not going to agree or disagree with that -- is that what I know is that a number of questions were answered by the claimants. That information then triggered a retainer agreement to be signed --
Q. But --
A. -- and then that API information was sent over to MMA. And that's what I know. Now, who -- whom --
MS. GOOTT: I'm going to object -- I'm

Page 159

going to object as non-responsive.
BY MS. GOOTT:
Q. I want you to listen to my question.
A. I'm not going to answer that as a yes or no.
Q. But you're --
A. And I'll just tell you that, Miriam.
Q. I'm going to -- listen --
A. So --
Q. Listen to my question.
A. It's fine.
Q. You have no personal knowledge of Galindo's practices in doing intake; isn't that true?
A. I don't know who answered the phone.
Q. That's right. You don't know if Galindo did it, correct?
A. Correct.
Q. You don't know if someone in his staff did it, right?
A. Correct. Correct.
Q. You don't know if he hired a third party to do it.
A. I do not know.
Q. No idea.

Page 160

A. No idea.
Q. All right. But you did testify -- so we've gone through the intake of Galindo's role. The next thing you said of Galindo's role was that, when clients were hard to find, they would locate them. That's the skip tracing, right?
A. That's right.
Q. And that's when you talked about changing the phone number so that clients would pick up, right?
A. Yeah. That was one of the variety of methods that you could do.
Q. And we've already discussed that searching for clients and locating clients is not, in your opinion at least, legal work, right?
A. It's part of legal representation, is what I've got to say.
Q. That's not what I asked you.
A. Yep.
Q. My question to you is -- I'm confirming your prior testimony --
A. Sure.
Q. -- that you agreed that the act of skip tracing or looking for clients does not require any legal work.

Page 161

MR. SHELTON: Objection to form.
THE DEPONENT: I said it doesn't require you being a lawyer.
BY MS. GOOTT:
Q. Correct. That's right. And in order to do legal work, you must be a lawyer, right?
A. Lawyers are the only ones that can do legal work.
Q. That's right.
A. But what I'm struggling with still -- and I will just say --
Q. Hold on. I -- I don't have a pending question.
A. All right. But I'm going to use it in the next question, so go ahead.
Q. How do you know what my next question is going to be? You're just going to -- you've already decided how you're going to answer?
A. Just go ahead --
MR. SHELTON: Objection to --
THE DEPONENT: -- and ask the --
MR. SHELTON: Objection to --
THE DEPONENT: -- question.
MR. SHELTON: -- form.
BY MS. GOOTT:

Page 162

Q. Have you already decided?
A. I'm going to say what I want to say in the next question, yeah, and so I'm going to tie it in. So go ahead.
Q. How old are you?
A. Forty.
Q. Did you tie it in there?
A. Object to relevance.
Q. You're not the lawyer. You don't get to make objections.
MR. FALK: This --
THE DEPONENT: Miriam --
MR. FALK: -- I'm going to object to relevance. Please, move on and ask your substantive questions.
THE DEPONENT: I'm a witness and --
BY MS. GOOTT:
Q. It's all -- I need you --
A. And Miriam, if you're --
Q. I --
A. -- going to bully me, yeah, that -- this is one of those things you would get Rodriguez on the phone. Look, I'm sitting --
Q. Would --
A. -- I'm sitting here --

Page 163

Q. Would you --
A. -- as a witness and --
Q. We can stop. Would you like to stop -- would your lawyer like to stop? I'm more than happy to get Judge Rodriguez on the phone and address this issue --
A. That I'm not being responsive?
Q. -- where you said --
A. I'm being responsive.
Q. -- I'm going to answer the question, I'm going to answer your question in the next one without knowing my question. Your job is to ask -- answer my questions. Your job is not to raise objections.
A. Go ahead.
Q. Thank you. All right.
And then the last thing you said regarding Galindo's legal role was that second tier -- on a second-tier level, he would talk to clients who were upset, right?
A. Yes.
Q. Were you ever part of those calls?
A. No.
Q. Did you ever listen to those calls?
A. No.

Page 164

Q. You ever hear a recording of those calls?
A. No.
Q. So you don't know if they actually happened, right?
A. I don't know.
Q. All right. But you -- you don't have any knowledge of Galindo filing any pleadings in any of these cases, right?
A. I do know that he had to file a lot of cases in the Western District.
Q. After the relationship was over, right?
A. Yes.
Q. Again, we're only talking about the same time period that Mr. Shelton talked to you about, while a relationship between these -- these three firms -- yours, MMA, and Galindo, right?
A. Got it.
Q. And during that time period, Galindo did not file pleadings for any of your clients, right?
A. No.
Q. All right. And he didn't attend any mediations for any of your clients, right?
A. Not to my knowledge.
Q. Didn't conduct discovery for your clients, right?

Page 165

MS. GOOTT: Objection to form.
THE DEPONENT: Not to my knowledge.
BY MS. GOOTT:
Q. All right. But to your knowledge, you do know that MMA -- and I'm just going to go through to confirm what you testified about earlier, is that you -- you do know that MMA was responsible for a -- you said the client would be assigned to MMA, who would work on the case, right?
A. That's right.
Q. And that MMA would select the appraiser.
A. That's right.
Q. And MMA would review that appraisal report.
A. Correct.
Q. And MMA would be the one to go to mediation, right?
A. That's right.
Q. And you're aware of Mr. Huye. I think you referenced him as the attorney in Louisiana working on these cases for MMA?
A. Indeed.
Q. And you, I think, believe he is a good lawyer?
A. William Huye is a good lawyer.

Page 166

Q. All right.
A. Good person.
Q. And if there were settlements reached in any of the cases, MMA was the one that drafted them, right?
A. Correct.
Q. And if settlement failed, MMA would be the one that would serve discovery and draft it, right?
A. Yep. They're supposed to.
Q. And if an offer was made after a failed mediation, that offer would have gone to MMA, correct?
A. Indeed.
Q. All right. And in fact, you testified that Galindo used a different system, right? It didn't have -- Galindo didn't have SmartAdvocate, right?
A. Correct.
Q. But you -- you don't even know what that system is, right?
A. I believe it's HubSpot.
Q. Well, why did you tell Mr. Shelton in your testimony that Galindo used a different system; I don't know what it is?
A. And then I said thereafter that I think

Page 167

it's HubSpot or some other one.
Q. Okay. So you don't know.
A. And which is what I told you. I said I think it's HubSpot.
Q. But you also think it might be a different company, right?
A. It could be.
Q. Could be. So you don't know.
A. I said I think.
Q. I'm not asking you what you think. I'm asking you: Do you know what system Galindo used for the cases in -- relevant to this relationship?
A. I think it's --
MR. FALK: Objection --
THE DEPONENT: -- HubSpot.
MR. FALK: -- asked and answered.
Ms. Goott, please -- please move on. You've asked this question about four times. Move on.
BY MS. GOOTT:
Q. I'm not -- okay. Answer my question because I didn't hear you then. My -- my question isn't what do you think. My question is: Isn't it true that you do not know what system Galindo used related to the cases as part of this relationship?

Page 168

A. I think it is HubSpot.
Q. I didn't ask what you think. I am asking you: Do you have personal knowledge -- under oath, do you know what system Galindo used?
A. Under oath, I --
MR. FALK: Objection --
THE DEPONENT: -- think it's HubSpot.
MR. FALK: -- asked and answered. Move on.
BY MS. GOOTT:
Q. I can't hear -- I can't hear you.
A. Under oath --
MR. FALK: It's -- I'm --
THE DEPONENT: -- and to the Judge --
MR. FALK: -- objecting --
MS. GOOTT: I heard --
THE DEPONENT: -- I think it's HubSpot.
MS. GOOTT: -- I heard your objection, and it's noted for the record.
BY MS. GOOTT:
Q. Answer my question.
A. Under oath and to the Judge, Judge Rodriguez, I think it is HubSpot.
Q. And what's the other one that you also believe that it might be?

Page 169

A. Hubstaff, HubSpot or Hubstaff. Or -- it's one of those two.
Q. One of those two. And so your testimony that you want to represent to the Court addressing the bankruptcy judge that you know -- you have personal knowledge -- as an attorney, you have personal knowledge of what system Galindo uses and simultaneously don't know which of the two it is? If that's your testimony, I'm moving on.
MR. SHELTON: Objection to form.
THE DEPONENT: Yeah. Turner, object to that.
MR. FALK: Objection to everything -- form; argumentative; asked and answered; just absolutely everything. And I'm glad to hear that we're moving on.
THE DEPONENT: Me, too.
BY MS. GOOTT:
Q. So you're not going to answer my question?
A. I think HubSpot is my answer because that is a --
Q. You think.
A. -- truthful, honest answer -- I'm talking -- under oath.
Q. Could be. Could be that; could be another

Page 170

**one, right?**
A. Could be. That's why I said I think.
**Q. That's right. And -- and therefore --**
A. You need to --
**Q. -- you do not --**
A. -- look up --
**Q. -- know.**
A. -- a definition of "think." I mean, my God, I'm not moving on. I mean, I -- you can move on from this. But that's my answer. I'm being truthful. I'm under oath. I'm answering your question. I think it's HubSpot.
So I don't know why this is such a big deal unless --
**Q. Because --**
A. -- it's just something --
**Q. -- what --**
A. -- that you have to be right. But I think --
**Q. No, it's --**
A. -- it's HubSpot.
**Q. -- it's not about -- it's -- I'm trying to understand. Your -- your testimony is based on personal knowledge. And my concern is that you don't know what that means because if you cannot say**

Page 171

**-- if you cannot tell me, I'm simply trying to understand if you have personal knowledge of what system this co-counsel in your agreement uses. And if you know, you don't say I think it's one or the other. You say I don't know. It could be one. It could be the other. But I have no personal knowledge.**
MR. SHELTON: Objection --
BY MS. GOOTT:
**Q. But if you don't want to answer it, the record will speak for itself.**
A. Sounds good.
MR. FALK: Objection. That's not --
MS. GOOTT: All right.
MR. FALK: -- that's not even a question.
MS. GOOTT: I didn't --
MR. FALK: Objection. There is no question posed. Objection to form. Objection; badgering. Objection; harassing the witness. Move on, Ms. Goott.
MS. GOOTT: Objection; everything.
BY MS. GOOTT:
**Q. All right. Let's go -- let's see what else we have here.**
**All right. You also testified that one of**

Page 172

**Galindo's -- oh, this might be the same thing -- the -- the missing client report, is that the skip tracing?**
A. So the -- Galindo would receive a report from MMA that was all of the clients that MMA was having trouble getting a hold of. And that would -- report would automatically go over via email in an Excel file to the -- daily or weekly.
And they would take that report. Galindo would take that report, and they were to skip trace and -- and/or try to get in touch with those clients.
**Q. Okay. I was just making sure that's the same thing. That's not anything different --**
A. No, there's not --
**Q. -- than what we already talked about.**
A. There's not a skip trace report, and there's not a missing client report. The missing client report would, hopefully, MMA -- or excuse me -- Galindo would do calling and skip tracing from that report.
**Q. Got it. I'm just making sure there wasn't some other work that was done by them that we didn't discuss.**
**Now, Mr. Shelton asked you about the**

Page 173

**benefit that you thought Galindo brought to this relationship, and I want to talk to you about that. And I believe your response was there was a benefit because of the potential attorney's fees, right?**
A. Indeed.
**Q. And if Galindo brings in -- well, let me back up.**
**If Galindo doesn't bring in clients, then there's no way to make money; is that essentially what you're saying? That's the benefit? Without a client, there is no agreement and, therefore, no means to make money.**
A. Yeah, that's right.
**Q. Okay. And would you agree with me that that is a financial benefit?**
A. Definitely, it's a financial benefit.
**Q. And -- and the fact that he brought in the -- in these cases to this relationship is why he was receiving a substantial fee.**
A. That -- yeah. That was a big reason, is that he was paying for the advertising and bringing in the clients for us to represent. And so, therefore, he got a -- you know, it was anticipated he would get a big fee. Yeah, that's right.
**Q. And -- and do you know who he was paying**

Exhibit 2.
THE DEPONENT: You mean Exhibit 2?
BY MS. GOOTT:
**Q. Oh, I'm sorry, Exhibit 2.**
A. Yep.
**Q. Now, this is -- when he first showed you this email, you testified that you've never seen this email before, correct?**
A. Correct.
**Q. And you would agree with me that you did not send this email, correct?**
A. I did not.
**Q. And you did not receive this email?**
A. I did not.
**Q. And so, every question that you answered about the contents of this email was not based on any personal knowledge, correct?**
A. Correct.
**Q. All right. Exhibit 3 is the report.**
A. Yep.
**Q. Same question. You answered Mr. Shelton's question that you had never seen that specific report before, correct?**
A. This specific report with this information, I have not seen.



**Q. That's all I'm saying. And I appreciate that you are very familiar with that type of report, right?**
A. Quite. I did years of work developing these reports for the data --
**Q. No -- no question. No one is going to know better than you what that report means, right?**
A. Amen to that.
**Q. But the specific Exhibit 3 that he put in front of you is not a report that you're familiar with the contents of?**
A. Indeed, you're right.
**Q. Okay. So you don't know if the numbers in this report are correct or incorrect?**
A. You have bigger problems if it's incorrect, but you're right. I do not -- I do not know if the information in this report is correct or not. I do not know.
**Q. Right. And you don't have access today to determining whether it is correct or incorrect, right?**
A. That's correct.
**Q. And you don't know who created this report?**
A. I do know that.



**Q. How can you look at this specific two pieces of paper and know who created it?**
A. Because this is an automatic report, so the report was set up to just automatically go out of the system. It was set up years ago, and it just automatically sends daily and daily and daily and daily all the time. So nobody really created -- yeah, someone created the report, but, like, the system just automatically generates it and sends it out.
**Q. Got it.**
A. Yeah.
**Q. It's just a computer-generated report. I got that.**
A. Yeah.
**Q. And that was a bad question on my part. You have no way of knowing who entered the information that resulted in this report, right?**
A. What I know is that, like -- right. So I know that there is a, like -- I know the person that was in charge of writing in the -- like, whether it was encumbered or not encumbered. I know the person who, you know, that --
**Q. How do you know that from looking at this piece of paper, who entered the information?**



A. I just know who was responsible at the law firm to do so.
**Q. And I get that. And I'm being very careful and specific.**
A. Okay.
**Q. I'm not asking you who was responsible at MMA for doing it. My question is: By you looking at this piece of paper in front of you that you've never seen before, you don't know who entered the information that generated this report?**
A. That's true.
**Q. Okay. And you don't know that it is a true and accurate report because you've never seen it before?**
A. I don't know.
**Q. It looks like it, right? It looks like a report that you've seen before, but you can't swear that it is because this is not something you created, right?**
A. That's right.
**Q. All right. And there's no question you weren't the one that put the information in the report.**
A. No. Absolutely not.
**Q. Okay. And you would agree with me that,**

Page 186

**in fact, whatever it is, in your opinion, is an incomplete report?**
A. It is an incomplete report.
**Q. Okay. And there's even a section in this report under amount distributed that you believe shouldn't even be relied on, right?**
A. Yeah. We -- that was a work in progress, is what I would call it.
**Q. So all of the testimony regarding this exhibit that Mr. Shelton asked you about, would you agree with me that that was not based on personal knowledge of the content of Exhibit 3, but of your understanding of what the form would provide?**
A. That's right. So I cannot say the information within this report -- you know, it is what it is on this piece of paper. I don't have any knowledge of it. What I know a lot about is, like, you know, how we created the report, why we created the report, who asked me to create the report, you know, how --
**Q. What about that report? You wouldn't know who asked to create that report because you've never seen that report.**
A. Yeah. This type of report, yeah, this type of report.

Page 187

**Q. Right. Got it.**
A. This report, no. The type of report, 100 percent.
**Q. So we can rely on your testimony regarding Exhibit 3 as what does this type of report provide?**
A. Yeah.
**Q. Got it. Okay.**
A. Yeah.
**Q. You testified that Galindo was involved in reviewing case reports that would come to them, which would have the status of a case, right?**
A. Yeah.
**Q. And that was a report that Galindo specifically requested that you guys provide?**
A. Yep. Yes.
**Q. And is it fair to say that this report let Galindo know the status of any particular case?**
A. Not specifically this report, but the combinations of the various reports that were sent to him would give him the status of the case, right? So this is only a check-receive report.
**Q. Okay.**
A. There's another report called a status report. There's another --
**Q. I'm sorry. That's my fault. I moved on**

Page 188

**to the status report question. I'm not looking at this exhibit anymore. Sorry. That's the problem of being remote.**
**And the purpose of a status report lets Galindo know what MMA is doing in the cases. Is that fair?**
A. Yes. That's right.
**Q. Receiving a status report doesn't require Galindo to then do any work?**
A. No, it does not.
**Q. Okay.**
A. Yeah. No, it does not.
**Q. And your firm had no involvement with the QuickBooks or access to MMA's QuickBooks or check writing or any of that, right?**
A. So as far as, like, the accounting part of it goes, we did not have access to QuickBooks. I didn't want access to QuickBooks. I worked in conjunction with their accounting folks. So, like, Robert Higdon was a name that was thrown out here. I helped him determine how to put things into SmartAdvocate. And then I worked on the integration between SmartAdvocate and QuickBooks, if that helps you.
**Q. Okay. That's helpful. You helped him --**

Page 189

**taught MMA how to integrate that information. But you, your firm, didn't have access to MMA's QuickBooks?**
A. Definitely not.
**Q. And they weren't -- and you weren't in charge of -- you had no check writing capability, right?**
A. I did not want it. That's right.
**Q. I got it. Now, Mr. Shelton asked you a question about whether or not you, your firm, had any concerns or issues with Galindo's performance. And you qualified your answer, and you said, "Well, not in Louisiana." What was the purpose of that qualification?**
A. Yeah. So because I'm unfamiliar with -- you know what, and perhaps I did qualify that. You're exactly right.
I'll tell you what I was thinking about. I think there were unrelated cases, which is -- you're going to tell me, "Adam, we're focusing on these cases." But there were some cases in Mississippi that didn't involve me. And I just was thinking in the back of my head that I know that MMA at one time had been complaining about those cases. But to be honest, I don't have very much knowledge

Page 190

on those.
**Q. Okay.**
A. And so, I was really talking -- I had that thing in the back of my head that was saying, "Well, I don't really know much about Mississippi. But in Louisiana, I felt like Galindo was, you know, just fine."
**Q. All right.**
A. So perhaps I shouldn't have qualified that because that was speculation.
**Q. Now you're making objections for me.**
**You testified that Zach, Mr. Moseley, could not handle any other cases because he is only licensed in Texas. Remember that testimony?**
A. Yeah.
**Q. Do you know where Mr. Moseley is only licensed?**
A. Texas.
**Q. How do you know that? How do you testify -- how do you believe that you have personal knowledge about somebody else, about where they're licensed?**
MR. FALK: Objection to form, argumentative.
THE DEPONENT: Yeah. I --

Page 191

BY MS. GOOTT:
**Q. Is your testimony still that you know that Mr. Moseley is only licensed in Texas?**
A. Yeah. I read on his website that he's licensed in Texas. I suppose he couldn't have -- I suppose he could have left some out. But --
**Q. So your source -- back to personal knowledge, you agree with me that personal knowledge doesn't come from reading somewhere. That's the opposite, right?**
A. No. I believe you could read stuff, and then that would be personal knowledge.
**Q. You do? That's really important. I need to make sure I understand that. Your testimony today is that you believe that if you read something, that gives you personal knowledge?**
A. It depends on what context.
MR. FALK: Objection to form.
BY MS. GOOTT:
**Q. So if you read something on a website, that gives you personal knowledge?**
A. Yeah.
MR. FALK: Objection to form.
BY MS. GOOTT:
**Q. I couldn't hear your answer.**

Page 192

A. My answer is yes.
**Q. And so, if you read something on a piece of paper that you didn't draft or you didn't receive, do you have personal knowledge then?**
MR. FALK: Objection to form.
THE DEPONENT: So I did receive it though. I looked up the website. I saw it. That gives me personal knowledge --
BY MS. GOOTT:
**Q. I'm asking --**
A. -- that's different.
**Q. -- a general question.**
A. But it's impossible, because right now, yes, I don't have personal knowledge of the contents of -- within here --
**Q. Correct.**
A. -- which is different -- which is different.
**Q. That is different.**
A. If I went and I looked up a website, and I saw that he had only licensed -- or it says licensed in Texas, then I have personal knowledge. It gives me personal knowledge under that scenario.
**Q. And does this website say he doesn't have a license anywhere else?**

Page 193

A. I recall it saying licensed in Texas. So it could --
**Q. Licensed in Texas only?**
A. So it could mean that he has licenses other places. You're right.
**Q. That's right. And that is -- I want to understand, because a lot of your testimony today is affirmative statements about things that you don't have personal knowledge about. For example, are you aware that Mr. Moseley is licensed in the state of Colorado?**
A. No idea.
**Q. All right. Mr. Shelton asked you, and you testified, that Mr. Moseley never told Galindo to stop sending him cases. Remember that testimony?**
A. I believe the question was, "Did he ever -- to your knowledge, did he ever ask Galindo to stop cases?" And I said, "No," I think is what it was, which was for me saying that I was unaware of Zach or anyone at MMA telling Galindo to stop sending cases, which is true. I don't know.
**Q. Okay. And so, that's what I'm trying to confirm, because the question is: Isn't it true that you don't know one way or another about any conversation between Mr. Moseley and Mr. Galindo**

Page 194

about sending cases or stopping to send cases, correct?
A. That is true. And I think that's how I testified.
**Q. All right. I just want to clarify. How involved were you with MMA's operations?**
A. Very.
**Q. And when you say "very," does that kind of go back to the fact that you were, on average, daily communication with somebody at MMA?**
A. Yes.
**Q. You testified that you guys -- you at MMA met daily to discuss procedures and flow of the cases, roughly daily, right?**
A. Yeah. Yes.
**Q. And Galindo was not part of those meetings, right?**
A. He was not.
**Q. Now, do you recall any issues with the intake information that Galindo claims, or that you believe came from Galindo or someone on his behalf?**
A. I do.
**Q. Can you explain that to me specifically, what problems there were?**
A. Right. So I do remember that there was

Page 195

challenges associated with the insurance company. That was the -- I do remember that that was a big challenge, was the insurance company.
I think I gave the example -- it may have been a bad example -- about State Farm. The insurance company could have been notated as State Farm, but the actual name of the insurance company is State Farm Property and Casualty, which are actually two different companies. That causes issues when you're sending out the letter of representation on behalf of the firm, because it says -- it says -- it's going essentially to the wrong place, right? And so, that's off the top of my head, what I remember as being a challenge.
**Q. And, between this -- and is that something that would have come in from the -- what did you call it -- the gateway questions?**
A. Yeah, that's right.
**Q. So that's something that Galindo was responsible for?**
A. Right.
MS. GOOTT: All right. I am -- I think I am done. I would like to take a 10-minute break to just review my notes, but I think I'm done. Can we go off the record, come back? Let's just do 3:30.

Page 196

Is that all right?
THE REPORTER: Sure.
THE VIDEOGRAPHER: Stand by. The time is 3:13:03. We are off the record.
(WHEREUPON, a recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:28:39.
MS. GOOTT: All right. Can y'all hear me okay?
THE REPORTER: Yes.
BY MS. GOOTT:
**Q. Okay. Just a few more questions. I don't -- what I want to talk about now is Galindo specifically. You -- when did you first meet Galindo? Was it as -- in relation to this relationship between you, your firm, Galindo, and MMA?**
A. Yes.
**Q. Do you currently have any business relationship with the Galindo Law Firm?**
A. I do.
**Q. Excuse me?**
A. I do.
**Q. You do. And describe that for me, please.**
A. He's referred some cases to me.

Page 197

**Q. How many?**
A. That's a great question. Maybe 1,000.
**Q. What kind of cases?**
A. Zantac.
**Q. Anything else?**
A. No.
**Q. Any other relationship currently with Galindo other than the 1,000 Zantac cases?**
A. Oh, I'm sorry, I take that back. He has referred some Camp Lejeune cases as well too.
**Q. How many?**
A. I'm not the lead lawyer there, but I'm going to go with 4,000 cases.
**Q. 4,000?**
A. Yeah. And for the Zantac cases, do you -- does your firm and Galindo have an engagement agreement to share attorney's fees in these Zantac cases?
A. We do.
MR. FALK: Objection, relevance.
BY MS. GOOTT:
**Q. And on the Camp Lejeune cases, does your firm and the Galindo Law Firm have an agreement to share attorney's fees on those cases?**
A. We do.

Page 198

MR. FALK: Objection, relevance.
BY MS. GOOTT:
**Q. I couldn't hear you.**
A. We do.
**Q. How often -- how often do you speak to Mr. Galindo?**
A. Maybe once a month. Maybe.
**Q. When was the last time you talked to him?**
A. March -- April.
**Q. April. When was the last time you communicated with him in any way?**
A. Within the last month, for sure.
**Q. And how do you communicate with Mr. Galindo?**
A. Via email.
**Q. Only?**
A. Yeah, pretty much email. I'm sure I've texted with him before too, of course.
**Q. So email, phone, text. Any other apps that you use to communicate with him?**
A. No.
**Q. I'm sorry. I couldn't hear you.**
A. No.
**Q. And in the last -- since -- have you communicated with Mr. Galindo about the claim**

Page 199

**objection that MMA filed against the Galindo Law Firm?**
A. I have generally spoken to him about -- very generally, about his claim objection.
**Q. And what did he tell you?**
A. That he's going to do an adversary -- and now I'm getting into bankruptcy knowledge that I don't know as much about. But that he's going to do an adversary proceeding against the debtor, MMA.
**Q. Do you have any current disputes with the Galindo Law Firm?**
A. Yes.
**Q. Over what?**
A. Unpaid marketing.
**Q. He owes you money, or you owe him money?**
A. Yeah, it depends on who you talk to.
**Q. No, I'm asking you.**
A. Well, I think that we are just fine that nobody owes anyone any money at all.
**Q. So you don't have any dispute with Galindo?**
A. I do not have any current dispute with Galindo.
**Q. And does Galindo -- has Galindo represented to you that he has a dispute with your**

Page 200

**firm?**
A. I don't think he has fought -- no, I don't. No, I don't believe so.
**Q. You don't think so? He hasn't made any representations to you about any dispute between his firm and your firm?**
A. I know there's a -- I know that -- I know this sounds crazy, I really -- I know there was a lawsuit filed against us that wasn't served. But I admittedly don't quite recall who that -- who that was against. I really don't. But I do believe there's a dispute over who owes what in marketing costs. But that has --
**Q. How would you know that?**
A. Come again?
**Q. How do you know that there is a dispute between your firm and Galindo's firm over marketing costs if you've never made representations to him and he's never made representations to you?**
A. I think there is conversation, or there was conversation between us over marketing costs in Camp Lejeune, which I, to be honest, I have no idea what it has to do with the debtor in an adversary proceeding here. But --
**Q. Today's not your day to object. My**

Page 201

**question to you is: You testified that you have no dispute with him.**
A. Sure.
**Q. You then testified that he's never represented to you that there's any dispute. And then you testified, "Well there might be, but I don't know," and maybe there's a lawsuit, but you don't know who filed it?**
A. Yeah. You know what --
**Q. Is that your testimony?**
A. My testimony should be I really don't know. I really don't. I don't have enough information for me to sit here today to give you a clear-cut answer on this. I really don't.
**Q. What information do you have?**
A. The information --
MR. FALK: Object to form. What does that question even mean?
BY MS. GOOTT:
**Q. Answer the question.**
A. I'm not exactly sure what your question is getting at.
**Q. You don't have to understand what I'm getting at. You just have to answer truthfully.**
A. Truthfully --

Page 202

**Q. That's your job today. Answer the questions. You don't have to figure out why I'm asking --**

A. Miriam, I think I've done that today for you the whole time. And so, I'll continue to do so, of course. But right now, I don't know if there is a dispute. I think we're fine.

**Q. Have you been sued?**

A. I know there is a lawsuit, and I couldn't even tell you who the parties of the lawsuit are. I have not been served, so I have not even taken a look at it.

**Q. How do you know there's a lawsuit?**

A. Because I've seen it on social media.

**Q. Okay. So you've seen the lawsuit?**

A. Mm-hmm.

**Q. And what does it say?**

A. I don't --

**Q. What did you see?**

A. I don't remember.

**Q. That's your sworn testimony, that you saw on social media that your firm was sued, and you don't remember what it says or who has sued you? That's your sworn testimony?**

A. That is my sworn testimony, because it is

Page 203

truthful. It is not my concern until it's served on me, and then I'll deal with it.

**Q. And is your representation today, under oath, that Mr. Galindo has never had any communication with you, whether verbally or in writing, about any concerns he has about the relationship between your firm and his firm regarding any cases?**

A. That's right.

**Q. All right. So you guys have a great relationship, right?**

A. Yeah.

**Q. And how is it that you received a copy of Mr. Moseley's declaration in his claim objection?**

A. Well, I review every single filing that's on the ECF or whatever that thing's called.

**Q. Really?**

A. Well, okay. Admittedly, I don't look at all of them, but I do look at a lot of them. There's a lot of bankruptcy filings that are there. I do my very best, but --

**Q. So my question is: How did you review -- Mr. Shelton showed you and pulled up Mr. Moseley's declaration, right?**

A. Yes.

Page 204

**Q. And you looked at it, and you immediately said, "I'm familiar with this," right?**

A. Well, I reviewed it, and I said I was familiar with it.

**Q. That's exactly what I asked you. You didn't have to read it to know it. You looked at it and immediately answered, right?**

A. That's right. What did you say?

**Q. How did you get a copy of the declaration?**

A. The copy of the declaration is here at the deposition right now.

**Q. Who gave it to you?**

A. Mr. Shelton.

**Q. Mr. Shelton gave it to you?**

A. Indeed.

**Q. When did he give it to you?**

A. I got it here today.

**Q. Before the deposition?**

A. Well, I printed out the pages for him for this deposition when he got here.

**Q. Mr. Shelton handed you -- Mr. Shelton asked you to print Mr. Moseley's declaration for you prior to the deposition?**

A. When he got here, I printed stuff out for him and stuff like that prior to the deposition,

Page 205

yes.

**Q. And you reviewed the documents that he printed?**

A. I did not review the documents, but I could see, you know, what I saw when it was printed.

**Q. Well, when he asked you about the declaration, you testified you were familiar with this document. You knew what it was. And I'm asking you: When did you first get it? And you just testified that Mr. Shelton gave it to you. Did you review it?**

A. I did review it in detail when I was sitting here, and he asked me to review 1 through 8 or whatever it was on the declaration.

**Q. Prior to that, his first question was: Have you seen this before? Are you familiar with it, right?**

A. Right.

**Q. And you testified that you're familiar with it, correct?**

A. Correct.

**Q. And you testified that you'd seen it before?**

A. Correct.

**Q. And then I asked you: When did you first**

Page 206

**get it?**
A. Correct.
**Q. And is your testimony that Mr. Shelton gave it to you before the deposition?**
A. Yes.
**Q. All right. Did you and Mr. Shelton discuss it?**
A. No, we discussed the topics that he would go over on my deposition today.
**Q. We'll get to that in a minute, but I want to focus on this specific declaration.**
A. Okay.
**Q. Did he hand it to you and say, "This is an exhibit"?**
A. No. I mean he just basically said generally what we were going to go through today.
**Q. Well, we know you had his exhibits prior to the deposition, right?**
A. Correct.
**Q. Because you printed them for him, right?**
A. I did.
**Q. What did he tell you about the declaration?**
A. He says we were going to go through these documents, and then we went through the topics that

Page 207

we were going to go over today.
**Q. In terms of the declaration, did he tell you what it was?**
A. No.
**Q. How did you know it was a declaration for the claim objection?**
A. I didn't. I still don't.
**Q. You still don't?**
A. I don't even know what a claim objection is, to be honest with you. So I'm not a bankruptcy lawyer, but I know it's a declaration.
**Q. So you didn't know what it was when he put it in front of you, and you said you were familiar with it?**
A. I said I -- I mean, what I said is that, you know, I looked at it and it's a declaration, right?
**Q. No.**
A. I know what a declaration is. I do declarations all the time when you're using a declaration to support a summary judgment motion and things like that. But I --
**Q. He did not ask you, and I am not asking you what is a declaration.**
A. Okay.

Page 208

**Q. He asked you if you were familiar with this document.**
A. I see.
**Q. And when you testified that you were, was that a true statement or not a true statement?**
A. I wasn't trying to be untruthful, but --
**Q. I'm not asking what you were trying to be. I'm asking you again, under oath. When you testified and stated that you were familiar and had reviewed this document before, was that a truthful statement?**
A. That was -- I wasn't trying to be untruthful. I -- I don't know. I mean, I review the ECF documents. I -- to my knowledge right now, did I have, like, personal knowledge of that document, if that's where you're going?
**Q. No. I'm asking: Was your statement truthful or not? When Mr. Shelton asked you whether or not you were familiar and had reviewed --**
MR. FALK: This question has been asked and answered. Please move on. He's answered this question about half a dozen times you've asked him that question.
MS. GOOTT: All right.
MR. FALK: Move on.

Page 209

BY MS. GOOTT:
**Q. All right. Listen to my question. Was it a truthful statement or not? Had you reviewed Mr. Moseley's declaration prior to Mr. Shelton handing it to you at the deposition?**
A. I don't think so.
**Q. How many exhibits did we have today? A total of three, right?**
A. Yeah, three.
**Q. And you testified that you printed three exhibits.**
A. Admittedly, I don't know how many exhibits we had today, so I shouldn't speculate to that, but it feels like three or four.
**Q. Less than five, would you agree with me?**
A. I believe so.
**Q. Not too many, right?**
A. Right.
**Q. In your experience as a lawyer, less than five exhibits at a deposition, that's not a lot of exhibits, right?**
A. In my cases, I tend to have many more.
**Q. That's right. And here, we had a spreadsheet that was a total of two pages, right?**
A. Indeed.

Page 210

Q. **We had an email. How long was the email?**
A. Not long.
Q. **Not long. What, two pages?**
A. That's right.
Q. **Maybe one?**
A. Correct.
Q. **It's in front of you.**
MR. FALK: Objection, relevance to this whole line of questioning. You're asking him -- how many pages. Please move on.
BY MS. GOOTT:
Q. **So we had an email, maybe a page. We had the spreadsheet that we know is two pages. The declaration, very short, right?**
A. Right.
Q. **Two pages. So we're talking about six pages. And now my question to you: You can't remember how many pages you printed for Mr. Shelton prior to the beginning of this deposition, or do you know?**
A. No, I didn't say that. I said that I printed the exhibits that he needed printed, and I gave it to him. And then we went over the topics of what he was going to talk to me about today in the depo.

Page 211

Q. **And when did you meet with him?**
A. Like, 15 minutes before the deposition.
Q. **In your office?**
A. Indeed.
Q. **Was your lawyer with you?**
A. Nope.
Q. **Just you and Mr. Shelton?**
A. Indeed.
Q. **And was that when you gave him the exhibits?**
A. Indeed.
Q. **And did he say to you, "Here's one exhibit that is a" -- did he talk to you at all about the exhibits?**
A. No. He talked to me about the topics that we'd be going over today.
Q. **Tell me what he told you.**
A. Yeah. He said that we'd be going over basically how the relationship formed between us and MMA and Galindo Law Firm, the various roles that each one of us performed in the litigation. That he'd be asking me questions about my role in the litigation and what I had knowledge of. The --- we went over the type of lawyering that I do on a day-to-day basis, and what knowledge I have as far

Page 212

as, like, storm litigation goes.
THE REPORTER: Before you ask your next question --
BY MS. GOOTT:
Q. **So he asked you questions?**
A. No, he told me what we were going to be going over.
Q. **Did you ask him any questions?**
A. I did. I asked him how long it would take, and he quoted much shorter than this. Significantly shorter than this.
Q. **That's the only question you asked him?**
A. I asked him where they were at in the litigation. I asked him when plain confirmation was. And that was about it.
Q. **What did he tell you when you asked him about the litigation?**
A. He said they have an adversary proceeding going against the debtor. And that the debtor, you guys have an adversary proceeding against them. You guys are basically, like, litigating against each other over fee disputes. As far as the confirmation hearing goes, I don't think he --
Q. **Let's stick to this question. So he explained that there's an adversary?**

Page 213

A. Yeah.
Q. **But you asked him about the status of the litigation, meaning you already knew about it, right?**
A. In bankruptcy court, there's all sorts of stuff that's happening, right? So you've got adversary proceedings, you've got confirmation hearings, you've got whatever the hell --
Q. **No, no. I'm focused on litigation. You said that you asked him about the status of the litigation, right?**
A. Yep.
Q. **So you knew about the litigation, clearly?**
A. Of course, I read the pleadings and stuff like that, and I generally understand them. I'm not a bankruptcy lawyer.
Q. **Right. Well, you're here being deposed because of the litigation, right?**
A. Yeah. But I didn't know if it was in the context of the bankruptcy and now it's the adversary proceeding, I'm to understand. So I'm not, again, quite familiar. He didn't give me information as far as, like, how many people have been deposed and all this stuff. But --
Q. **Had you ever talked to Mr. Shelton before**

Page 214

**today?**
A. No.
**Q. Are you aware whether or not he's talked to any lawyers on your behalf?**
A. Probably.
**Q. Have you ever talked to Ms. Van Meter?**
A. I have.
**Q. When?**
A. I talked to her probably a month ago.
**Q. She --**
A. We were originally going to be taking my deposition in Puerto Rico, and then for some reason that didn't happen, which I wanted it to happen in Puerto Rico instead of Kansas City since my wife's due in literally 10 days. And so, I talked to her then about 1,000 times about scheduling and finding a place for her to take the deposition in Puerto Rico.
**Q. Ms. Van Meter talked to you about the litigation between Galindo and MMA?**
A. No. She said that I needed to be deposed as a result of the litigation that's happening between MMA and Galindo. And that --
**Q. Did you ask her why?**
A. I mean, it's obvious. It's going to be

Page 215

over fee disputes. I mean, I don't think it's just, like, for fun. But --
**Q. I'm asking: Did you ask her why?**
A. No.
**Q. Did she offer any information to you about why they were deposing you?**
A. No.
**Q. Have you had written communications with Mr. Galindo about MMA?**
A. No.
**Q. Zero? No emails?**
A. I mean, from a long time ago, obviously, from years ago, but no.
**Q. In the last year?**
A. No.
**Q. All right. So Mr. Shelton met with you before your deposition and told you the topics of what he was going to ask you about, right?**
A. Yeah. Yes.
**Q. You remember when the deposition started, he asked you, "What did you do to prepare for today," right?**
A. That's right.
**Q. Why didn't you say, "I spoke to you, and you told me what you were going to ask me about"?**

Page 216

A. I didn't really view that as much preparation. What I did do --
**Q. Knowing the topics of what the lawyer is going to ask you? Was he being -- that seems awfully helpful for the person -- the lawyer deposing you, to let you know in advance what he's going to ask you. Is that not unusual for you?**
A. I mean, I don't know. I'm a witness in this whole deal, but --
**Q. But as a lawyer, isn't that weird?**
A. Yeah, I don't know.
**Q. You don't know?**
A. I mean, I'm not going to answer that that's weird by any means, is that --
**Q. So that's normal to be deposed. Did you -- why are you -- you're willing to answer questions, right --**
A. I'm answering --
**Q. -- for Mr. Galindo?**
A. I'd rather not be a part of this at all.
**Q. Well, why did they have to depose you? Why did they have to do this formally? Why didn't you willingly answer their questions, sign a declaration, go all the way to Kansas when your wife is almost about to have a baby?**

Page 217

A. I would have loved that. I would have loved that. I would have loved that. That would have been wonderful. I would have done that. Sign me up. That sounds good. Do you think I want to waste an entire day here, no offense, with you guys?
**Q. None taken. I'm with you.**
A. I mean, I really don't. I really don't want to be here. I'm not getting anything from this. I wish I was. I wish you were paying my hourly right now, but I'm getting nothing from it. And I wish I was, but I'm not.
**Q. But what you do have is a current, significant financial business relationship with Mr. Galindo. Isn't that true?**
A. I do.
**Q. And his attorney meets with you prior to your deposition and lets you know in advance the topics of what he's going to ask you about today, right?**
A. Indeed.
**Q. And I'm going to ask you one more time, because I'm going to talk to Mr. Shelton about this probably under oath too. Did he tell you how to testify?**
A. No.

Page 218

**Q. Did you ask him, "How should I respond?" or in some way, how you should address or respond to an issue?**
A. No.
**Q. Did he give you any guidance?**
A. He said that I should just go in and tell exactly what, you know, my career, where it started, and how I got into this, how I met Galindo, how I met MMA, blah, blah, blah, all that stuff.
**Q. Did he give you any guidance about how you should testify?**
A. No.
**Q. Did he answer any specific questions for you?**
A. No.
**Q. What else did you ask him about during this meeting?**
A. I didn't ask him about anything else. I was mainly concerned about how long this would take, because I had the court hearing at whatever it was, 2 o'clock. And he said that we'd be done well before that, and again, we're here at 4 right now. But that's what we discussed. I apologize that we couldn't -- I have depositions going upstairs in my courtrooms -- or excuse me -- in my --

Page 219

**Q. Conference room?**
A. Thank you.
-- conference rooms, and I know that we couldn't do it there. I asked if we needed to order food in for our lovely court reporter and the videographer, and he thought that we'd be done in time, so that's kind of the stuff. We went through housekeeping stuff.
**Q. And then you talked about the case, right?**
A. We did.
**Q. Correct?**
A. Yes.
**Q. Anything other than the status of the litigation or plan confirmation?**
A. Really, no.
**Q. Did you talk about Mr. Moseley?**
A. No.
**Q. His name didn't even come up?**
A. They did -- he did -- I'm sorry about that. He did ask me when was the last time I talked to Zach.
**Q. And what did you tell him?**
A. I thought that the last time that I talked to him was in -- what did I say -- I think like -- I don't know -- April or something like that. I

Page 220

didn't say what we talked about or anything like that, but -- and it may have been longer than that by the way. This is -- now you're asking me to speculate, but I don't quite remember anymore. But I think the last time I talked to Zach was in April.
**Q. I'm not asking you to speculate. I'm asking you to tell me what your response was to Mr. Shelton --**
A. I think it -- yeah, I've got you.
**Q. -- today.**
A. Yeah, I think I said April.
**Q. Any other questions he asked you?**
A. No. Where the bathroom was, and I told him.
**Q. Did he hold up any of the exhibits and show them to you?**
A. No.
**Q. Did he say, "I'm going to have you go through a few exhibits"?**
A. Yes.
**Q. Did he tell you one of them was going to be an email?**
A. No.
**Q. Did he mention the exhibits at all?**
A. No.

Page 221

**Q. But you had them in your possession?**
A. I did.
**Q. Did he tell you to look at them?**
A. No.
**Q. Did he ask you to make copies of them?**
A. Yes.
**Q. Did you keep a copy for yourself?**
A. No.
**Q. You handed them all to him?**
A. Yes.
**Q. After you looked at them?**
A. Well, I mean, I didn't scan through them and look at them closely or anything like that. I just had someone print them for me, and then I handed it on over to him.
**Q. I thought you printed them.**
A. No, it wasn't me. It was my colleague that printed them. I had one of my legal assistants print them.
**Q. Did he email you the exhibits?**
A. They were emailed over to me. No, excuse me. They were emailed over to -- whatever her name is -- Teshi or -- I can't remember. This is going to look really bad on the record.
**Q. Who are you talking about? How did Mr.**

Page 222

**Shelton get these exhibits to you?**
A. The -- he messaged them all over to my legal assistant lady. I don't remember her name. Hopefully she doesn't read this.
**Q. By email?**
A. So they need to be printed. Admittedly, I don't print things at my office. I have my legal assistant do it. So I brought her over and I was like, "Hey. Can you print this?" And so she printed them for us.
**Q. How did she get them from Mr. Shelton?**
A. Mr. Shelton emailed her.
**Q. From your office?**
A. Indeed.
**Q. On his laptop?**
A. Yes.
**Q. Were you copied on that email?**
A. No.
**Q. So she came into your office --**
A. I went and got her.
**Q. You went to her office to get the emails?**
A. She doesn't have an office. She's right outside of my office. So I went, and I grabbed her and I said, "Hey. I don't know how to print in my office. Can you come help us print these -- this

Page 223

paperwork?" So she comes in. And then I said, "Hey. Can you give him your email address?" And then emailed her. And then she printed them.
**Q. From where?**
A. Our office.
**Q. Your office?**
A. I don't have a printer in my office. From our copy room.
**Q. And then she came back directly into your office and handed the exhibits to who?**
A. Me.
**Q. And that's when you looked at them?**
A. That's when I had glanced at them. I mean, I really just went like this. And it was like -- and then handed them on over to see --
**Q. But you only looked at the front page?**
A. Yeah.
**Q. So you didn't look at the exhibits. You only looked at the top page?**
A. And then I will say I also helped staple them as well too.
**Q. So when you just picked up that stack of papers and looked at the top page and then motioned to handing it to him, that didn't actually happen, right?**

Page 224

A. I -- no, admittedly, I don't remember. I may have handed it to him and then maybe he asked me to staple them thereafter. Or maybe before I handed it to him, he asked me to staple it. It was one of the two. I don't remember.
**Q. Did you look at more than the first page or not?**
A. No. I mean, as I was going through them -- excuse me. As I was stapling them and help stapling them, perhaps I saw the top of them or something like that. But I didn't examine these documents before the deposition. I wasn't going -- combing through them or anything.
**Q. Other than the declaration, right?**
A. The declaration. I mean, can you be more specific? You're now kind of just -- sorry, I've been at this for a minute. So go ahead. If you could ask the question a little bit more specific, I could help you. Sorry.
**Q. Why are these difficult questions?**
A. You kind of got me turned around a little bit because you're asking me this, but it's very simple. It's --
**Q. Very simple. But first you told me you printed it.**

Page 225

A. My colleague printed --
**Q. Then you told me you looked at it. Then you said, "Wait. No. He was in my office, and I had someone else do it." Then you grab the paper and show us that you look at it and then hand it to him. So yes, it is. I'm getting a lot of versions over something that should be really simple.**
A. Yeah. So like I said, we went over the topics. He didn't tell me how to testify. And I did help with the printing of these documents, certainly. And so -- well, my colleague helped with the printing of the documents, certainly. And that --
**Q. And you looked at them while you stapled them?**
A. I helped staple them. Yeah.
**Q. And you looked at them while you stapled them?**
A. I did take a look at them. Yeah. I did not closely --
**Q. And you knew that these were the exhibits that he was going to ask you about during your depo, right?**
A. That he could potentially ask me about. Yep.

Page 226

**Q. Why do you say potentially?**
A. Because, look, when I go into a deposition and I have 200 exhibits, I may only ask about 50 of them, right?
**Q. Right. But he told you, "Can you print these exhibits for your deposition," right?**
A. That's right.
**Q. So you knew when you were holding those documents, those were the exhibits he intended to use at your deposition?**
A. That's right. That he could potentially use. Yep.
**Q. Did he tell you he was going to potentially use them?**
A. He didn't tell me anything.
**Q. Well, you just said he told you, "These are the exhibits that I need for your deposition," right?**
A. Yep.
MR. FALK: Objection, asked and answered, and harassing. And I'm actually going to instruct the witness to not answer any more questions down this line, because we're just going around in circles.
MS. GOOTT: We sure are --

Page 227

MR. FALK: Move on to your next topic, please.
MS. GOOTT: We sure are. We cannot get a straight answer on a very basic issue.
BY MS. GOOTT:
**Q. But I would like -- Mr. Krause, are you going to take your lawyer's instruction and not answer that question?**
A. What was your question?
MS. GOOTT: Can you read it back for me? I'm so sorry.
THE REPORTER: Sure.
THE DEPONENT: Even you forgot the question. I get it.
(WHEREUPON, the record was played back.)
BY MS. GOOTT:
**Q. There we go. Is that -- are you going to take your lawyer's instruction and refuse to answer that question?**
MR. FALK: If the question is --
MS. GOOTT: Do you want to withdraw your objection, or do you want to instruct him not to answer?
MR. FALK: Yes. I'm going to withdraw my objection to that question.

Page 228

MS. GOOTT: All right. Thank you.
MR. FALK: But I'm just telling you, we are absolutely at the line because you just keep asking the same question again --
MS. GOOTT: I don't need your speaking objection. Either object or instruct him not to answer. Thank you.
THE DEPONENT: Can you read it off again?
THE REPORTER: Yes.
(WHEREUPON, the record was played back.)
THE DEPONENT: Admittedly, I don't know what that question is. I don't know what that's asking me.
BY MS. GOOTT:
**Q. You don't understand? What part of it is confusing for you?**
A. It's not even a sentence -- the question --
**Q. Did Mr. Shelton -- did Mr. Shelton ask you to print the exhibits for your deposition?**
A. Yes.
**Q. All right. Did he tell you, "These are -- I might use some of these, I might not"?**
A. No.
**Q. All right. Two last questions, and we'll be done.**

Page 229

**Earlier -- earlier in my questioning, I asked you to list all of the law firms that you have an interest in.**
**Did you disclose all of them?**
A. No.
**Q. Why not?**
A. Because it's not relevant to anything that we have going on here.
**Q. So you chose to only give me a few and not complete the response?**
A. Yes.
**Q. So that was not a complete, honest statement when I said, "Identify all law firms," right? Correct?**
A. If you read back at my old statement, I didn't say anything untruthful by any means. What I did say --
**Q. No. Listen to my question.**
A. Yep.
**Q. I asked you to identify all law firms that you have an interest in, and you started to list the law firms, right?**
A. Right.
**Q. And now I've asked you about an hour**

Page 230

**later, "Did you disclose all of them as I asked you to do?" And you now said, "No, I didn't."**

A. Correct.

MR. FALK: Objection. This mischaracterizes prior testimony.

BY MS. GOOTT:

**Q. Do you -- and then I believe you just said, "No. I didn't because it's not relevant," right?**

A. Indeed.

**Q. And you do understand that you're required to answer all of the questions unless your lawyer instructs you not to answer and then you take that instruction?**

A. I know how it works.

**Q. All right. Are you going to answer the question?**

A. I'll ask my lawyer.

**Q. Let me do it again. Let me ask the question again, and he can either object, and then you'll answer, or he'll instruct you not to answer and then we'll deal with it.**

**Please identify all law firms that you have an interest in.**

MR. FALK: Objection, relevance, and asked

Page 231

and answered, and harassing.

And I'm also going to instruct my client not to respond to this question.

BY MS. GOOTT:

**Q. All right. Mr. Krause, are you going to take your attorney's instruction and refuse to answer this question?**

A. I am going to cede his advice, yes.

MS. GOOTT: All right. All right. We will -- we'll stop here, and we'll decide what we're going to do in terms of getting that question answered, and if we need to reset this, but I will communicate with Mr. Falk. Thank you.

THE DEPONENT: All right, guys. Are we off the record and done?

MR. SHELTON: We have to do our --

MR. FALK: I'd like to -- are we still on the record? I did want to put just one thing on the record.

THE REPORTER: Yes, we are.

MR. FALK: So just so that this is clear, this is Turner Falk, counsel for Krause & Kinsman Trial Lawyers. And I just want to make it clear on the record that we think that the transcript of this deposition very likely contains confidential

Page 232

commercial information inside Bankruptcy Code Section 107, so I want to work with the other parties to this deposition to see what we can do to keep this information sealed and confidential just between us parties.

THE REPORTER: Okay.

MS. GOOTT: You're more than welcome to call me to discuss, but we don't -- we're not reaching any agreement on the deposition transcript. But I'm more than happy to talk to you and for you to explain.

MS. VAN METER: Mr. Falk, the -- Galindo does agree with you. I believe that there is. You know, not the whole (audio disruption) --

THE REPORTER: One moment. Hold on.

MS. VAN METER: -- at least be --

THE REPORTER: One moment, Ms. Van Meter. I'm sorry. I wasn't able to catch your testimony.

Mr. Falk, do you think you could mute for a moment?

MS. VAN METER: Mr. Falk, I'm not sure if you're open to -- there. Okay.

MS. GOOTT: All right. Well, everybody -- everybody, we can -- we can talk about it.

MS. VAN METER: I can speak too, Miriam.

Page 233

But we do think, not the entire deposition needs to be sealed, but there probably are parts that are beneficial to all parties that need to be sealed.

MS. GOOTT: Yeah, I'm not saying I'm against it. I'm just saying let's -- let's get on the phone and talk about it.

MS. VAN METER: I agree.

THE REPORTER: Okay. The videographer will now take orders.

THE VIDEOGRAPHER: Okay.

THE REPORTER: You're going to pass that to me first?

THE VIDEOGRAPHER: Yeah. Please stand by.

This is the end of the deposition of Adam Krause.

The court reporter will now take orders for the transcript, and afterwards, I will take orders for the video.

THE REPORTER: Ms. Van Meter, do you want to order the original transcript today?

MS. VAN METER: Yes.

THE REPORTER: Okay. Ms. Goott, would you like to order a copy of the transcript?

MS. GOOTT: I'm not sure. I'll let you know if I do.

Page 234

THE REPORTER: Understood.

Mr. Falk, would you like to order a copy of the transcript today?

MR. FALK: I'll also let you know.

THE REPORTER: Thank you.

And Ms. Galerne -- never mind.

Okay. Curtis?

THE VIDEOGRAPHER: Ms. Van Meter, will you be getting a copy of the video?

MS. VAN METER: Yes.

THE VIDEOGRAPHER: Okay. Ms. Goott?

MS. GOOTT: No, thank you.

THE VIDEOGRAPHER: Mr. Falk?

MR. FALK: Likely not. I'll let you know if so.

THE VIDEOGRAPHER: Okay. That's it.

Okay. The time is 4:14:57. We are off the record.

(WHEREUPON, the deposition of ADAM KRAUSE, was concluded at 4:14 p.m.)

Page 235

CERTIFICATE

I, the undersigned, Curtis Busker, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Adam Krause, in the above captioned matter on the 26th day of June, 2025, taken at the location of 4717 Grand Avenue, Suite 300 in Kansas City, MO 64112.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

Curtis Busker

Page 236

CERTIFICATE

I, Hillary Minton do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 3rd day of July, 2025.

Hillary Minton #1226427, #24549217

Page 237

CORRECTION SHEET

Deposition of: Adam Krause Date: 06/26/25

Regarding: Cristobal M. Galindo PC vs. MMA Law Firm

Reporter: Minton/Willman/Gallo

______________________________________________

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number. If there are no changes, write "none" across the page. Sign this sheet and the line provided.

| Page | Line | Reason for Change |
|---|---|---|
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |
| ____ | ____ | ________________________________ |

Signature: ________________________

Adam Krause

DECLARATION

Deposition of: Adam Krause Date: 06/26/2025
Regarding: CRISTOBAL M. GALINDO VERSUS MMA LAW FIRM
Reporter: Hillary Minton

______________________________________________________

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at ____________________________, ______________
on the ____________ day of __________________, 20____.

Signature: ___________________________
Adam Krause

**Exhibits**

**EX001 CHECKS RE PORT** 37:4,7,8,12 47:8,9 65:21 66:4 86:4 181:21,23,24

**EX002 AGREEMENT** 94:10,11 182:1,2,4

**EX003 EMAIL 01262 3** 103:16,17 122:14 181:22 182:19 183:9 186:12 187:5

**EX004 DECLARATI ON** 111:25 112:1

**$**

**$1** 181:2

**$1,266,690.85** 97:9

**$10,000** 89:4

**$100,000** 85:23 86:15,18,24 88:25 101:15

**$197,749.69** 97:14

**$2,000** 58:21 101:14

**$21,985** 106:15

**$24,750** 97:18

**$26,771,954.62** 122:21 123:15

**$26.7** 124:9

**$300,000** 141:25

[redacted]

**$40,000** 87:8 101:13

**$492,441.16** 98:4,11

**$5,000** 60:16

**$50,000** 85:16 88:4,5,10

**$558,750** 97:24

[redacted]

**$8** 124:19

**0**

**0.33** 124:18

**1**

**1** 37:4,7,8,12 38:17,18 40:8,9 47:9 65:21 66:4,7 86:4 87:12 100:12 110:11 181:21,23,24 205:13

**1,000** 16:22 197:2,8 214:16

**1,750** 123:5,7,10,23

**10** 89:2 94:5 181:4 214:15

**10-minute** 195:23

**100** 58:13 74:13 86:17 88:7 101:7,13 129:8,22 187:2

**100,000** 17:8 19:5,17

**100-plus** 19:22

**107** 232:2

**10:31:45** 7:8

[redacted]

**11:33:57** 61:14

**11:51** 61:17

**12** 124:19,22 129:5,20 130:8,11,15

**12.5** 39:10 66:9,13 99:18 110:15 124:9

**12:47:12** 103:9

**12:50:20** 103:12

**15** 90:12 105:20,21,22 211:2

**150** 127:24

**16th** 112:9

**17** 56:17,23 60:4

**175** 129:10

**1:08:28** 114:24

**1:27:30** 115:2

**2**

**2** 74:5,8 94:10,11 182:1,2,4 218:21

**2,000** 101:15

**20** 56:15,18,23 60:3 94:24

**20-** 23:17 91:13

**200** 226:3

**2013** 14:11,16 17:4,7 20:10

**2021** 16:4 20:14 23:18,20,22 24:6,9,16 43:8 45:21 46:2,12,17,18 48:20 49:13 67:7,10 69:18 77:4,5,18 91:6,10,13

**2022** 14:5 47:12,15 49:13 62:22 91:23 92:5

**2023** 95:1,23

**2025** 7:8 14:4 94:25 112:9

**2100344** 52:21

**2100447** 105:23

**2110447** 105:19

**22** 92:19

**2503310** 112:5

**26** 7:8 95:1,23 124:18

**26.7** 124:2,14

**281** 12:20

**28th** 16:4,5 24:9 43:8

**2:37:05** 174:7

**2:39:46** 174:12

**3**

**3** 103:16,17 122:14 181:22 182:19 183:9 186:12 187:5

**3,000** 23:1

**30** 18:2,5,12 123:24 146:23 147:10 148:4,10

[redacted]

**33** 58:16

**33.33** 86:6

**37** 110:16

**37.5** 39:8 66:8

**3:13:03** 196:4

**3:28:39** 196:7

**3:30** 195:25

4

**4** 111:25 112:1 218:22
**4,000** 197:13,14
**40** 86:10,23 87:2,7 88:1,6 89:1 129:16
**447** 97:24
[redacted]
**4:14:57** 234:17
**4:51** 95:1

5

**5** 42:17,19,21 63:23 66:23,24 67:3,9 68:2 75:24 76:11,15
**5,000** 48:21 75:15
**50** 39:6,9 66:8 85:13 89:7 110:14 129:4 226:3
**50,000** 88:4
**50-50** 88:3
**550,000** 97:23
**5th** 94:25

6

**6** 112:25
**6,000** 42:17,19,21 48:21 63:23 66:23, 24 67:3,10,19 68:2 75:15,24 76:11,15 152:8

7

**7** 113:6
**74-1** 112:8
**750** 12:20

8

**8** 124:22 205:13
**8,000** 104:5 125:1 137:16 138:8
**86** 109:8

9

**960,000** 124:22
**99** 97:18

@

**@robert** 98:10

A

**a-n** 7:20
**ability** 27:10
**absolutely** 46:4,8 78:3 82:7 169:15 185:24 228:3
**abuse** 12:25 126:21
**access** 74:25 75:3, 12 81:4 118:10 121:16,19,20,22 122:3,5,12 139:20, 21,22,23 140:3,4, 12,15,18,21 142:14 183:19 188:14,17, 18 189:2
**accidents** 126:18
**account** 118:10
**accountant** 96:8,9
**Accountants** 129:24
**accounting** 96:12 111:18 129:24 188:16,19
**accurate** 185:13
**achieve** 90:4
**achieved** 90:5
**acquaintance** 21:6
**act** 160:23
**action** 32:15
**actions** 13:21 19:15 51:3
**active** 19:15 62:13
**actual** 44:2 65:10 101:5 106:20 107:7 113:7,9,13 134:13 141:23 142:19 195:7
**ACV** 84:14,19,20 104:15
**ad** 151:3,5,6
**Adam** 7:10 8:20 189:20 233:14
**add** 37:12 53:11 74:15 123:14
**added** 94:14 111:15
**additional** 62:21 101:3 138:8,17
**address** 54:16 68:25 69:1 96:2 163:5 218:2 223:2
**addressed** 96:15
**addresses** 105:22
**addressing** 169:4
**adjuster** 141:19,22, 24
**adjustment** 141:23
**admittedly** 200:10 203:18 209:12 222:6 224:1 228:11
**admonitions** 9:4
**advance** 216:6 217:17
**adversary** 112:5 199:6,9 200:23 212:18,20,25 213:7, 20
**advertise** 68:15 95:17
**advertised** 68:15
**advertisement** 110:9,10,18,25 111:5,11 139:3
**advertising** 50:7 68:14,19 150:24 173:21 174:1,21,24 175:4,5,7
**advice** 12:17 28:20 130:12 231:8
**affects** 25:19
**affirm** 8:7
**affirmative** 193:8
**affirmatively** 140:7 145:18
**affirmed** 8:20
**afield** 176:22

**agree** 134:4,6,12 135:13 153:24 154:3 158:17 173:14 182:10 185:25 186:11 191:8 209:15 232:13 233:7
**agreed** 145:11 160:23
**agreeing** 158:8
**agreement** 36:12, 13,15,20,21,24 37:21 38:1,2,11,21, 25 41:9,13,14,17,19 42:12 47:8 48:22 49:1 50:25 56:21 66:22 74:16 75:16 77:23 80:18 86:6 87:13 99:6,8,21 100:1,13 101:17,23 113:14 116:19 117:22 119:8 121:9 145:11 156:2,21 158:20 171:3 173:11 197:17,23 232:9
**agreements** 26:6,23 38:3,7,12 42:13,16, 20,22 63:7 66:25 67:5,6 68:23 80:13 81:20 115:5 116:9 117:3,9 118:21 119:2,9,22 120:4 121:7 146:14 178:5
**ahead** 26:20 28:23 31:21 140:2 161:15, 19 162:4 163:15 179:11 224:17
**alive** 62:13
**alleged** 117:21
**allowed** 74:23 181:15
**ambiguous** 9:22 73:6
**Amen** 183:8
**amount** 58:12 76:13,16,22 84:6,10 97:8 98:24 106:6,14 108:15,16 109:19, 23,24 122:21 125:17 141:23 146:8,11 175:5,6 186:5
**amounts** 81:2 83:25
**analyst** 130:6
**and/or** 90:20 172:11
**anniversary** 118:16
**answering** 68:17 138:9 154:16 170:11 216:18
**answers** 24:2 28:19 138:14,16,21,24 181:15
**anticipated** 128:8 173:23
**anymore** 188:2 220:4
**API** 50:19,22 52:4 70:25 106:2 155:10, 13 158:22
**APIS** 117:15
**apologies** 18:6 39:10 98:19 111:8 122:17
**apologize** 64:6 111:21 129:1 218:23
**apparently** 34:25
**appearances** 8:15
**Appearing** 7:18
**appease** 136:21 137:25
**applicable** 124:14
**applied** 138:24
**apply** 11:9 87:10
**applying** 17:1
**appraisal** 51:12,13 59:6 101:14,16 165:13
**appraisals** 74:24
**appraiser** 51:9,11, 13 54:10,11,12 58:20 70:6 102:11 165:11
**appraisers** 16:24 24:23 54:15,22 55:4,6 71:25 74:23 85:21 102:18
**appreciated** 9:17
**approximate** 47:13
**approximately** 14:2, 4 15:24 20:14 24:7 45:20,24 49:12 123:24 124:19 129:12 137:15 148:4
**approximation** 10:13
**apps** 198:19
**April** 24:15 45:20 77:4,5 198:9,10 219:25 220:5,11
**area** 73:23
**arena** 24:24
**argumentative** 169:14 190:24
**arrangement** 99:22
**art** 179:11,13
**aspect** 132:24
**assert** 29:19 31:24
**assigned** 51:7,10 54:11,12 141:19 165:8
**assistant** 20:4 222:3,8
**assistants** 221:18
**assisted** 91:1
**Associates** 20:23 50:23 54:5,13 58:11
**assts** 129:24
**assume** 24:15 85:25 151:25
**assumes** 27:4 41:25 82:21 99:12 121:8 124:6,15 126:3
**assuming** 17:15,16 87:16
**assumption** 11:12 152:24,25
**assumptions** 157:8 158:15
**attempt** 74:12
**attempted** 89:25 115:5 116:8
**attempting** 74:10 128:10
**attend** 150:15 164:21

**attending** 65:22

**attention** 32:23 44:22 112:24

**attorney** 12:4 50:15 58:15 65:7,12 67:2, 15 76:13,15,16 86:25 90:21 99:18 101:9,14,18,19 113:3,6 131:4,6 132:22 154:9 165:20 169:6 217:16

**attorney's** 64:6 86:13,23 87:8 88:17 100:11 109:11 124:14 173:4 197:17,24 231:6

**attorneys** 40:13 50:4 65:18 68:8 126:10,23 127:13 129:21 130:9,11 131:2 134:10 154:17

**audio** 232:14

**August** 16:4,5 24:6, 9 43:8

**automated** 54:3,8 55:20

**automatic** 70:15 184:3

**automatically** 54:6 71:18 172:7 184:4, 6,9

**avengers** 18:25

**avenues** 50:2

**average** 194:9

**aware** 63:25 96:25 103:2 115:6 116:7, 14,17 120:2 128:13 157:15 165:19 193:10 214:3

**awareness** 50:9

B

**baby** 216:25

**back** 32:21 34:4 43:1 51:12 53:19,25 57:25 59:5 65:21 66:4 71:4 72:22 74:14,23 77:3,4 86:4 89:8 101:22 103:11 107:18 122:14 133:6 137:2 139:11 141:23,24 148:19 173:7 174:11,17 178:1 189:23 190:4 191:7 194:9 195:25 196:6 197:9 223:9 227:10, 15 228:10 229:16

**background** 12:7 18:20

**bad** 184:16 195:5 221:24

**badgering** 171:19

**balance** 128:20

**ballpark** 180:23

**bandwidth** 45:5

**bank** 88:13

**bankruptcy** 48:7 112:6 118:15,18,23 119:11 169:5 176:10 199:7 203:20 207:10 213:5,16,20 232:1

**based** 56:17 66:12 100:12 101:25 110:3 126:6,14 150:13 158:15 170:23 177:5 178:2 182:16 186:11

**basic** 14:7 227:4

**basically** 50:20 52:20 57:24 71:13 117:11 206:15 211:19 212:21

**basis** 44:23 59:12 148:15,17 211:25

**basketball** 21:9,10

**bathroom** 220:13

**bear** 39:6 131:22

**beginning** 7:9 47:14 48:19 77:3 129:2 210:19

**behalf** 7:22 12:21 54:24 113:8,13 194:21 195:11 214:4

**behavior** 32:19

**beneficial** 233:3

**benefit** 75:15 76:14 173:1,3,10,15,16

**benefitted** 75:25

**bespoke** 53:11

**big** 48:4 51:24 71:2 76:13 85:4 170:13 173:20,24 195:2

**big-picture** 130:21

**bigger** 104:21 183:15

**biology** 12:11 18:19

**bit** 12:3,7,13 14:21 16:11,22 26:7 44:22 49:10,16 93:2 132:1 139:17 224:18,22

**blah** 78:25 218:9

**blocked** 73:21

**bonus** 101:20

**borne** 101:8

**bottom** 36:16 38:18 40:7,8 87:11,12

**Boy** 126:20 129:16

**brackets** 102:10

**break** 61:1 177:15 195:23

**briefest** 10:25

**briefing** 18:23

**bring** 25:20 29:2 50:8 55:24 143:24 145:9,23 152:10 173:8

**bringing** 24:19 25:9 27:8,10 35:6,8 43:15,17 44:24 46:23 75:14,24 114:9 145:12 173:21

**brings** 173:6

**broke** 70:25

**brought** 25:13,20 32:23 47:16 48:22, 24 49:3,8 63:23 143:15,20 173:1,17 222:8

**buddies** 46:12

**building** 90:13,23, 25 91:1,3,18 92:6 125:22

**bulk** 13:19 52:25 93:3

**bully** 162:21

**bumping** 98:20

**bunch** 12:19 71:8

**bushel** 12:20,21 14:24

**business** 12:15 31:25 32:4 196:19 217:13

**C**

**calculated** 109:11

**calculations** 87:10

**call** 20:5 29:10 38:14 41:16,18 43:25 50:10 65:12 67:14,16,18 72:14 73:13 74:5 84:4 85:10,18 102:20 105:23 130:3 136:7 154:2 155:5 156:7,8 186:8 195:17 232:8

**called** 41:13 42:22 73:22 87:4 154:24 187:23 203:16

**caller** 73:25

**calling** 73:17,18 172:20

**calls** 22:19 36:4 56:9 60:15 64:25 75:4,17 76:3,24 81:21 82:7,22 83:7 88:19 89:23 91:14 93:17 96:22 97:11 99:1 105:2,15 106:10 107:25 109:14 113:18 115:11 116:20 119:3 120:13 121:25 122:25 123:20 124:7 126:4 127:3,14 128:4,16 136:13 138:14 144:6 152:15 153:12 163:22,24 164:1

**camera** 11:3

**Cameron** 63:12

**Camp** 197:10,22 200:22

**cancel** 125:18

**cancer** 12:24

**capability** 118:12 189:6

**capacity** 19:7,8 126:1

**capital** 66:18,20

**caption** 7:10

**captured** 124:4

**career** 218:7

**careful** 185:4

**Carry** 60:25

**case** 7:10 12:19 14:25 16:8,13,15,16 18:3,14 19:8 20:15 22:25 23:1 24:22 36:7,17 43:22 48:3 49:15 51:8,10 52:20 53:24 57:12 58:6,13,22 60:11,17 65:14,16 69:24,25 70:2,3,25 72:2 85:11 89:3 93:15 99:20 101:7,11,12 102:3,6,9,14,16,20 104:7,8,24 105:6,7,8,9,12,13,18,25 106:15 108:20 109:1,2,7 110:11,14,25 112:4,8 114:9 126:20,21 135:11 136:10 137:13 139:9 141:10,20 142:2,7 165:9 187:10,11,17,20 219:9

**case-level** 140:22

**case-specific** 141:13

**cases** 15:5,6,7,10,22,24 16:7 17:5,6,8,22,25 19:6,17 23:10 25:14,17 27:9,11 35:8 39:3 40:15,16,19 41:8,10 42:18,24 43:9,17,18 44:13 46:23 47:7,24 48:1,21,25 49:3,4,6,7,8,11 50:1 55:8 56:7,15,18,23 57:18 60:3,20,21 61:20,25 62:1,4,5,10,12,23 63:6,11,16,23 64:7,11,13 65:19 67:19 68:3 70:20,22,23 71:24 75:24 76:12,15,16 80:8,15,20,22 81:1 82:24 83:1,16,24 84:7,13 90:4,5,7 92:22,23 93:4,9 94:4 95:17,18 102:23 111:9 117:12,15 118:1 119:10 120:3,17,18,22 123:6,7 125:1 126:1,10,18 127:2 128:7,14 137:8,16,22,23 138:8,15,17 139:12 141:8 142:20 143:7,16,20,24 145:9,12,23,24 157:3 158:13 164:8,10 165:21 166:4 167:12,25 173:18 175:7,16 176:10,11 178:2 179:6,22 180:12 188:5 189:19,21,24 190:13 193:15,18,21 194:1,14 196:25 197:3,8,10,13,15,18,22,24 203:8 209:22

**cash** 84:4,5 85:7,9,10,19 88:6,11 90:20

**Casualty** 72:16 195:8

**catastrophe** 15:7

**catastrophes** 13:1

**catastrophic** 16:14

**catch** 232:18

**caused** 54:19

**caveat** 77:25

**cede** 231:8

**center** 20:5 128:3 130:3

**challenge** 195:3,14

**challenges** 195:1

**chance** 46:24 63:9

**change** 73:25 87:25

**changed** 45:15

**changing** 37:11 160:8

**charge** 59:25 118:7,8 184:21 189:6

**Charlie** 7:15 11:3,8 77:24

**chat** 37:2 39:20 94:14 103:22 111:24

**check** 82:12 84:8, 23,25 85:5,13 88:3, 5,13,17 89:1,7 96:12 104:9,10,11, 12,13,14 105:5 106:6,7,12,13,14, 16,17,19,21,23,24 107:7,9,16 108:9, 10,11,12,15 109:2, 4,10 111:17 114:5 123:4,11 125:17,19 132:17,19 135:12, 17 136:4 188:14 189:6

**check-receive** 187:21

**check-writing** 118:11

**checked** 106:25

**checks** 41:4 71:25 81:2 82:10 84:6,14 88:4 89:18 90:9,22 93:5,7 104:5,19 108:24,25 109:4,6 110:23 114:6,8,11 118:7 124:3 125:14 127:24,25 128:2 132:4,7 134:13,21 135:11

**chef** 19:24

**chemical** 12:22

**chooses** 33:19 181:19

**chose** 229:10

**church** 16:13

**circles** 226:24

**City** 12:14 214:14

**claim** 44:4 86:18 141:16 198:25 199:4 203:14 207:6, 9

**claimant** 36:15 37:22 44:2 51:6 52:22 53:23 54:7 57:9 85:20,21 89:5 137:1 156:22

**claimants** 24:12 43:20 44:20 57:10 144:21 158:19

**claims** 68:6,8 194:20

**clarification** 137:12

**clarify** 133:24 138:20 143:5 152:11 181:15 194:5

**clarifying** 26:24 66:5 181:12

**clarity** 20:22 78:7 79:10 116:3

**clear** 32:25 41:12 108:22 133:4 137:7 231:21,23

**clear-cut** 201:14

**clerks** 129:23

**clicked** 39:23

**client** 40:25 41:2 43:24 46:16 49:16 51:4,6,20 52:3 70:6 71:20 72:2,6,8,14, 23,25 73:8,14,15,20 89:9 101:9 104:13, 19 105:8,10,19,23, 25 113:4,8,22,25 114:10,16 132:14, 16,25 136:4,19 137:3,23,25 138:4,5 140:4,16 148:14 154:5,11 156:7 165:8 172:2,18,19 173:11 179:21 231:2

**client's** 59:4 137:24

**clientele** 45:9

**clients** 41:3 44:6,9, 11,21,22 45:4 47:5 50:9 59:2 68:18,24 69:13,18,21,22 71:1,21,23 74:4,6, 14,15,18 75:15 102:18 113:13,23 114:1,3,7,8 127:25 134:13 136:7 144:1, 16 145:3 146:14 150:21,22 151:15 152:8,10,20,23 160:5,9,14,24 163:19 164:19,22, 24 172:5,12 173:8, 22

**Closed** 97:24

**closely** 221:13 225:20

**clue** 180:25 181:1

**co-** 39:2 40:18 78:24 80:20 99:6 119:7

**co-counsel** 26:6,23 78:17,18 80:18,23 82:25 83:3,16 99:11 103:3 104:10 117:23 118:21 119:1 171:3

**code** 73:24 232:1

**coincide** 125:23

**coincided** 93:1

**colleague** 94:3 221:17 225:1,11

**Colorado** 193:11

**column** 104:20,23 105:7 106:5 108:13, 15,16 109:20,25 110:8 111:1,13 122:16,20 125:10

**columns** 106:8 109:18

**combinations** 187:19

**combing** 224:13

**comments** 24:1 131:23

**commercial** 16:12 232:1

**commercially** 53:6, 8

**Committee** 8:18 19:13

**common** 175:18

**communicate** 198:13,20 231:13

**communicated** 198:11,25

**communicating** 97:1

**communication** 71:4 194:10 203:5

**communications** 148:19 215:8

**companies** 72:17

93:25 195:9
**company** 12:12,22 50:14,15 51:15,19 55:14,23,25 69:3,4 72:13,19,21 84:24 85:12 86:15,20 87:7 89:17 93:11,21 95:16 104:12 107:8 108:10,11 141:16, 17,19 143:23 153:16 167:6 175:4 195:1,3,6,7
**compare** 81:5
**complaining** 189:24
**complaint** 139:13
**complaints** 44:18 114:17 139:14
**complete** 10:18 229:11,13
**completed** 32:10 33:8
**completely** 110:2
**component** 48:8
**computer** 39:24 50:21 52:4,7
**computer-generated** 184:13
**concern** 170:24 203:1
**concerned** 118:5,13 218:19
**concerns** 189:11 203:6
**conclusion** 36:5 75:18 76:4 113:19
**concur** 30:6,10
**conduct** 30:11 102:1 164:24
**conference** 21:8,11 219:1,3
**confidential** 231:25 232:4
**confirm** 67:1 165:6 193:23
**confirmation** 212:14,22 213:7 219:14
**confirming** 17:12 160:20
**confusing** 158:6 228:16
**conjunction** 68:9 188:19
**connection** 175:3,9 179:2
**considerable** 76:12
**consistent** 38:7,12
**constantly** 148:7
**contact** 73:7 128:3
**contained** 99:7
**content** 56:2 186:12
**contents** 182:16 183:11 192:14
**context** 18:13,15 191:17 213:20
**continue** 28:25 31:24 32:21 202:5
**continued** 92:15,23
**contract** 58:16 102:16
**conversation** 31:4 193:25 200:20,21
**COO** 130:2
**cool** 57:23
**copied** 222:17
**copies** 221:5
**copy** 42:19,21 103:22 111:24 203:13 204:9,10 221:7 223:8 233:23 234:2,9
**corn** 12:19,20 22:25
**corporate** 26:2
**correct** 10:19,20 12:4 17:17 20:16 23:21 27:12,13 36:2 39:13 41:14,21,22 45:22 48:15 52:5 54:20,23 55:1 58:3 62:23 67:7,8 77:20, 21 81:6 83:13 86:8, 9,11,12 87:8,9,13, 14,19 88:8 89:15 100:3,7 102:11,13, 23 106:3,4 116:5,6 124:4 125:5 130:10 134:10,11,16 143:14 148:6 152:12 153:10,15 156:20 158:2,4 159:17,18,21 161:5 165:15 166:6,12,18 182:8,9,11,17,18,23 183:14,17,20,22 192:16 194:2 205:20,21,24 206:2, 19 210:6 219:11 229:15 230:3
**corrected** 149:2
**correctly** 58:17
**correspond** 111:16
**cost** 54:17 97:17,23 98:25 101:14,16
**costs** 101:8 102:17, 19 200:13,18,21
**counsel** 7:12,25 37:22 39:3 40:19 78:25 80:21 99:7 119:8 125:16 153:21 231:22
**counsel's** 28:19
**couple** 63:14 66:5 75:13 116:22 177:1, 7
**courier** 134:19
**court** 8:4 9:15 19:14 29:10 33:12 37:15 62:22 63:5 90:12,21 103:20 111:24 112:6 145:19 169:4 213:5 218:20 219:5 233:16
**Court's** 32:23
**courteous** 35:18
**courtroom** 33:4
**courtrooms** 218:25
**cover** 11:19
**crazy** 200:8
**create** 52:14,19 70:11 71:6,7 156:1, 4 186:19,22
**created** 52:11 54:4,6 68:9 71:12 104:7,17 105:8 155:19 183:23 184:2,7,8 185:19 186:18
**creating** 52:10
**creation** 106:7,16,

23 107:9

**Creditors** 8:18

**Cris** 46:5 96:19 98:11,24 114:13 116:4 146:9 147:13, 21

**Cris's** 96:25

**Cristobal** 7:21 96:15,20 113:4,7,12

**criteria** 68:9,12,18

**CRM** 42:23 79:11,12 111:18

**cross-reference** 70:21

**cup** 14:12

**curious** 11:17

**current** 132:21 199:10,22 217:12

**Curtis** 234:7

**custom** 71:10,12

**customer** 53:2 79:13

**cut** 121:16,22 122:5

**CV** 12:9

**cycle** 14:22

**D**

**daily** 53:16,17 67:17 93:6,7 172:8 184:6, 7 194:9,13,14

**damage** 15:5 16:8, 12,15,21 50:13 85:1 93:24 110:11 111:12 141:25 153:19

**damages** 54:18

**data** 42:24 50:24 52:12,18,21,23,25 53:20 54:4 55:24 57:8 68:24 130:5,6 155:23 183:5

**database** 57:23,24 58:2 111:14,15

**date** 7:8 10:22 48:12 57:13 104:11,12 106:7,16,17,23,24 107:7,9,10

**dated** 94:25

**dates** 92:12

**day** 28:4 117:11 127:24 200:25 217:5

**day-to-day** 148:14, 16 211:25

**days** 214:15

**DB_ID** 111:13,19

**deal** 33:23 55:12 170:14 203:2 216:9 230:22

**dealing** 44:21 47:4 122:10

**dealt** 41:3

**death** 126:17

**debtor** 179:21 199:9 200:23 212:19

**Decibel** 151:7,10,14, 15 175:13,14

**decide** 231:10

**decided** 66:6,10,11 77:19 156:5 161:18 162:1

**deciding** 90:8

**decision** 154:13 156:14,20

**declaration** 112:10 113:1,2 133:15 203:14,24 204:9,10, 22 205:7,14 206:11, 23 207:2,5,11,16, 19,21,24 209:4 210:14 216:24 224:14,15

**declarations** 207:20

**declaratory** 90:10, 20

**deduct** 103:2

**deducted** 99:10

**deducting** 100:11

**deed** 69:3

**deep** 12:18

**definition** 170:8

**deliver** 70:13 114:8

**delivered** 41:4 114:7,12 135:12

**delivering** 71:25 134:13 135:17

**delivers** 132:4,7 134:21

**delivery** 53:22 114:5 134:14 135:11 136:3

**Delta** 15:12,14,20 91:8

**demand** 51:14

**demonstrate** 139:8

**department** 60:1

**depending** 13:11 87:5

**depends** 16:9 88:22 127:7 129:14 191:17 199:16

**depo** 210:25 225:22

**deponent** 8:10 11:6 14:14 22:21 23:23 30:12 34:7 36:9 38:11 40:10 49:24 57:2 61:1 62:15 75:6,19 76:5,11 77:1 78:17,24 79:2, 5,20 80:1 82:9,23 88:21 89:25 91:16, 23 93:19 94:5 97:4, 21 98:8,15 99:3,14, 16 100:7 105:5,17 106:12 109:16,23 113:20 115:13,16, 24 116:22 119:4,24 120:15 121:11 122:2 123:3,22 124:17 126:5,14 127:6,16,23 128:18 138:20 139:1,8 142:24 150:9,12 157:11 161:2,21,23 162:12,16 165:2 167:15 168:7,14,17 169:11,17 174:20, 23 176:9,13,18 179:9 180:1,7 182:2 190:25 192:6 227:13 228:8,11 231:14

**depose** 216:21

**deposed** 30:13 50:4 213:17,23 214:21 216:15

**deposing** 215:6

216:6

**deposition** 7:9 11:1, 20,25 28:24 30:11 32:22 38:15 102:19 125:4 132:18 147:22 204:11,18, 20,23,25 206:4,9,18 209:5,20 210:19 211:2 214:12,17 215:17,20 217:17 224:12 226:2,6,10, 17 228:20 231:25 232:3,9 233:1,14

**depositions** 9:5 18:22 218:24

**describe** 15:2 21:2 131:8 154:22 196:24

**describing** 41:9

**deserved** 119:13

**design** 107:13

**designing** 19:18

**detail** 26:5 140:22 141:13 205:12

**details** 130:20

**determination** 107:18,23 108:6

**determine** 29:11 30:2 71:1 87:15 104:18 154:4,10 188:21

**determining** 43:18 44:1 46:24 54:16 183:20

**develop** 68:2,18

**developing** 183:4

**device** 25:5 64:20

**dictate** 139:4

**dictates** 104:7

**died** 177:21

**differently** 16:7

**differs** 126:14

**difficult** 9:16 44:21 47:5 74:14 157:11 224:20

**digital** 50:7 150:23

**dips** 35:2

**directly** 36:25 69:14 94:16 130:3 223:9

**Disability** 126:16

**disagree** 11:13 158:17

**disagreeing** 158:7

**disagreement** 11:15

**disburse** 85:19

**disclose** 229:5 230:1

**discovery** 18:21 140:19 164:24 166:8

**discuss** 117:8 132:25 172:24 194:13 206:7 232:8

**discussed** 116:23 119:14 147:19 160:13 206:8 218:23

**discussing** 117:25 125:4

**discussion** 41:11 132:21

**discussions** 149:7

**dishwasher** 19:25

**displayed** 151:4

**dispute** 199:20,22, 25 200:5,12,16 201:2,5 202:7

**disputes** 199:10 212:22 215:1

**disruption** 232:14

**disruptive** 32:3,19

**distinct** 102:4

**distinction** 137:5

**distinguished** 138:7

**distributed** 109:19, 23,25 125:11,14 186:5

**District** 112:7 143:1 164:10

**Division** 112:7

**docket** 16:8,21 22:12 64:15 112:8

**dockets** 16:7 22:24 23:4 25:15

**document** 37:3,17 40:2 60:13 87:23 94:9,18,23 95:7 98:23 103:14,25 104:4 105:3 109:22 111:22 112:12 123:2,5 155:4 205:8 208:2,10,16

**documents** 12:1 39:18 205:2,4 206:25 208:14 224:12 225:10,12 226:9

**dollar** 76:22 122:21

**dollars** 84:11 85:9

**download** 94:16 103:22

**dozen** 208:22

**draft** 166:8 192:3

**drafted** 146:13 166:4

**draw** 112:24

**dropped** 103:21

**due** 62:8 104:14,15 126:18 214:15

**duly** 8:20

E

**e-** 18:20

**earlier** 64:16 79:11 83:11,18 136:7 138:6 139:19 144:4 158:12 165:6 180:12 229:2

**early** 19:21 24:19 43:7 147:22 178:17

**ease** 136:25

**easier** 86:2 105:19, 23 133:9

**easy** 37:13

**ECF** 203:16 208:14

**educational** 12:7

**effect** 10:13

**effective** 92:21

**effectively** 25:22 50:17,23 125:17

**effort** 17:13 19:5 68:1

**efforts** 53:14 103:2

**email** 51:5 54:7 73:13 94:15,23,25 96:2,14 172:7 181:21,23,25 182:7, 8,11,13,16 198:15, 17,19 210:1,12 220:22 221:20 222:5,17 223:2

**emailed** 221:21,22 222:12 223:3

**emails** 215:11 222:21

**emotionally** 15:4

**employee** 106:14 108:8

**employees** 54:25 129:8

**encourage** 24:3

**encumbered** 84:6 85:14,16,18 89:7,18 104:9 107:16,17,19 108:6,12 128:2 184:22

**end** 12:18 47:11,14, 16 233:14

**ended** 34:10 47:12, 18,19,21 48:13,20 142:24 155:20

**engagement** 197:16

**engineers** 129:25

**enter** 35:25 77:20

**entered** 38:8 69:7 93:5 104:12 106:17 107:10 125:24 145:8 184:17,25 185:9

**entering** 80:3,5 107:20

**entire** 23:7 85:5 217:5 233:1

**entirety** 80:17

**entitled** 81:14

**entity** 26:2 73:10 111:4

**entry** 130:5

**environmental** 13:1 15:6 23:10

**equal** 109:8 123:14 125:19

**equals** 98:4

**equity** 151:13

**error** 35:18

**escalation** 114:17

**essentially** 24:25 173:9 195:12

**established** 106:1

**estimate** 17:4,19 67:25

**estimated** 54:17

**estimator** 97:23 98:25

**event** 15:3 60:2

**eventual** 128:5

**eventually** 25:24 35:24,25 74:19

**everyone's** 12:16 59:4

**evidence** 11:9,19 27:5 29:2,20 31:23 32:18 33:2 42:1 76:25 82:22 87:22 99:13 121:9 124:7, 16 126:4

**evidentiary** 33:22

**Ewing** 7:25

**exact** 20:23 43:6 104:4

**EXAMINATION** 8:22 128:21

**examine** 224:11

**examined** 8:21

**examples** 133:22

**exceed** 32:17

**Excel** 172:8

**excess** 17:8

**excessive** 32:16

**exchange** 60:13

**exclusivity** 151:25 152:1

**excuse** 11:2 66:13 73:10 105:5 109:2 156:7 172:19 178:21 179:7 181:7, 10 196:22 218:25 221:21 224:9

**executed** 42:13,15

**Executive** 19:13

**exhaust** 63:22

**exhibit** 37:4,7,8,12, 14 47:8 65:21 66:4 86:4 94:10,11 103:16,17 111:25 112:1 122:14 181:21,22,23,24 182:1,2,4,19 183:9 186:10,12 187:5 188:2 206:14 211:12

**exhibits** 206:17 209:7,11,12,20,21 210:22 211:10,14 220:15,19,24 221:20 222:1 223:10,18 225:21 226:3,6,9,17 228:20

**existence** 80:11

**exited** 174:8

**expediency** 94:23

**expenses** 58:19 59:5 85:25 87:17 89:3 94:20 99:10,20 100:11 101:8,21,24 102:3,4,6,9,14,16, 20 103:3 125:15 142:4

**experience** 22:23 56:6 74:7 126:9 130:2 131:8 209:19

**expert** 18:18 126:12

**expertise** 40:15,16 68:11

**experts** 16:18 17:1 18:16 24:23

**explain** 20:18 56:12 194:23 232:11

**explained** 143:11 212:25

**explanation** 10:25

**explanatory** 108:14

**expo** 19:25

**exposure** 130:22

**extra** 71:11

F

**facing** 34:23
**fact** 32:22 78:4 113:9 124:12 125:25 126:13 127:4 134:9 166:14 173:17 186:1 194:9
**facts** 27:5 41:25 82:21 99:12 121:8 124:6,15 126:3
**failed** 119:1 166:7, 10
**failures** 117:21
**fair** 130:8 152:24,25 187:16 188:6
**fairly** 9:7 23:1
**Falk** 7:24 162:11,13 167:14,16 168:6,8, 13,15 169:13 171:13,15,17 176:7, 20 179:8,25 180:6 190:23 191:18,23 192:5 197:20 198:1 201:17 208:20,25 210:8 226:20 227:1, 20,24 228:2 230:4, 25 231:13,17,21,22 232:12,19,21 234:2, 4,13,14
**familiar** 9:6 135:10 175:1 183:2,10 204:2,4 205:7,16,19 207:13 208:1,9,19 213:22
**fancy** 50:20
**Farm** 56:16 57:14 60:3 72:15,16 195:5,7,8
**farmers** 12:19 14:23
**fashion** 55:21
**fast** 92:12 128:10
**fault** 187:25
**federal** 11:9,19 27:17 29:2,19 31:23 32:18 33:1 90:12,20
**fee** 66:6 67:2 80:21, 23 83:17 86:23 87:8 99:18 110:21 139:5 173:19,24 212:22 215:1
**feed** 34:21
**feel** 94:4
**feels** 129:4 209:14
**fees** 58:16 76:13,15, 16 80:18 84:2 86:13,25 88:17 90:22 97:17 98:25 99:7,11,19 100:11 101:9,14,18,19 102:17,19 103:3 109:11 117:23 124:14 173:4 179:5, 14,23 180:1,4 197:17,24
**fell** 12:20
**felt** 22:12,17 190:6
**field** 107:14
**fighting** 157:16,19
**figure** 61:2 124:13 202:2
**figuring** 45:2
**file** 37:11 90:9,20 120:19 142:20,25 164:9,19 172:8
**filed** 60:12 68:7 86:3 90:11 112:4,9 118:15 199:1 200:9 201:8
**files** 97:18 126:17 140:4,16 148:14
**filing** 65:14 97:17 98:25 99:19 102:17 118:18,23 119:11 164:7 203:15
**filings** 47:20 203:20
**fill** 106:9
**final** 86:16 111:13
**financial** 173:15,16 217:13
**financially** 15:4
**find** 45:8 74:6 80:13 114:1,3 125:25 160:5
**finding** 45:14 74:9 113:22 214:16
**fine** 11:19 79:4 159:11 190:7 199:18 202:7
**finish** 9:10,11 22:14 26:13,19 31:20 32:8 81:16
**finished** 26:16
**fire** 12:25 48:4
**firm** 7:11,21,23 12:15 13:5,8,13 14:17 17:10 19:1,4, 11,20 20:3,10,11 26:2 36:19 40:18, 21,24 41:21 43:2 44:11,17,24 45:23 46:1,22 47:3 49:3, 25 50:23,24 52:2 68:1 70:17 71:16 73:2,15,16 74:1,9 76:1 80:12 82:11,13 83:5 85:21 94:1 99:9 104:19 106:2 110:15 111:8 114:15 115:7 118:20,25 119:13, 16 121:23 122:3 126:16 129:8 132:21 133:10 137:1,9 142:18 146:20,21 147:3,11 148:7,13 157:4 175:19,23 177:3,5 185:2 188:13 189:2, 10 195:11 196:16, 20 197:16,23 199:2, 11 200:1,6,17 202:22 203:7 211:20
**firms** 19:1 79:8 84:1 115:6 148:2 164:16 176:1,24 177:7 229:3,14,21,23 230:23
**first-party** 44:3 48:6
**fit** 86:24
**fixing** 85:4
**flagged** 72:9
**Florida** 63:20,21 64:7 65:4 120:12
**flow** 117:15 194:13
**focus** 129:19 133:9 206:11
**focused** 23:7 25:1 213:9
**focusing** 189:20
**folks** 12:24 44:19

73:3 92:1 94:13 128:6 188:19

**follow** 71:17 156:20

**food** 19:25 219:5

**footer** 36:18,19 38:2

**Footnote** 38:17 40:8 66:7 87:11,12 100:12

**forgot** 227:13

**form** 18:25 26:1 108:2 138:19 142:23 150:7 155:4 157:10 161:1,24 165:1 169:10,14 171:18 179:8,25 180:6 186:13 190:23 191:18,23 192:5 201:17

**formally** 216:22

**formed** 24:7 27:2 79:8 146:1,2 211:19

**forming** 77:14

**Forty** 162:6

**forward** 77:24

**fought** 200:2

**foundation** 38:10 56:10 62:14 65:1 75:18 76:10,24 81:21 82:8,22 83:8 88:19 89:24 91:14, 21 93:18 95:6 96:22 97:3,12,20 98:2,7, 14 99:2 105:3,16 106:11 108:1 109:15,22 115:11 116:21 120:13 122:1 123:1,21 124:7 127:15,22

**frame** 43:11 82:14 129:15 146:7

**free** 94:4

**frequently** 115:10, 17 147:8

**friends** 46:7

**front** 10:19 37:12 133:15 181:20 183:10 185:8 207:13 210:7 223:16

**frustrated** 132:16 146:11

**full** 15:14 62:25 86:18 123:17,22

**fun** 215:2

**function** 94:14

**functionality** 53:12

**funding** 66:17

**future** 41:11 150:6

G

**g-h-e** 22:4

**Galerne** 8:16,17 18:7 234:6

**Galindo** 7:10,16,21 38:9,13,22 39:4,6,8 40:13,17,18,21,24 41:18,21 42:18 43:2,9,13,16 44:24 45:23 46:1,9,20,22 47:3 49:3,25 50:3,5, 6,10,22,24 52:2,10, 13,23 54:4 55:7,8, 10 66:8 68:1 69:19 70:14,17,22 71:8,16 73:2,15,16 74:6,8 75:14,24 76:1 81:12,13,24 82:2, 11,13,17,18 83:1,5 96:16,20 99:9,22 102:25 106:2 110:11,13,15,21,24 111:7,8,10,12 113:4,7,12 114:2 115:7,19,21 116:4, 5,9,15,18,25 117:2, 7 118:20,25 119:13, 15,25 121:23 122:2 126:2,7 128:14 133:9,13,16 136:13, 19 137:3,10,13 138:4,13,15,17 139:4,13,19 140:12, 15,18,21,25 142:4, 7,13,17,18,19 143:23 144:5,11 145:22 146:1,6,7,9, 15,20,21 147:3,11 148:3,18,21,24 149:7 150:22 151:9 152:18 156:24 157:4,8,25 159:16 164:7,16,18 166:15, 16,23 167:11,24 168:4 169:7 172:4, 9,20 173:1,6,8 187:9,13,17 188:5,9 190:6 193:14,17,20, 25 194:16,20,21 195:19 196:13,15, 16,20 197:8,16,23 198:6,14,25 199:1, 11,21,23,24 203:4 211:20 214:20,23 215:9 216:19 217:14 218:8 232:12

**Galindo's** 45:13 50:4 70:23 136:23 143:15 145:22 152:9 158:9 159:13 160:3,4 163:18 172:1 189:11 200:17

**game** 21:9,10

**gaps** 81:9 83:12,19

**gateway** 154:2,24 155:1,3,16,20 156:13,19 195:17

**gather** 73:3

**gave** 60:2 70:7 120:20 139:22 149:6 181:21 195:4 204:12,14 205:10 206:4 210:23 211:9

**gearing** 19:14

**general** 14:22 45:10 192:12

**generally** 10:25 11:23 14:25 19:2 21:3 55:5 69:23 79:18 93:9 132:14 199:3,4 206:16 213:15

**generated** 58:9 71:17 140:23 185:10

**generates** 184:9

**get all** 34:7

**get-go** 13:4

**give** 8:8 12:6 20:23 57:24 61:8 89:8 94:5 108:18 126:12, 22 130:11 187:20 201:13 204:16 213:22 218:5,10 223:2 229:10

**giving** 177:22

**glad** 169:15

**glanced** 223:13

**GLF** 53:21 54:22

**GLF's** 119:7

**God** 170:9

**good** 7:24 8:24 9:1 18:20,21,22 22:10 23:6 24:22 40:2,4 44:19 59:23 68:5 80:1 88:22 98:21 108:17 124:24 130:18 136:1 144:15,18 165:23, 25 166:2 171:12 177:24 217:4

**GOOT** 177:15

**Goott** 7:22 11:8,12, 16,21 22:13,19 23:25 26:8,11,15,20 27:4,14,17,18,23,25 28:2,4,7,8,9,12,15, 17,22,23,24 29:3,7, 13,16,21,24 30:1,8, 10,14,17,18,19,20, 22,25 31:2,3,7,9,13, 16,19,21 32:1,5,7, 12 33:3,10 34:11, 14,19,24 35:14,15, 20 36:4,10 37:5 38:10 39:16,20,22 40:2,4 41:23,25 42:8 49:21 56:9 62:14 64:23,25 65:25 75:4,17 76:3, 10,24 77:22 78:6,8, 9,14,19,21 79:21 81:15,21 82:5,7,21 83:7 87:21 88:19 89:23 91:14,21 93:17 95:5 96:22 97:2,11,19 98:1,6, 13 99:1,12,15 100:4,6,25 105:2,15 106:10 107:25 109:14,21 112:17 113:18 115:11,14 116:11,20 119:3,17, 20,23 120:13 121:1, 4,8,25 122:25 123:20 124:6,15 126:3,11 127:3,14, 21 128:16,22 138:25 139:7,10 141:6 143:3 145:16 150:4,16 157:12 158:25 159:2 161:4, 25 162:17 165:1,3 167:17,20 168:10, 16,18,20 169:18 171:9,14,16,20,21, 22 174:13,16,18,22, 25 176:8,12,15,23 177:12,18,25 179:12 180:3,8 182:3 191:1,19,24 192:9 195:22 196:8, 11 197:21 198:2 201:19 208:24 209:1 210:11 212:4 226:25 227:3,5,10, 16,21 228:1,5,14 230:6 231:4,9 232:7,23 233:4,22, 24 234:11,12

**govern** 20:4

**governed** 113:14

**governing** 19:8

**grab** 225:4

**grabbed** 222:23

**graduate** 12:8 14:10

**graduated** 14:11,16

**grand** 58:13 85:12, 13 87:2 88:7 89:1,2, 7 101:7,13

**gravitate** 18:18

**great** 197:2 203:10

**grew** 128:10

**gross** 87:3,6 88:1 99:18 100:10 101:10

**group** 13:12,15,16, 25 18:1,12 42:4 45:9,13 50:10 57:9 69:9 177:4

**groups** 17:24 41:6

**grow** 128:10

**grown** 23:3

**guess** 10:11,12 74:17 157:1,7

**guessing** 152:6,7

**guidance** 120:20 218:5,10

**guy** 96:8

**guys** 22:10 71:14 187:14 194:12 203:10 212:20,21 217:5 231:14

**H**

**H-U-Y-E** 59:19

**hail** 23:9

**half** 208:22

**hall** 50:8

**hand** 114:8 206:13 225:5

**handed** 103:19 204:21 221:9,15 223:10,15 224:2,3

**handing** 37:14 209:4 223:24

**handle** 16:7,8 27:11 44:11,17 64:17,20 69:13 93:11 114:16 120:21 126:1,19 128:1 139:12,14 142:19 190:13

**handled** 15:23 17:6, 7 19:9 44:5 61:24 65:3 102:25 120:3, 5,16,19

**handles** 49:17

**handling** 15:21 45:3 48:1,2 63:5 64:3,7, 10 65:6,12,16 102:3,6,22 120:22 126:16,17,20

**happen** 49:24 51:3 52:17 60:8,19 62:20 136:22 150:6 214:13 223:24

**happened** 23:19,24 24:11 57:9,20 60:6 62:9 138:21 164:4

**happening** 122:9 136:25 213:6 214:22

**happy** 136:24 138:1 163:4 232:10

**harassing** 171:19 226:21 231:1

**hard** 45:8 73:11 102:17,19 160:5

**Hayward** 7:15

**he'll** 230:21
**head** 9:16,17 124:18 189:23 190:4 195:14
**hear** 34:19 99:15 116:11 128:24 129:7,9 150:2 164:1 167:22 168:11 169:15 191:25 196:8 198:3,22
**heard** 15:18,19 35:17 158:5 168:16, 18
**hearing** 212:23 218:20
**hearings** 213:8
**hearsay** 95:6 97:11 115:12 116:20 119:3
**heck** 176:14
**hell** 213:8
**helped** 45:13,18 83:19 107:13 188:21,25 223:20 225:11,16
**helpful** 188:25 216:5
**helping** 92:9
**helps** 188:23
**hey** 72:22 96:19 139:3 222:9,24 223:2
**Higdon** 96:6,7,15 188:20
**high** 46:11
**highlight** 104:7
**hire** 24:23 27:8 35:6 80:7,14 93:11,13 126:6 128:6 144:16
**hired** 68:4,20 129:16 130:3 144:5,11,13 159:22
**hiring** 16:23,25 67:14 102:11
**history** 21:3
**hit** 15:25 16:2 46:3, 13 91:25
**hold** 20:22 26:11 42:8 45:15 61:9 71:23 72:2 73:1,12 74:4 95:5 135:22 161:12 172:6 177:12 220:15 232:15
**holders** 86:21
**holding** 226:8
**homes** 45:12 69:2
**honest** 55:7 110:2 135:19 169:23 189:25 200:22 207:10 229:13
**hope** 152:3
**hopes** 114:9
**hostile** 41:3 44:18 45:4,7 136:8
**hour** 31:11 229:25
**hourly** 217:10
**hours** 31:14
**house** 52:21 85:1,2, 5
**housekeeping** 219:8
**houses** 42:23
**Houston** 106:13 112:7 117:13
**Houstonians** 46:6
**Hubspot** 52:15,16 53:3 166:21 167:1, 4,15 168:1,7,17,23 169:1,20 170:12,21
**Hubstaff** 169:1
**huh-uh** 9:21
**human** 107:20
**hundred** 25:17 85:12
**hundreds** 93:6,7
**hurricane** 15:12 16:1,21 20:15 23:14,17 24:7,10,11 25:18 39:3 40:19,23 43:11 44:3 45:11 46:3,10,13,16 50:9, 13 57:19,20 59:24 67:15 69:5 91:4,8 95:17 153:19 175:7
**hurricanes** 15:16 23:8 69:5 91:25 92:3
**hurts** 15:3,8
**Huye** 59:13,18,21 63:11 96:16 115:7, 19,21 165:19,25

**I**

**ID** 73:25 111:14,15, 19,20
**Ida** 15:12,14,19 16:1 20:15 23:14,17 24:7,10 43:11 46:10,16 57:19 91:4,8
**idea** 46:4,8 55:7,10 68:13,16 71:22 103:1 114:7 150:21 151:6,17 159:25 160:1 180:21 193:12 200:22
**identical** 67:1,3
**identification** 37:9 94:12 103:18 112:2, 4
**identified** 81:8
**identify** 83:19 229:14,21 230:23
**identifying** 83:12
**imagine** 67:12
**immediately** 12:17 204:1,7
**impermissible** 33:7
**implied** 72:4
**important** 9:9 132:23 191:13
**impossible** 192:13
**improper** 33:15 126:11 127:4
**in-house** 53:7
**Inappropriate** 24:4
**include** 138:16
**includes** 78:25
**including** 83:1,5
**incomplete** 186:2,3
**incorrect** 144:12 183:14,16,20
**increased** 92:15
**incurred** 102:5

**indicating** 124:3

**individual** 21:12,23 66:25 109:6 116:5 120:19,22

**individually** 16:19 65:3 118:19,25 119:12 120:25

**individuals** 16:22 17:3 45:6 50:11,17 54:13 63:9 64:22 68:5,21 69:9,10 179:23 180:2

**industry** 93:13

**ineffective** 33:25

**information** 43:20 50:21 51:2 53:22 55:21 56:19 57:21, 25 58:7,9,23 69:6 70:8 72:10 73:4 96:13 106:2,8 107:20 138:16 144:16 145:3,5 146:8,11 149:20 153:5,6 155:16,17, 20 158:19,22 182:25 183:17 184:18,25 185:10, 22 186:15 189:1 194:20 201:13,15, 16 213:22 215:5 232:1,4

**informed** 118:19

**infrastructure** 25:21 35:10 56:1 66:16 68:14 146:3

**initial** 68:22

**injury** 15:6 16:17 25:3

**input** 58:9

**inside** 53:12 105:20 232:1

**instance** 80:6

**instruct** 226:21 227:22 228:6 230:21 231:2

**instruction** 227:7,18 230:14 231:6

**instructs** 230:13

**insurance** 43:19 50:14 51:15,19 55:14,22,23,25 69:3 72:13,17,19,21 73:5,6 84:24 85:12 86:15 87:7 104:11 107:8 141:15,17,18 153:14,16 156:12, 15 195:1,3,6,7

**insure** 72:22

**insured** 72:15

**intake** 40:22 41:2 43:17 92:25 144:7 153:2 154:3 158:1, 9,12 159:13 160:3 194:20

**intaking** 113:22

**integrate** 189:1

**integration** 188:22

**intended** 111:1 226:9

**intention** 78:4 79:24 114:13 125:21

**interacting** 77:6

**interest** 13:6 86:21 151:10,13 175:19 178:12 179:24 229:4,22 230:24

**interested** 43:25 67:14,18 69:22 130:20

**interesting** 40:12 85:8

**internal** 105:13,17 111:19,20

**internally** 110:12,13

**interplay** 90:9

**interrupt** 9:10

**interrupted** 34:5

**interrupting** 29:6 30:20,22

**interruption** 32:15 39:17 60:23

**intimidate** 31:14

**introduce** 7:12

**introduced** 21:12,22

**introduction** 22:6

**invalid** 31:24

**involve** 15:4,5 48:5 50:2 110:21 111:10 189:22

**involved** 19:6 20:14 25:16 42:18 43:3 63:17 69:19,24,25 70:1 96:12 138:17 148:18 187:9 194:6

**involvement** 69:20, 23 188:13

**involves** 22:23

**involving** 12:24 16:13 110:19

**issue** 118:6 132:18 139:11 163:6 218:3 227:4

**issued** 106:24 107:7

**issues** 14:24 119:7 143:2 189:11 194:19 195:10

**iterations** 72:18

**Ivy** 108:20

J

**James** 77:11,12,13

**January** 95:1,22,23

**Jayhawk** 12:11

**job** 30:3,11 33:18,25 163:12,13 202:1

**John** 8:19 21:19 105:19,20 112:10 113:1,2

**joined** 45:23 46:1

**joining** 43:14

**joint** 117:8

**judge** 10:19 29:11, 24 30:1 32:20 33:13,21 78:22 163:5 168:14,22 169:5

**judgment** 90:10 207:21

**judgments** 90:20

**jump** 133:6

**jumping** 139:16

**June** 7:8 112:9

**jury** 10:19

K

**K&k** 117:7

**K-O-R-I** 114:19
**Kansas** 12:10,14 214:14 216:24
**key** 110:10
**kids** 13:20
**kind** 12:17 13:2,23 16:10 17:1 18:24 19:1,23 20:2,3 21:7 25:22 41:5 44:10 47:21 59:17 66:22 113:16 122:10,11 130:21 156:14 194:8 197:3 219:7 224:16,21
**Kinsman** 7:25 13:5, 12,15,16,25 20:7, 12,13 38:13 39:13 41:19 43:5 99:9 100:10 110:15 138:15 175:23 177:2,3,4 178:6 231:22
**KKL** 38:14
**KKLF** 46:20 54:23
**KKTL** 38:14 39:4,9, 11 42:18 55:19 66:9,13 69:13 75:25 84:1 99:17 110:20 111:9 117:10 118:4, 5,13 137:17 138:23 179:1 180:2,7,9
**KKTL's** 53:10 71:13
**KKTM** 84:1
**knew** 24:22 27:9 35:6,7 43:16 46:5 80:7,8 144:5,10 149:12 150:5,12 174:21 205:8 213:3, 13 225:21 226:8
**knowing** 80:14,15 163:12 184:17 216:3
**knowledge** 24:21 25:8 27:8 35:5,6 48:24 59:12 62:13 63:5 67:2,4 71:16 80:7,14 88:14 91:6, 10,19 93:14,21 102:7 113:9 122:2 139:22 140:5,8 142:14,21 149:8,10, 24,25 150:10 152:18 157:21 158:1,8,15 159:12 164:7,23 165:2,4 168:3 169:6,7 170:24 171:2,7 182:17 186:12,17 189:25 190:21 191:8,12,16,21 192:4,8,14,22,23 193:9,17 199:7 208:14,15 211:23, 25
**Kori** 114:15,19 136:23
**Krause** 7:10,25 8:6, 20,25 13:5,12,14, 16,25 20:12,13 28:18 33:19 36:5 37:15,18 38:13 39:12 41:19 43:4 49:22 99:9 100:9 101:4 110:15 112:13 124:10 128:23 138:15 175:23 177:1,2,3,4 178:6 227:6 231:5, 22 233:15
**Krause's** 33:17

**L**

**l-h-e-l-m-y** 22:5
**l-i-e-n** 90:15
**L-I-G-A** 57:2
**label** 37:7 94:10
**labeled** 37:4 125:10
**lace** 22:25
**lady** 222:3
**laid** 105:4
**landfall** 24:10
**laptop** 222:15
**large** 16:12 17:3 22:23 25:15 40:15 56:22 75:16
**larger** 23:3 27:11
**late** 46:17 67:7,10 146:6
**Laura** 15:12,14,19 24:11 57:20 91:8
**law** 7:11,17,21,23 12:13,14,15 13:9 14:10,16,17 19:1 20:3,10 27:3 36:19 38:9,13,22 39:7 40:18,21,24 41:21 43:2 44:24 45:23 46:1,20,22 47:3 49:3,25 50:22,24 52:2 68:1 70:17 71:16 73:2,15,16 74:1,8 76:1 79:8 82:11,13 83:5 85:21 94:1 99:9 104:19 106:2 110:11,15 111:8,12 115:6,7 118:20,25 119:13, 15 121:23 122:3 129:3 130:9 137:1 142:18 146:21 147:3,11 157:4 176:1,24 177:3,5,7 185:1 196:20 197:23 199:1,11 211:20 229:3,14,21, 23 230:23
**law-specific** 53:5
**Lawson** 8:17
**lawsuit** 86:3 200:9 201:7 202:9,10,13, 15
**lawsuits** 90:9,10 142:20,25
**lawyer** 17:25 51:7 59:22,23 79:2 114:16 132:25 134:5,7,8,15 135:14 149:24 161:3,6 162:9 163:4 165:24, 25 181:13,18 197:12 207:11 209:19 211:5 213:16 216:3,5,10 230:12,18
**lawyer's** 227:7,18
**lawyering** 211:24
**lawyers** 8:1 18:2,5 23:6 36:17 38:13 39:13 51:12,20 58:22 63:14 110:16 120:20 128:4 129:13,17 131:17 161:7 175:24 178:7 214:4 231:23
**lead** 17:25 19:11 197:12

**leading** 19:14

**leaking** 44:15

**lease** 92:21

**leave** 60:14

**lecturing** 33:23

**led** 58:8

**ledger** 59:3

**left** 61:19 104:24 174:14 191:6

**lefthand** 105:6

**leftover** 101:17

**legal** 20:4 21:6 27:1, 2 35:25 36:4 65:10 75:17,23 76:3 113:3,7,13,16,18 130:11 131:9 132:7, 18 133:16 134:2,3,5 135:13,17 136:4,5 153:25 154:1,11 160:15,16,25 161:6, 8 163:18 221:18 222:3,7

**legally** 43:4

**Lejeune** 197:10,22 200:22

**lets** 188:4 217:17

**letter** 51:14 55:13,25 56:2 72:20 141:17 195:10

**letting** 53:23

**level** 32:19 46:24 74:5,8 163:19

**license** 192:25

**licensed** 120:10,17 190:14,17,22 191:3, 5 192:21 193:1,3,10

**licenses** 193:4

**lie** 111:17

**lien** 84:12 85:15 86:25 90:14,15,17, 18,23 91:5,9,12,24 92:6,24 93:8,22 128:1

**lienholder** 84:8 87:25 89:17

**lienholders** 86:21

**liens** 93:11

**life** 14:22 46:14

**LIGA** 56:24 57:2

**limited** 32:25

**link** 39:23 51:5

**list** 45:6 144:20 229:3,22

**listed** 108:10,11 133:22

**listen** 28:6 157:20 159:3,8,10 163:24 209:2 229:19

**listens** 28:19

**lists** 45:8

**literally** 22:25 214:15

**litigate** 13:20

**litigating** 92:2 212:21

**litigation** 12:18,24 13:3,11 15:12 16:25 23:6,8 24:24 25:2,3, 5,6,18 39:3 40:19, 23 41:1 44:3,8 45:10,11 48:2,6,7,9 50:9 51:21 56:21 59:25 60:11,12 61:22,23 62:6,7,17 63:1,6 64:4,20,21 65:4,17 66:15 67:15 70:4 88:23 93:10, 20,24 102:13,20 105:13 120:3 126:15 127:8 128:5 129:16 146:10 177:9 211:21,23 212:1,14,17 213:3, 9,11,13,18 214:20, 22 219:14

**litigators** 19:11

**live** 13:18 52:25 80:17

**lived** 152:1

**LLC** 13:12 14:1 20:12,13 177:2,4 178:9

**LLP** 7:25 38:14 39:13 110:16 177:3 178:10,11

**local** 73:23

**locate** 160:5

**locating** 160:14

**locked** 84:5

**log** 39:17

**long** 44:12 129:3 156:20 210:1,2,3 212:9 215:12 218:19

**longer** 220:2

**looked** 12:1 24:22 192:7,20 204:1,6 207:16 221:11 223:12,16,19,23 225:2,14,17

**lose** 75:12

**loss** 12:22 68:25 69:4,6

**lost** 45:12 69:1 174:14

**lot** 9:6 15:3,8 22:22 44:14 45:2 47:19 48:14 51:22 71:7 74:2 85:17 96:11 104:16 113:25 114:16 122:7 126:20 128:6 142:25 146:23 148:9 157:7,14 164:9 186:17 193:7 203:19,20 209:20 225:6

**lots** 57:11 73:18 179:21

**Louisiana** 47:20 48:14 59:25 60:1 62:10,22 63:4,10, 16,22 91:24,25 92:2,7,16 119:10 120:10 122:7 165:20 189:13 190:6

**loved** 217:1,2

**lovely** 219:5

**lumped** 133:25

### M

**M-E-T-E-R** 7:20

**mad** 136:20 137:24

**made** 22:7 62:18 104:22 131:23 166:10 200:4,18,19

**magically** 85:25

**magnitude** 67:24

**mail** 55:24

**mailing** 68:25

**main** 96:8

**majority** 17:15 56:7

**make** 8:15 9:6,13 10:2,11,14 16:10 22:10 28:13 30:4 32:25 33:18 34:23 36:8 41:11,17 43:12 53:11 58:15,23 59:2 70:24 72:5 81:23 86:14 92:13 94:21 104:20 108:5 111:3 136:24 137:12,25 162:10 173:9,12 191:14 221:5 231:23

**makes** 10:3 57:22 107:17 127:19 153:11

**making** 9:8 18:9 20:22 26:24 58:5,18 107:22 135:9 172:13,22 190:11

**management** 53:2 79:14

**March** 47:15 49:13 92:18,19 94:24 198:9

**mark** 63:1 103:16 111:25

**marked** 37:8 47:8 94:11 103:17 112:1

**market** 68:2 179:20, 22

**marketing** 67:13,17 95:16 102:4 199:14 200:12,17,21

[redacted]

**mass** 12:18,23 13:3 14:18,22 15:1,2 16:7,20,23,24 18:13,15 22:11,22 25:2 45:9 47:23,24 64:15,17 93:9,10 175:5

**master** 36:21

**match** 22:17 125:17

**math** 86:2 101:6 124:12,17,24

**matter** 16:6 99:19 100:23 101:6,18,23 125:20 129:12

**Maui** 12:25 48:3,4

**Mcclenny** 20:23 50:23 54:5,13 58:11 77:7 79:7

**meaning** 85:18 125:14 136:15 213:3

**means** 50:20 109:9 110:12,18 123:6 135:25 170:25 173:12 178:22 183:7 216:14 229:17

**meant** 111:8 133:20

**med** 25:5

**media** 202:14,22

**mediated** 60:3

**mediation** 56:4,6,7, 14,23 58:6 59:14, 15,16 60:15 61:21 62:2,24 70:4 74:24 104:15 108:22,23 109:7 142:15 165:17 166:11

**mediations** 59:8 164:22

**Medicaid** 93:12

**medical** 64:19 130:4

**Medicare** 93:12

**medication** 56:16

**meet** 77:13,14,16 116:25 117:2 147:2, 11 149:22 196:14 211:1

**meeting** 23:12,15,19 77:16 115:19,25 117:8 147:5,6 149:12,16,23 150:13,14,15,18 218:17

**meetings** 50:8 116:7,14,17 117:20, 25 149:13 194:17

**meets** 217:16

**members** 180:5

**memorialization** 36:16 38:20 99:6

**memorialized** 36:12 38:2

**memory** 129:2 149:4

**mention** 220:24

**mentioned** 83:11,18 113:21

**mercifully** 112:15

**merge** 55:24

**merits** 46:25

**message** 51:4 54:1, 6

**messaged** 222:2

**messages** 53:21 117:16

**met** 20:19 21:4,5,7, 8,14,17 24:14,16 46:10 77:6,12,17 79:7 96:4 115:7 116:22 117:10,11, 13,17,18 145:17,22, 25 146:5,9,15 147:13,21 148:3,20 194:13 215:16 218:8,9

**Meter** 7:18,19 8:14 11:2,5 23:21 214:6, 19 232:12,16,17,21, 25 233:7,19,21 234:8,10

**Meter's** 24:1

**method** 33:22

**methodically** 17:2

**methods** 73:16,17, 19 160:12

**mic** 34:24 177:17, 19,21

**microphone** 34:22

**middle** 47:14

**million** 124:2,10,14, 18,19,20,22 181:3,4

**millions** 84:11 85:9

**mind** 36:6 121:12 174:13 234:6

**minority** 66:15

**minute** 132:11 178:1 206:10 224:17

**minutes** 94:6 211:2

**Miriam** 7:22 79:20 157:11 159:7 162:12,19 202:4 232:25

**mischaracterizes** 27:15 87:22 230:5

**missing** 71:2,19,21 72:5,25 73:14,15 74:4,18,21 109:10 113:23,24 172:2,18

**Mississippi** 63:20, 22 64:10 65:4 120:11 189:22 190:5

**Missouri** 177:3

**mitigation** 51:17

**mixed** 47:25

**Mm-hmm** 145:14 202:16

**MMA** 7:10,23 20:19, 24 21:3,17 23:5 24:17,18 25:11 27:7 35:5 36:1,22 38:9, 12,22 39:4,6,8 40:15 41:18 42:18 43:4 45:19 46:20 47:19 50:25 51:7 52:4,24 53:10,12,21 54:14,23 55:6,8,11, 15 59:5,22,23 60:1 63:8 64:5,7,10,17 65:4,18 66:8 68:9 69:8 70:17,23 71:7 72:25 73:4,9 75:6,8, 25 77:14 80:5,6,13, 17 81:13 82:3,8,10 88:12 89:13,19,20 90:23 93:15 95:14, 24,25 96:2,8,10 99:8,22 102:3,6,21 106:3,13,21 107:11 108:8 110:11,12,16, 19,20 111:6,7,9,12 113:5,8 114:1 117:7,10,21 118:15, 18,23,24 119:11 121:16 122:9 123:11 125:5,16,25 136:16,20 137:9,16, 25 138:15,23 139:12 140:9 141:2 143:1 145:22 146:2, 9,12,20 148:7,13 149:20 155:9,17,21, 23 156:1 158:23 164:16 165:5,7,8, 11,13,16,21 166:4, 7,11 172:5,19 180:15 185:7 188:5 189:1,23 193:20 194:10,12 196:17 199:1,9 211:20 214:20,23 215:9 218:9

**MMA's** 52:4,18 93:23 96:13 111:20 117:3 188:14 189:2 194:6

**modifying** 55:17

**moment** 18:6 38:5 39:25 60:24 66:2 103:6 122:18 174:3, 4 177:14,19 232:15, 17,20

**monday** 53:3

**money** 49:18 51:18, 19 71:11 76:13 81:1,5 82:16,18 83:2 84:10,11 85:3, 11,17 87:15 100:10 118:2 132:20 142:10 173:9,12 179:20,21 180:15 199:15,19

**monitor** 142:4,7,10

**monitoring** 69:24

**month** 43:6 198:7, 12 214:9

**months** 23:16

**morning** 7:24 8:24

**mortgage** 84:7 85:14 86:20 89:17 93:25 108:10,11

**mortgagor** 84:8 85:15 89:9

**mortgagors** 90:11, 19

**Moseley** 8:19 20:23 21:18,19 36:25 50:23 54:5,13 58:11 77:6 96:16 112:10 113:2 116:10,15,18 118:19,24 119:12 120:3,7 121:10 148:21,24 149:8 190:12,16 191:3 193:10,14,25 219:16

**Moseley's** 120:24 133:14 203:14,23 204:22 209:4

**Moshenberg** 8:17

**motion** 207:21

**motioned** 223:23

**move** 14:12 27:20, 23,25 30:5 31:18 162:14 167:17,18 168:8 170:9 171:19 208:21,25 210:10 227:1

**moved** 13:17,24 45:16 187:25

**moving** 169:9,16 170:9

**multiple** 15:16 19:1 69:5

**mute** 232:19

**mutual** 21:6

## N

**named** 63:12 95:1

**names** 63:15

**Natalie** 8:14,16

**nationwide** 19:12

**needed** 44:22 56:19, 21 91:7 112:20 126:5,23 128:1,3,4, 6 210:22 214:21 219:4

**negotiate** 90:19

**negotiated** 151:24

**negotiates** 93:25

**negotiators** 93:22

**net** 87:4

**nobody's** 74:13

**nods** 9:16

**non-lawyers** 129:13

**non-responsive** 159:1

**normal** 216:15

**notated** 58:17 195:6

**note** 92:14

**noted** 79:25 168:19 176:8

**notes** 131:24 195:24

**nother** 125:3

**nuances** 72:17

**number** 13:10 17:3, 20 40:25 41:1,4 42:13 43:9 44:18 45:16 50:16 52:20 55:22,23 66:7 69:4 73:20,21,23 86:19 88:1 104:10,24 105:6,7,9,12,14,18, 25 106:7,19,20 112:5,8 117:13,17 122:24 128:7 141:16 156:10 158:18 160:9

**numbers** 69:2 104:25 105:1 109:5 110:3 183:13

**nurse** 130:5

**O**

**oath** 10:17 168:3,5, 12,22 169:24 170:11 203:4 208:8 217:23

**object** 22:13 24:1 26:8,14 28:18 42:9 49:21 64:23,25 77:22 78:1 79:20 81:21 87:21 91:21 95:6 101:1 112:17 158:25 159:1 162:8, 13 169:11 200:25 201:17 228:6 230:20

**objecting** 168:15

**objection** 22:19 26:12 27:4,14,16 28:13 32:14 33:18 35:13 36:4,8 38:10 41:23 49:21 56:9 62:14 75:4,17 76:3, 10,24 82:7,21 83:7 88:19 89:23 91:14 93:17 96:22 97:2, 11,19 98:1,6,13 99:1,12 100:4 105:2,15 106:10 107:25 109:14,21 113:18 115:11 116:20 119:3,17,23 120:13 121:1,8,25 122:25 123:20 124:6,15 126:3,11 127:3,14,21 128:16 138:19 141:5 142:23 150:3,7 157:10 161:1,20,22 165:1 167:14 168:6, 18 169:10,13 171:8, 13,17,18,19,21 176:7 179:8,25 180:6 190:23 191:18,23 192:5 197:20 198:1 199:1, 4 203:14 207:6,9 210:8 226:20 227:22,25 228:6 230:4,25

**objections** 27:20 28:25 29:1,14,19 30:2,4 31:23,24 32:3,4,16,17 33:1,6, 11,14,15,22 162:10 163:14 190:11

**obtain** 68:2

**obtaining** 43:19

**obvious** 214:25

**occasions** 116:23

**occur** 85:2

**occurred** 54:19 92:25 150:17

**occurs** 25:18 132:24

**October** 91:13

**offense** 217:5

**offer** 166:10,11 215:5

**office** 106:13 117:13 134:20 136:23 211:3 222:7,13,19, 21,22,23,25 223:5, 6,7,10 225:3

**oftentimes** 51:4

**one-** 13:2

**ongoing** 53:14

**onward** 69:18

**open** 232:22

**operates** 107:14

**operating** 66:17

**operations** 194:6

**opine** 16:11

**opining** 55:17

**opinion** 126:9 157:15 160:15 186:1

**opinions** 126:13

**opposed** 74:2 134:1

**opposite** 191:10

**opposition** 119:15

**order** 161:5 219:4 233:20,23 234:2

**orders** 233:9,16,18

**orientation** 40:7

**original** 233:20

**originally** 44:24 95:13 214:11

**outlines** 39:2

**outreach** 40:25

**overview** 51:24

**owe** 199:15

**owed** 83:3,25 84:2 97:8 98:24

**owes** 180:15 199:15,19 200:12

**owner** 86:20

**owners** 179:3

**ownership** 13:6 175:19 179:24

**P**

**pages** 123:12,17 204:19 209:24 210:3,10,13,16,17, 18

**paid** 55:3,4,6,8 57:16 58:20 59:4,5 81:13 82:3,18,25 83:20 84:2,12,15,16 99:11 101:12,16,22 110:8,10,17,24 111:5,11 118:1,3, 13,20 119:13,16,25 125:14 139:3 179:5, 14,20,21,23 180:1,4

**pairing** 22:10

**paper** 184:2,25 185:8 186:16 192:3 225:4

**papers** 223:23
**paperwork** 223:1
**paragraph** 112:25 113:6
**paragraphs** 112:16, 23,24 113:10
**paralegal** 20:5 135:21
**paralegals** 129:23
**part** 17:24 21:10 44:23 46:22 115:22 160:16 163:22 167:25 177:8 178:3, 23,24 184:16 188:16 194:16 216:20 228:15
**participated** 146:13
**parties** 125:15 202:10 232:3,5 233:3
**parties'** 80:12
**partner** 12:16 25:24 26:10,25 110:19
**partnership** 26:25 27:2 36:1 43:4 44:25 46:20 75:23, 25 77:20,25 78:1 99:8
**parts** 13:24 233:2
**party** 39:5 48:7 74:16 144:17 152:14 159:22
**pass** 50:25 128:19 233:11
**passed** 155:17
**passing** 50:20,24
**past** 101:25
**path** 176:22
**pause** 18:10 36:7 177:10
**pay** 60:16 71:11 88:16 89:3 101:24
**payable** 86:19
**paying** 59:1 101:21 173:21,25 174:19, 23 217:9
**payment** 97:14 103:3 117:23
**PC** 113:4,7,13
**penalty** 8:7
**pendency** 102:22
**pending** 101:1 112:6 161:12 181:11,17
**people** 9:12 15:3,8 18:22 19:22 22:24 23:1 25:20 43:24 44:11 45:8,14 67:14,16,17 68:16 86:19 105:22 126:6 131:18 144:5 154:16 178:18 213:23
**percent** 39:6,9,10 58:16 66:8,9,13 74:13 86:7,10,17,23 87:2,7 88:1,7 99:18 110:14,15,16 124:9, 19,22 187:3
**percentage** 61:20, 22 110:14
**perform** 74:11,12 113:13 117:21 119:1
**performance** 69:16 80:12 115:4,5 116:8,18 117:3,8 119:7 121:7 189:11
**performed** 47:3 74:10 89:20 113:3,7 133:16 211:21
**performing** 47:23
**period** 46:19,21 48:21 49:15 63:1 67:20 69:16 96:8 115:4 143:6 164:14, 18
**perjury** 8:7
**permanently** 13:25
**permissible** 32:17 33:6
**person** 58:14,18 59:9,10,16,17 73:9 147:5,12 166:2 184:20,22 216:5
**personal** 15:6 16:17 25:3 149:8,10,24,25 150:9 152:17 157:21 158:1,8,14 159:12 168:3 169:6, 7 170:24 171:2,6 182:17 186:11 190:20 191:7,8,12, 16,21 192:4,8,14, 22,23 193:9 208:15
**personally** 17:10,21 120:5,7,15,17
**pertain** 104:19 117:20
**pertained** 104:14
**pertains** 99:17 105:8
**pharma** 25:5
**pharmaceutical** 12:12 17:1 64:19 93:23 126:19
**Phil** 95:1,10,12,23 96:4,14 97:1 98:12 178:19,20,23,24 180:4,9
**phone** 45:16 50:11 69:2,7 73:20,23 128:4 147:7 148:4 152:15 153:9 154:16 156:9 159:15 160:9 162:23 163:5 198:19 233:6
**phones** 68:5,17,21 152:19
**phrase** 15:1 41:8 44:6 48:16 65:6 75:22 76:19 88:6
**phrases** 9:21
**physical** 136:3
**physically** 147:11, 13 150:15
**pick** 160:9
**picked** 223:22
**piece** 184:25 185:8 186:16 192:2
**pieces** 184:2
**ping** 57:24
**place** 195:13 214:17
**places** 193:5
**plain** 212:14
**plaintiff** 36:15 38:1 84:24 108:14

**plaintiffs** 19:12,13 38:9 40:22 42:14,15
**plan** 219:14
**plating** 65:15
**played** 174:17 227:15 228:10
**pleadings** 164:7,19 213:14
**PLLC** 7:15 8:17 20:24
**point** 121:20 122:12 144:19 176:5
**points** 66:5
**pony** 13:3
**pops** 72:21
**populating** 58:7
**portion** 145:11
**posed** 171:18
**possession** 221:1
**possibly** 50:18
**post-suit** 86:2,11 87:1
**potential** 37:22 44:3 48:7 76:16,20 173:4
**potentially** 21:8 43:22 51:16 56:24 85:20 124:25 225:24 226:1,11,14
**practice** 23:7 130:9 132:12
**practices** 159:13
**practicing** 129:3,5
**practitioners** 23:2
**pre-suit** 86:1,7
**prefer** 29:18
**preparation** 216:2
**preparatory** 9:3
**prepare** 11:1,24 149:22 215:21
**presume** 10:5 130:12
**pretty** 41:10 88:21 108:22 124:23 141:15 198:17
**price** 12:20
**pricing** 14:24
**principals** 178:11, 22,25
**print** 204:22 221:14, 19 222:7,9,24,25 226:5 228:20
**printed** 94:24 106:20 107:8 204:19,24 205:3,5 206:20 209:10 210:18,22 221:16, 18 222:6,10 223:3 224:25 225:1
**printer** 223:7
**printing** 225:10,12
**printout** 111:22
**prior** 25:15 27:15 46:5,7 62:22 63:4 92:3 97:14 113:21 115:18,25 116:25 118:18,23 119:11 149:7,15 160:21 204:23,25 205:15 206:17 209:4 210:19 217:16 230:5
**priority** 86:25
**problem** 33:21 39:11 71:2 72:23 119:24 139:18 188:2
**problems** 183:15 194:24
**procedure** 16:6
**procedures** 17:2 25:21 66:17 117:14 158:13 194:13
**proceed** 8:12 72:11
**proceeding** 112:5 132:18 199:9 200:24 212:18,20 213:21
**proceedings** 174:9 213:7
**process** 49:10,16,19 54:8 69:23 87:5 90:8 92:10 114:6 117:14 138:13 146:10 158:9
**processes** 17:2 25:21 35:10
**production** 60:13
**productive** 46:21
**profile** 52:11,14,19 54:3,5
**progress** 71:24 186:7
**projects** 129:16
**proper** 58:15 59:3 125:15 126:10 127:1
**properly** 72:3
**properties** 44:16
**property** 15:5 48:3 54:18 72:16 86:20 195:8
**property-related** 48:5
**prosecute** 72:2
**protect** 85:2
**provide** 10:24 111:24 146:3 149:19 186:13 187:5,14
**provided** 55:19 56:1,2 75:15
**providing** 24:2 66:15
**PSC** 19:12
**Puerto** 13:17,22,24 177:5 214:12,14,17
**pull** 55:21 65:23 86:5 181:20
**pulled** 203:23
**purports** 94:23 112:9
**purpose** 188:4 189:13
**purposes** 112:4
**pursuant** 81:19 158:13
**push** 52:18
**pushed** 69:8 70:20
**put** 11:13 37:2 39:20 52:4 88:13 96:12 102:9 111:23 133:14 183:9 185:22 188:21

207:12 231:18

**putting** 66:18,20

**Q**

**qualification** 189:14

**qualified** 139:2,5 149:11 189:12 190:9

**qualify** 50:17 189:16

**qualifying** 140:7

**question** 9:11 10:5 11:6,11,23 22:15 28:17,18,19,20 36:6 63:1 75:20 85:24 88:22 92:20 101:1 108:17 116:16 121:12,15 132:9 133:4 136:1 137:19 144:15 145:6 150:8 157:20,23 159:3,10 160:20 161:13,15, 16,23 162:3 163:10, 11,12 167:18,21,22, 23 168:21 169:19 170:12 171:15,18 175:8 176:6,17 179:10 181:11,18 182:15,21,22 183:6 184:16 185:7,21 188:1 189:10 192:12 193:16,23 197:2 201:1,18,20, 21 203:22 205:15 208:20,22,23 209:2 210:17 212:3,12,24 224:18 227:8,9,14, 19,20,25 228:4,12, 17 229:19 230:17, 20 231:3,7,11

**question's** 9:25

**questioning** 210:9 229:2

**questionnaire** 155:5,8,9

**questions** 27:19 28:5,13,21 30:3,12 33:16 50:12,16 122:15 135:3 138:7, 10 144:11,21 152:11 153:6,12,13, 24,25 154:1,2,3,23, 25 155:3 156:10,11, 13,19 157:7,25 158:11,18 162:15 163:13 176:14,19 181:14,19 195:17 196:12 202:2 211:22 212:5,8 216:17,23 218:13 220:12 224:20 226:22 228:25 230:12

**quick** 81:17 177:11

**Quickbooks** 111:17, 20 118:8,10 125:22 188:14,17,18,23 189:3

**quiet** 30:4 33:18

**quote** 16:2

**quoted** 212:10

**R**

**R1** 111:12

**raise** 27:19 29:1 32:14 163:13

**raising** 33:7

**ran** 25:7 67:17 68:13

**range** 48:12

**rate** 35:7 80:15

**ratio** 126:10,23 127:1

**reach** 68:17

**reached** 24:10 62:10 166:3

**reaching** 61:21 73:2 232:9

**read** 191:4,11,15,20 192:2 204:6 213:14 222:4 227:10 228:8 229:16

**reader** 72:7

**reading** 95:7 174:13 191:9

**ready** 149:13,15

**real** 28:15 78:1 81:16 92:12 177:11

**reason** 18:10 22:22 25:12 34:6 45:17 47:18 58:25 80:3 83:22 93:2 94:20 173:20 214:12

**reasons** 83:2,10,12, 18,21 84:3

**recall** 21:5 43:2 117:6 143:1 193:1 194:19 200:10

**receive** 66:12,13 80:20,23 81:6,10 83:16 99:18 100:10 110:13 124:9,20 172:4 182:13 192:4, 6

**received** 81:2,10,25 82:2 93:6,7 104:5 106:12,14,21 108:25 109:1 123:4, 11 124:25 203:13

**receiving** 69:18 70:7,10 126:2 127:23 173:19 188:8

**receptionists** 129:23

**recess** 61:15 103:10 114:25 174:10 196:5

**recitation** 101:25

**recollection** 24:8 33:6 38:6 40:17 58:10 113:17

**record** 7:7 8:15 9:12 11:13 30:15,17,19 31:12 38:24 39:12 61:5,6,14,16 80:8 103:5,8,12 114:21, 24 115:1 123:10,25 130:4 158:7 168:19 171:11 174:5,7,12, 17 195:25 196:4,7 221:24 227:15 228:10 231:15,18, 19,24 234:18

**recording** 9:16 164:1

**records** 123:6,10, 14,23,24

**recover** 12:21

**recovery** 87:4,6 156:18

**refer** 20:24 41:12

**reference** 105:18

**referenced** 165:20

**referencing** 66:7

**referral** 58:22 110:19,20 125:16

**referred** 196:25 197:10

**referring** 17:10 19:4 20:6 39:12 102:11 105:13 116:4 178:3

**refers** 79:17

**refresh** 33:5 129:2

**refuse** 176:19 227:18 231:6

**refusing** 176:16

**reimbursed** 101:21

**rejoining** 18:8

**relate** 137:8

**related** 48:13 132:17 138:16 141:7 167:25 177:8

**relates** 140:9

**relation** 196:15

**relationship** 24:20 45:19 47:2,22 48:13,20 69:17 77:4,14 78:14,20,21 79:4,7 80:4,5,12 81:20 92:15 102:1 122:11 125:24 132:11,15 133:17 137:9 138:23 145:8 146:1,2,20,25 147:4 148:2 151:16 158:14 164:11,15 167:12,25 173:2,18 178:3 196:16,20 197:7 203:7,11 211:19 217:13

**relationships** 125:3

**relative** 180:12

**release** 85:15 90:19, 21

**relevance** 97:19 98:1,6,13 105:4 119:20,23 121:9 127:21 162:8,14 176:4,7 197:20 198:1 210:8 230:25

**relevant** 167:12 229:8 230:8

**relied** 186:6

**rely** 110:6 187:4

**remaining** 86:17 89:2

**remember** 16:5 21:7 43:6,7 63:15 64:5 110:4 115:21 121:19 133:17 149:3 151:3 190:14 193:15 194:25 195:2,14 202:20,23 210:18 215:20 220:4 221:23 222:3 224:1,5

**remote** 59:9 188:3

**remotely** 65:23

**repair** 54:17

**rephrase** 75:19 108:3 116:16

**report** 51:11,12,13 57:5,6,7,8,10,12,17 58:8 70:18,19,20 71:20,21 72:6,7,25 73:14,15 74:18 81:4 83:11,19,23 104:5, 6,17 107:5,6,13 113:24,25 123:4,7, 11,13,18,23 124:4 139:23 140:22 141:14 142:1,3 149:14,15 155:4 165:14 172:2,4,7,9, 10,17,18,19,21 182:19,23,24 183:2, 7,10,14,17,24 184:3,4,8,13,18 185:10,13,17,23 186:2,3,5,15,18,19, 21,22,23,24,25 187:2,5,13,16,18, 21,23,24 188:1,4,8

**reporter** 8:4,6,11 9:15 18:7 37:15 39:25 57:1 60:24 61:6,10 84:17 103:20 111:25 145:15,19 174:3,15 177:14,19,24 181:25 196:2,10 212:2 219:5 227:12 228:9 231:20 232:6, 15,17 233:8,11,16, 19,22 234:1,5

**reports** 56:17 57:8 70:1,2,7,10,12,13, 16 71:3,6,7,8,9,10, 12,15,17 80:25 115:18,25 125:22 140:3 141:1,7,12 149:13 183:5 187:10,19

**represent** 7:13 50:18 105:1 122:24 154:10 156:17 169:4 173:22

**representation** 40:23 72:21 141:18 160:16 195:11 203:3

**representations** 200:5,18,19

**represented** 22:24 113:5,8 153:21 199:25 201:5

**representing** 7:16, 21 8:18 12:18 14:23 16:12,21 138:5

**represents** 50:16 137:16

**reps** 130:4

**request** 33:5

**requested** 141:1 187:14

**requests** 60:13

**require** 53:14 132:21 134:7 135:14 160:24 161:2 188:8

**required** 134:5,14 230:11

**requires** 132:7

**requisite** 80:14

**reserve** 128:20

**reset** 231:12

**resolution** 61:21 86:7,16 89:17

**resolve** 51:17 62:2, 10 90:13,14

**resolved** 62:2,4

**resource** 79:13

**respect** 19:6 25:10 38:8 41:10 42:6,11 46:23 47:4 54:18 79:11 81:12 89:18 92:7 93:8 102:1,5

117:22
**respond** 51:16 218:1,2 231:3
**response** 121:6 173:3 220:7 229:11
**responsibility** 47:4 89:16,21 118:6 137:25 144:3
**responsible** 40:20, 22 43:21 44:1,9 51:7 55:9 58:18 59:24 65:13,16 73:9 90:18 136:13 140:10 165:7 185:1, 6 195:20
**responsive** 138:14 163:7,9
**rest** 106:5 129:22
**restate** 10:1,7
**restaurant** 19:24
**restore** 85:5
**result** 52:12 153:9 214:22
**resulted** 184:18
**retain** 67:19
**retained** 70:5
**retainer** 36:14 37:21 38:1 41:14,16,19 42:11 47:8 48:22 49:1 50:25 63:7 66:24,25 67:6 68:23 75:16 81:20 87:13 99:7 100:12 113:14 115:5 116:9,19 117:3,9,22 119:8,9, 22 120:4 121:7 156:1,21 158:20 178:5
**retake** 32:22
**retract** 37:7
**retrieval** 130:4
**review** 81:5 83:11 130:5,6 165:13 195:24 203:15,22 205:4,11,12,13 208:13
**reviewed** 204:3 205:2 208:10,19 209:3
**reviewing** 55:16 68:8 69:25 83:18 112:21 187:10
**Rican** 13:18
**Rico** 13:17,22,25 177:5 214:12,14,18
**rises** 32:19
**risk** 66:18,20
**RM** 79:19
**Robert** 19:10,17,21 20:6,7 21:16 96:6,7, 15 178:21 188:20
**robust** 128:1 130:7
**Rodriguez** 29:11 32:20 162:22 163:5 168:23
**role** 30:3 33:15,16, 17 53:10 55:16,18, 19 66:15 71:13 95:14 120:25 143:15 145:9,22 152:9 154:9 158:1 160:3,4 163:18 211:22
**roles** 51:20 143:12 211:20
**roof** 44:15
**room** 7:14 148:23 219:1 223:8
**rooms** 219:3
**roughly** 129:9,11 194:14
**route** 135:1
**row** 123:24
**rows** 123:5
**rule** 33:13 76:25 87:22 99:13
**Rules** 11:9,19 27:17 29:2,20 31:23 32:18 33:2
**run** 57:10,11,17 67:13 74:20 104:18 107:5,6 115:18,24
**runner** 19:25
**running** 126:15
**Ruth** 7:19

**S**

**S-H-E-L-T-O-N** 7:16
**S-Q-L** 58:2
**sake** 20:22 41:11 79:10 85:24 94:22 116:3
**Salesforce** 53:3
**sanctioned** 29:1
**sat** 148:23
**satisfaction** 86:18 114:10
**Saul** 7:25
**saving** 94:20
**scale** 25:23 91:7
**scan** 221:12
**scenario** 192:23
**scheduling** 214:16
**school** 12:8,14,16 13:9,20 14:10,16,17 20:10 46:11
**science** 18:19
**scientist** 130:6
**scope** 32:17
**Scout** 129:16
**Scouts** 126:21
**scratch** 39:7 123:8 179:9
**screen** 39:19,21 40:2 103:15 111:23
**scroll** 112:20
**scrutiny** 47:20 48:16 62:9,21 63:4 92:16 122:9,10
**sealed** 232:4 233:2, 3
**searching** 160:13
**second-tier** 138:13 163:19
**secondary** 85:1
**section** 186:4 232:2
**Security** 126:16
**seeking** 40:23
**select** 165:11
**self-** 108:13
**send** 55:20,25 72:20 98:11 138:4 182:11 194:1

**sending** 54:1 128:14 193:15,21 194:1 195:10

**sends** 54:7 184:6,9

**sense** 10:2,3,14 27:1 42:12 75:23 76:22 127:1 153:11

**sentence** 228:17

**separate** 99:25 100:1

**September** 24:6 46:2,17 48:19 49:13 67:7,10 69:18 91:6, 10

**September-ish** 77:18

**series** 104:25

**serve** 166:8

**served** 200:9 202:11 203:1

**services** 134:4

**serving** 66:14

**set** 53:15 68:14 70:15 71:3,9,15 184:4,5

**settle** 17:16 56:7,24, 25 58:6 60:4 62:5 76:21,22 85:11 109:1

**settled** 56:18 57:13, 15,18 58:13 60:5 62:5,25 74:19,22 76:12 80:20,23 81:1 82:24 83:16,20,24 84:14 104:8 108:21, 22 109:7 114:9 118:1 127:8 135:12 141:10 142:8

**settlement** 56:17 57:5,6,7,10,11 58:12 59:1 62:3 70:18 80:25 81:4 83:11,19,23 88:25 108:14,15,16 109:2 132:24 149:14 166:7

**settlements** 57:20 128:5 166:3

**settles** 17:16 60:17 101:7,13

**severed** 122:12

**sexual** 12:24 126:21

**shakes** 9:17

**share** 39:19,21 80:18 197:17,24

**shared** 103:14

**shareholders** 179:1

**sharing** 94:9 111:23

**sheet** 144:8,10 153:3

**shelf** 53:9

**Shelton** 7:14,15 8:13,23 11:4,10,14, 17,22 14:15 18:9,11 22:14,16 23:11 24:5 26:9,13,18,22 27:6, 16,21,24 28:1,3,6,8, 11,14,16,22,24 29:5,12,15,17,23,25 30:6,9,14,18,20,24 31:2,6,8,10,15,19, 22 32:2,6,8,13 33:4 34:2,3,9,12,15,17, 20 35:3,13,17,23 36:11 37:6,10,16 38:16 39:19 40:1,6, 11 41:24 42:2,10 52:1 56:11 57:3 61:4,18 62:16 64:24 65:2,22 66:1,3 75:7, 21 76:6,18 77:2 78:3,7,11,15,18,20, 23 79:1,3,6,23 80:2 81:16,18 82:1,6,15 83:4,9 84:18 87:24 89:11 90:2 91:17 92:4 94:2,7,8,13,17 95:9 96:24 97:6,13, 22 98:3,9,16,19,22 99:4,24 100:5,8 101:2 103:5,13,19, 24 105:11,24 106:22 108:2,4 109:17 110:7 111:21 112:3,11,18 114:18,21 115:3,23 116:2,13,24 119:5, 18,21 120:1,23 121:2,5,13 122:4, 17,19 123:16 124:1, 8,21 126:8,25 127:10,18 128:12, 19 133:14 138:6,12, 19 140:7 141:5 142:23 143:8 147:25 150:3,7,11 157:7,10,24 161:1, 20,22,24 164:14 166:22 169:10 171:8 172:25 174:8 181:21 186:10 189:9 193:13 203:23 204:13,14, 21 205:10 206:3,6 208:18 209:4 210:18 211:7 213:25 215:16 217:22 220:8 222:1, 11,12 228:19 231:16

**Shelton's** 182:21

**short** 112:15 210:14

**shorter** 212:10,11

**shortly** 45:24

**shot** 22:4

**show** 37:3 72:25 73:14 98:23 220:16 225:5

**showed** 81:1 182:6 203:23

**shows** 66:8 83:23 107:6

**side** 26:11 70:23

**sidebar** 26:12,14,16, 19 27:4 42:9 95:7 100:6 112:17 125:8 141:5

**sign** 46:15 52:3 89:8 146:14 216:23 217:3

**signed** 49:17 68:24 70:20 92:22 120:4 158:20

**significant** 84:5,10 145:10 217:13

**Significantly** 212:11

**signing** 43:9

**signs** 36:15 38:1

**similar** 53:3

**similarly** 16:15

**simple** 28:15 36:14 108:12 224:23,24 225:7

**simply** 43:25 45:14 70:5 171:1

**simultaneously** 169:8

**Sine** 17:7

**single** 57:12 89:1 203:15

**sit** 33:18 201:13

**sitting** 162:23,25 205:13

**situation** 132:20

**size** 91:13

**skill** 132:7

**skillset** 22:18 23:4,5

**skip** 73:17 114:3 130:4,25 131:5,9, 18,25 134:6,7,9 135:6 160:6,23 172:2,10,17,20

**skip-tracing** 134:4

**slightly** 82:4,6

**small** 51:22 61:20, 22

**Smartadvocate** 42:23 43:1 52:8,11, 18 53:1 57:8,22 58:14,17,21 70:16 72:9 74:20 75:1 79:12 96:13 102:5 104:6,13,17 105:9, 21 106:18,25 121:17 122:3,13 130:3 139:20 140:13 146:3 166:16 188:22,23

**Smartadvocate's** 71:11

**Smith** 105:20

**Smiths** 105:20

**social** 126:15 202:14,22

**software** 53:7,11 79:18 129:25 140:10 142:14

**solely** 138:14

**sophisticated** 55:23

**sort** 12:8 14:22 19:8 27:3 36:1,21,24 37:13 47:25 75:15 121:20

**sorts** 18:16 71:15 213:5

**sound** 24:6 35:18 72:18

**sounds** 22:6,9 23:18 25:10 41:20 44:23 45:23 48:11 49:12 61:20 88:4 102:2 106:1 127:12 171:12 200:8 217:4

**source** 191:7

**Southern** 112:7

**space** 175:6

**spam** 74:2

**speak** 35:16 97:8 146:21 171:11 198:5 232:25

**speaking** 10:25 11:24 14:25 44:19 49:25 93:9 132:15 228:5

**specific** 16:18 141:15 145:6 153:12 157:24 182:22,24 183:9 184:1 185:4 206:11 218:13 224:16,18

**specifically** 49:1 141:1 143:11 187:14,18 194:23 196:14

**speculate** 209:13 220:4,6

**speculating** 79:19

**speculation** 22:20 49:22 56:10 65:1 75:5 76:25 79:25 81:22 82:8,22 83:8 88:20 89:24 91:15 93:18 96:23 97:2 99:2 105:3,16 106:11 108:1 109:15 116:21 120:14 122:1 123:1, 21 124:7 126:4 127:4,15 128:17 190:10

**spell** 22:2,3

**spelled** 59:19 95:19

**spend** 13:19

**spent** 59:6

**split** 66:10 67:2 139:5

**splits** 39:5 66:6,21 110:21

**spoke** 148:4 215:24

**spoken** 199:3

**sporadic** 32:14

**spread** 67:10

**spreadsheet** 209:24 210:13

**SQL** 57:23 58:2

**stack** 223:22

**staff** 68:8 102:13 126:19 127:13 129:15 144:11,13, 18 152:10,12 159:19

**stage** 127:8 142:2

**stand** 61:13 103:7 114:23 174:6 196:3 233:13

**standard** 66:16 93:13

**stands** 79:12 84:22

**staple** 223:20 224:3, 4 225:16

**stapled** 225:14,17

**stapling** 224:9,10

**start** 13:14 15:21 20:10 32:3 49:9 91:18 138:11

**started** 12:15,17 13:9,13,16,25 14:17,18 19:20 43:9 45:20 67:6 69:17 77:5 92:6 93:4 114:5 143:8 215:20 218:7 229:22

**starting** 7:14 14:18 21:4

**state** 7:13 19:14 27:3 56:16 57:14 60:3 72:15 193:10 195:5,6,8

**stated** 33:8 208:9

**statement** 11:10,11 31:12,20 142:15 208:5,11,17 209:3 229:14,16

**statements** 149:11

193:8

**states** 63:17 64:1 112:6

**stating** 11:18

**status** 69:24 70:3,19 117:15 142:2 187:11,17,20,23 188:1,4,8 213:2,10 219:13

**stayed** 62:6

**Steering** 19:13

**step** 59:1 94:2

**steps** 51:22

**stick** 79:3 212:24

**stool** 40:21

**stop** 28:8,11,14,16 29:5,10 30:20 31:2 128:14 163:3,4 193:15,18,20 231:10

**stopped** 121:18,20

**stopping** 194:1

**storm** 15:9,11,22,23 16:8,12,14 18:14 20:15 23:6,7 24:21,22,24 25:6,7 27:8 35:5,6 40:16 47:7,24 48:1,2 54:19 64:13,20 68:10 80:6,14 93:24 110:11 111:12 127:2 138:3 175:15 179:6 212:1

**storm-related** 23:9

**storms** 15:25

**straight** 227:4

**strategy** 19:9

**strength** 45:3

**strictly** 25:6

**strike** 67:22,24 88:11 117:1

**strongly** 24:3

**struggle** 135:25

**struggling** 127:24 135:18 161:10

**studied** 12:11

**stuff** 18:19 45:2 47:19 48:14 59:7 113:20 130:22 191:11 204:24,25 213:6,14,24 218:9 219:7,8

**subject** 63:6

**subpoena** 12:2

**substantial** 23:2 76:17 173:19 175:5,6

**substantive** 162:14

**subtraction** 98:24

**success** 24:24 27:9 35:7 46:25 80:15 90:4,5

**successful** 80:8

**successfully** 62:25

**suddenly** 40:13

**sued** 12:21 202:8,22,23

**suffer** 153:19

**suffered** 50:13

**summary** 207:21

**super** 19:1 136:20

**supervisory** 19:7

**supplied** 68:25

**support** 71:14 207:21

**suppose** 191:5,6

**supposed** 39:5,6,7,8,9 100:15,20,21 109:25 110:3,13 125:12,13 149:19 166:9

**survive** 68:6

**survivors** 12:25

**sustained** 69:4

**swap** 177:16

**swear** 8:4 185:17

**sworn** 202:21,24,25

**Syngenta** 22:25

**system** 42:22,23 50:21,22 51:1 52:4,7,13,14,19 53:2,13 58:19 69:7 70:16,24 72:9,13 74:23 75:1,11 96:13 106:18,25 107:11 111:18 166:15,20,23 167:11,24 168:4 169:7 171:3 184:5,9

**systems** 117:14

**T**

**T-I-** 22:3

**tab** 110:18 139:3

**table** 24:19 25:7,10 43:15

**tactic** 31:16

**tactics** 31:17

**takes** 49:18

**taking** 44:12 47:7 94:3 97:7 214:11

**talk** 12:3 14:21 17:5 41:7 42:25 50:4 59:13 62:18 73:5 85:7 92:12 133:13 163:19 173:2 176:10 196:13 199:16 210:24 211:13 217:22 219:16 232:10,24 233:6

**talked** 69:20 113:25 133:8 146:17 147:9 148:7 149:18 160:8 164:14 172:16 198:8 211:15 213:25 214:3,6,9,15,19 219:9,20,23 220:1,5

**talking** 9:13 37:24 40:7 42:3 49:2,9 62:8 63:10 64:16 65:20 84:9 87:1 120:6 122:8 130:16 132:15 133:5 135:7 137:6,18 138:9,22 143:5,6 147:7 164:13 169:23 190:3 210:16 221:25

**targeted** 151:5

**tarping** 84:25

**task** 74:10

**tasked** 44:9 54:15 73:2 74:9

**taught** 189:1

**teach** 25:22 55:20

**team** 17:13 19:5 71:11 90:14,15,17, 18,24 91:5,9,12,19, 24 92:6,24 93:8 128:1 130:4,5,6,7, 25 152:18

**technicalities** 157:15

**techniques** 74:3

**telling** 30:25 33:24 40:14 145:21 193:20 228:2

**temporary** 84:23

**tend** 209:22

**tens** 25:19 84:10 85:8

**tension** 136:25

**term** 26:7,25 36:1 43:3 65:6 77:24 78:13,16 79:4,11,17 102:15 154:22 179:11,13

**terminology** 65:11

**terms** 47:25 87:22 142:20 207:2 231:11

**Teshi** 221:23

**testified** 8:21 123:1 133:15 136:7,12 137:8 144:10 152:9 165:6 166:14 171:25 180:12 182:7 187:9 190:12 193:14 194:4,12 201:1,4,6 205:7,10, 19,22 208:4,9 209:10

**testify** 139:19 144:4 160:2 190:19 217:24 218:11 225:9

**testifying** 10:18 24:2

**testimony** 8:8 10:17,21 27:15 126:12 127:4 143:9 144:12 149:6 150:20 160:21 166:23 169:3,9 170:23 186:9 187:4 190:14 191:2,14 193:7,15 201:10,11 202:21,24,25 206:3 230:5 232:18

**Texas** 63:20,21 64:4 92:1 112:7 117:17 120:11,18 190:14, 18 191:3,5 192:22 193:1,3

**text** 51:3,5 53:21 54:1,6 73:13 117:16 198:19

**texted** 198:18

**thing** 115:17 131:12 160:4 163:17 172:1, 14 190:4 231:18

**thing's** 203:16

**things** 18:16 25:22 40:25 41:1,5 44:12, 14 50:8 60:18 72:1 85:22 114:4 117:16 132:4 133:25 162:22 188:21 193:8 207:22 222:7

**thinking** 74:2 92:5 101:5 179:19 189:18,23

**third-** 48:6

**third-party** 93:11 143:23

**thirty** 146:24

**thought** 21:12 22:10 26:15 32:11 33:9 34:5 35:17 92:14,16 102:24 119:13 132:19 136:18 143:5 145:1 173:1 181:24 219:6,23 221:16

**thoughts** 101:3

**thousands** 25:14,19

**threaten** 29:8

**threatening** 33:23

**three-** 74:15

**three-law-** 80:11

**three-law-firm** 80:4

**three-legged** 40:21

**three-party** 42:6,11 44:25

**threshold** 154:24

**thrown** 188:20

**ticked** 137:23

**tie** 34:25 162:3,7

**tier** 74:5,8 136:15,18 137:14 163:18

**Tighe** 22:1 178:19, 20,23,24 180:4,9

**tighter** 102:10

**time** 7:8 9:16 13:19 15:11,23,24 18:1 22:11 24:14,16 25:14,17 31:7 32:21 40:1 43:10,11,13 45:24 46:21 48:21 61:13,17 62:19 67:11,20 69:9,11 77:17 82:13 85:4 88:24 92:21 96:8 97:8 103:8,12 114:24 115:2,18 118:6 121:19,21 128:20 129:14 143:6 145:25 146:5, 7 164:14,18 174:6, 12 178:17 179:3 184:7 189:24 196:3, 7 198:8,10 202:5 207:20 215:12 217:21 219:7,20,23 220:5 234:17

**times** 96:11 104:6, 16 117:13,17,19 124:18 139:2 146:19,22,23,24 147:2,10,14,21 148:4,10,20 167:18 208:22 214:16

**today** 28:5 30:2,13 133:13 150:21 158:12 183:19 191:15 193:7 201:13 202:1,4 203:3 204:17 206:9, 16 207:1 209:7,13 210:24 211:16 214:1 215:22 217:18 220:10 233:20 234:3

**today's** 11:1,24 200:25

**told** 32:7 128:14 140:6 147:9,12 149:17,21 150:14

167:3 193:14 211:17 212:6 215:17,25 220:13 224:24 225:2 226:5, 16

**top** 195:13 223:19, 23 224:10

**topic** 33:9 227:1

**topics** 206:8,25 210:23 211:15 215:17 216:3 217:18 225:9

**tornadoes** 23:8

**tort** 12:18,23 13:3 16:7,23,24 18:13,15 22:11,22 25:2 45:9 47:23 64:15,17 93:9,10 175:6

**torts** 14:19,22 15:1, 2

**total** 88:7 97:8 98:24 124:3 209:8,24

**touch** 172:11

**tough** 72:1

**town** 50:8

**trace** 130:4,25 131:18 172:10,17

**tracer** 134:8

**tracers** 134:9

**traces** 114:3

**tracing** 73:17 131:5, 9 134:6 135:6 160:6,24 172:3,20

**track** 74:19 80:8 174:14

**tracked** 74:21

**train** 34:5

**transcript** 9:8 231:24 232:9 233:17,20,23 234:3

**transfer** 52:12 53:20 54:4

**transferred** 52:24

**transient** 45:10

**transmit** 52:3

**transmits** 106:2

**transportation** 102:18

**trap** 84:4

**trapped** 85:7,9,10 88:6 90:19

**travel** 13:23

**treat** 16:15 88:24

**tree** 156:15,21

**triage** 74:5,8 136:15

**trial** 8:1 10:22 17:14, 17,20,22,24 18:1,3, 12 38:13 39:13 40:13 49:18 60:22 61:23,24,25 62:1,18 110:16 175:23 178:6 231:23

**TRICARE** 93:12

**trick** 13:3

**trigger** 51:3 53:21

**triggered** 158:20

**triggering** 53:24

**tripod** 138:24

**trouble** 79:22 172:6

**troubled** 44:6 69:21

**trucking** 16:16 126:18

**true** 159:14 167:24 185:11,13 193:21, 23 194:3 208:5 217:14

**truncated** 9:7

**truth** 8:9,21

**truthful** 10:18 169:23 170:11 203:1 208:10,18 209:3

**truthfully** 157:21 201:24,25

**tuning** 8:19

**turn** 11:3

**turned** 155:3 224:21

**Turner** 7:24 169:11 176:18 231:22

**Twelve** 129:22

**type** 15:7 23:9 50:6, 12 51:17 56:20 58:13 69:5 72:10 85:4 107:16 131:5 139:9 156:18 183:2 186:24,25 187:2,5 211:24

**types** 44:13 48:8 50:1 70:7 130:22

**typical** 60:12

**typically** 15:7 56:3 85:3 93:10 111:19

**U**

**uh-huh** 9:21

**ultimately** 58:7,8

154:10

**UMKC** 12:13

**unable** 62:24 73:1

**unaware** 100:1 112:25 113:2 193:19

**uncertain** 129:15

**unclear** 9:25

**undergrad** 12:11

**understaffed** 127:12,16,20

**understand** 10:6,16 24:18 33:11 43:14 94:22 96:20 120:24 130:21 131:15 132:12 170:23 171:2 174:18 191:14 193:7 201:23 213:15,21 228:15 230:11

**understanding** 27:7 34:13 35:4,9 78:2 99:5,10 100:9,12 102:2,21 107:1 123:18 135:2 186:13

**understood** 9:14,18, 19,24 10:5,23 58:5 72:5 125:2 234:1

**unencumbered** 85:13 88:5,10,17 89:1 108:7

**unfamiliar** 95:8 189:15

**United** 112:6

**universe** 125:3

**University** 12:10

**Unpaid** 199:14
**unreasonable** 32:24
**unrelated** 189:19
**unrepresented** 24:13
**Unsecured** 8:18
**unsuccessful** 61:21
**unsure** 48:11
**untruthful** 208:6,13 229:17
**unusual** 216:7
**upset** 44:10,12,14, 21 47:4 136:8 146:7 163:20
**upstairs** 218:24
**useless** 53:9

V

**V-E-L-A-W-C-I-T-** 95:19
**V-O-T-T-I-E-R-O** 95:2
**vague** 121:4 126:4
**valid** 27:16 28:25 29:14,19 30:2 31:22 43:19 44:3
**Van** 7:18,19 8:14 11:2,5 23:21 24:1 214:6,19 232:12,16, 17,21,25 233:7,19, 21 234:8,10
**variations** 13:10
**variety** 83:1,10,17, 21 160:11
**Velawcity** 95:13,15, 19,24 151:18,19,23, 25 175:1,3,9,11,15, 19 178:12,22 179:2, 4,5,14,20,22,24
**verbal** 9:17
**verbally** 203:5
**versions** 225:6
**versus** 7:10 68:6 129:13
**vet** 68:5
**vetting** 43:17,21 46:23 68:22
**viable** 43:22
**Victor** 7:20
**video** 51:5 53:22 54:2 61:12 233:18 234:9
**view** 102:14 216:1
**virtually** 7:18
**voice** 35:1,2
**volume** 27:11 35:9 41:7 42:12 126:1,6
**Vottiero** 95:2,10,12, 23 96:4,14 97:1

W

**W-I-L-** 22:4
**Wait** 225:3
**walk** 49:15
**wanted** 42:19,21 71:14 73:22 117:25 118:2,3 136:9 214:13
**waste** 217:5
**wasting** 31:7
**water** 44:15
**ways** 57:11
**weather** 138:3
**website** 191:4,20 192:7,20,24
**week** 148:10
**weekly** 172:8
**weird** 216:10,14
**Westbrook** 114:15 136:23 137:14 139:13
**Western** 142:25 164:10
**whatsoever** 118:9
**wheelhouse** 25:4
**whiteboard** 117:14
**whomever** 101:16 153:9
**whoops** 113:1 122:17
**wife** 216:24
**wife's** 214:14
**Wilhelmly** 22:7
**Wilhelmy** 22:1,7,8,9
**William** 59:13,18,21 63:11 96:16 115:7, 19,20 165:25
**willingly** 216:23
**wind** 23:9
**window** 49:12 63:4 77:13
**windows** 62:19
**wire** 98:11
**withdraw** 115:15 121:15 227:21,24
**wonderful** 217:3
**word** 7:20 9:4 19:4 50:20 76:20 155:6
**words** 7:19
**work** 15:9 16:19 19:19 21:13 31:18 54:22 66:20 67:11 71:10 87:17 92:23 94:22 110:1 111:1 113:3,8,13,16 125:11 131:5,9,10, 18 133:16 134:2,3, 5,10 135:13,17 136:4,5 160:15,25 161:6,8 165:9 172:23 183:4 186:7 188:9 232:2
**worked** 12:12 15:11 24:13 41:6 46:7 51:25 54:24 59:22, 23 68:11 95:13 96:11 156:6 188:18, 22
**working** 18:2 51:8 53:10 60:4 92:1 95:24,25 110:4 113:3 117:12 148:2, 13,16 165:20 177:20
**works** 19:2 58:1 132:3 230:15
**workup** 19:16,18
**world** 93:22,23
**worse** 85:6 104:22
**worth** 76:12 141:25
**write** 71:8 82:10 85:12

**writes** 106:14

**writing** 18:23 100:16,19,21 118:7 127:25 184:21 188:15 189:6 203:6

**written** 82:13 104:11 110:24 111:11 125:19 215:8

**wrong** 33:12,22 72:19 143:15 195:13

**wrongful** 126:17

**wrote** 82:11 131:23

Y

**y'all** 196:8

**year** 16:5 24:11 47:14 118:16 215:14

**years** 13:18 14:3,4 16:1,3 75:13 129:4, 5 183:4 184:5 215:13

Z

**Zach** 8:14 21:16,17 24:17 46:4 96:16 115:21 120:2,6,16, 21,24 121:10 146:1 149:14 151:24 190:12 193:20 219:21 220:5

**Zachary** 112:10 113:2

**Zantac** 197:4,8,15, 17

**Zeta** 15:13,14,20 91:8

**zoom** 21:20 34:21 37:11 39:23 60:23 94:13,15 103:21 117:18,24 122:18